**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ORCHIDS PAPER PRODUCTS COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19- 10729 (MFW)<br><br>(Joint Administration Pending) |

**DECLARATION OF RICHARD S. INFANTINO, INTERIM CHIEF STRATEGY OFFICER OF DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1764, Richard S. Infantino declares as follows under the penalty of perjury:

1. I am a Managing Director of Deloitte Transactions and Business Analytics LLP ("**DTBA**") and serve as the Interim Chief Strategy Officer ("**CSO**") of Orchids Paper Products Company, a Delaware corporation ("**Orchids**"), along with certain of its wholly-owned direct and indirect subsidiaries (collectively, the "**Debtors**" or the "**Company**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2. On April 18, 2018, the Company appointed me as CSO and, in connection therewith, retained DTBA.

3. In the role as CSO of the Debtors, I, along with DTBA, at the direction of a special committee of the board of directors, have assisted with certain financial activities and cash management of the Debtors, including but not limited to, assessing the Debtors' business

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Orchids Paper Products Company, a Delaware corporation (6944), Orchids Paper Products Company of South Carolina, a Delaware corporation (7198), and Orchids Lessor SC, LLC, a South Carolina limited liability company (7298). The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.

plan and operations, ongoing cash requirements, profit center contributions, break-even levels, cost reductions and potential performance improvement initiatives; developing the Debtors' financial and operational turnaround strategy and associated activities; leading the implementation of the Debtors' financial and operational turnaround strategy or strategies; managing the relationship with the Debtors' lenders (prior to the involvement of the Prepetition Secured Lender (as defined below)) and other creditors; and managing the Debtors' liquidity issues, including management of vendor payments and related negotiations.

4. Based on my analysis of public and non-public documents, and my discussions with, and information provided by, other members of the Debtors' management team, employees, agents, investment bankers and advisors, and certain members of my engagement team, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other members of my engagement team or from the Debtors' employees, agents, attorneys, investment bankers and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

5. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

6. On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing a case for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"). The Debtors will continue to operate their business and manage their properties as debtors in possession.

7. I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief the relief sought therein is essential to uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

8. This First Day Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings, and sets forth the relevant facts in support of the First Day Pleadings.

## I. COMPANY AND BUSINESS OVERVIEW

### A. Overview of Business Operations

7. The Company is publicly traded on the NYSE: MKT under the stock ticker "TIS". A link to the Company's website where more information about the Company may be located is https://orchidspaper.com.

8. The Company is a customer focused, national supplier of high-quality consumer tissue products. The Company is strategically aligned with retail's higher growth private label

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

market, which large retail customers utilize to position competitively their brand against the dominant consumer brands. The Company is committed to supplying consistent, high quality, and competitively priced products, backed by a flexible and integrated manufacturing base. The Company provides a full range of tissue types (bath, towels, napkins and parent rolls) across the value spectrum (ultra-premium through conventional/value) with a wide range of packaging configurations to serve the diverse needs of national and regional customers. The Company offers premium virgin pulp based products, which rival national brands, along with a full suite of environmentally friendly recycled tissue products.

9. The Company recently completed the final phase of a five year expansion plan with the goal to become a national supplier of the highest quality, primarily private label, tissue products from a lower cost asset base. On the East Coast, the Company built a $165 million greenfield facility in Barnwell, South Carolina capable of manufacturing both ultra-premium parent rolls and other grades on a new QRT tissue paper machine, the first of its kind in the United States, with 35,000 tons of capacity from virgin and de-inked pulps. The Company's QRT paper machine is a new technology developed by Valmet which combines the benefits from other tissue manufacturing machine technologies (TAD, NTT, Conventional) that have been industry standards historically. The converting operations include two high-speed lines and printing capabilities. On the West Coast, the Company made a $37 million investment in a strategic partnership with Fabrica de Papel San Francisco, S.A. de C.V. ("**FAPSA**"), pursuant to which the Company acquired FAPSA's U.S. customers, acquired a tissue paper machine and converting lines located at FAPSA's facility in Mexicali, Mexico pursuant to a sale/leaseback transaction, and entered into a supply agreement with FAPSA providing access up to 19,800 tons of converted tissue. In the Midwest, the Company made a $39 million investment to replace two

tissue paper machines at its Pryor, Oklahoma facility which added 17,000 tons of paper making capacity and 12,500 of converting capacity. The Company also added a new high speed converting line and printing capabilities and upgraded two existing lines. Given its national footprint, the Company recently moved its headquarters to centrally located Brentwood, Tennessee in suburban Nashville.

10. The Company has approximately 465 employees. In particular, in Pryor, Oklahoma, the Company employs approximately 73 Employees who are members of the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, on behalf of its Local Number 13-930 and 120 Employees who are members of the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, on behalf of its Local Number 13-1480.

**B. Corporate Structure of the Company**

11. A chart reflecting the Company's organizational structure is attached hereto as Exhibit A. The lead Debtor, Orchids, directly owns the other two Debtors:

- Orchids Paper Products Company of South Carolina, a Delaware corporation ("**Orchids South Carolina**").
- Orchids Lessor SC, LLC, a South Carolina limited liability company ("**Orchids Lessor SC**").

12. Orchids owns, directly or indirectly, three (3) non-debtor subsidiaries:

- Orchids Mexico (DE) Holdings, LLC, a Delaware limited liability company ("**Orchids Mexico Holdings**").
- Orchids Mexico (DE) Member, LLC, a Delaware limited liability company ("**Orchids Mexico Member**").
- OPP Acquisition Mexico, S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable* organized under the laws of Mexico ("**OPP Acquisition Mexico**"), which is directly owned by Orchids Mexico Holdings and Orchids Mexico Member.

13. Orchids is governed by a board of directors (the "**Board**") consisting of six directors, including five independent directors. Steven Berlin serves as Chairman of the Board.

14. Jeffrey Schoen serves as President and Chief Executive Officer and Mindy Bartel serves as Chief Financial Officer and Secretary of Debtors Orchids, Orchids South Carolina, and Orchids Lessor SC and non-debtors Orchids Mexico Holdings and Orchids Mexico Member.

15. Messrs. Berlin and Schoen and Ms. Bartel serve as managers of Debtor Orchids Lessor SC and non-debtors Orchids Mexico Holdings and Orchids Mexico Member.

16. Mr. Schoen serves as President and Victor Corona serves as Secretary of non-debtor OPP Acquisition Mexico.

**C. Financial Overview of the Company**

17. As of the Petition Date, the Debtors had approximately $2.9 million of cash and cash equivalents and their assets consisted of approximately $327 million on an aggregate basis. The Debtors' aggregate liabilities as of the Petition Date are approximately $271 million.

**Prepetition Credit Facility**

18. On or about June 25, 2015, Orchids, as borrower, U.S. Bank National Association ("**USB**"), as administrative agent, arranger, sole book runner and lender, and the other lenders party thereto (collectively, "**Prior Prepetition Credit Lenders**") entered into that certain Second Amended and Restated Credit Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition Credit Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition Credit Loan Documents**"), pursuant to which the Prior Prepetition Credit Lenders provided Orchids with an aggregate financing commitment up to $187.3 million, consisting of a term loan commitment up to $47.3 million, a revolving loan

commitment up to $25 million, and a draw loan commitment up to $115 million (the "**Prepetition Credit Agreement Loan**"). The Prepetition Credit Agreement has a final facility termination date of June 25, 2020.

19. The obligations under the Prepetition Credit Agreement are secured by first-priority liens (the "**Prepetition Credit Agreement Liens**") on substantially all of the assets of Debtors Orchids and Orchids South Carolina (but not Debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico, and such liens are perfected and, except as otherwise permitted in the Prepetition Loan Documents, have priority over all other liens (the "**Prepetition Credit Agreement Collateral**").

20. The obligations of Orchids under the Prepetition Credit Agreement are guaranteed by Debtors Orchids and Orchids South Carolina (but not Orchids Lessor SC) and non-debtor Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico.

**<u>Prepetition New Market Tax Credits Loan</u>**

21. On or about December 29, 2015, Orchids, as borrower, and USB, as lender (the "**Prior Prepetition NMTC Lender**" and, together with the Prior Prepetition Credit Lenders, the "**Prior Prepetition Lenders**") entered into that certain Loan Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition NMTC Loan Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition NMTC Loan Documents**" and, together with the Prepetition Credit Loan Documents, the "**Prepetition Loan Documents**"), pursuant to which the Prior Prepetition NMTC Lender provided Orchids with a financing commitment equal to $11,109,050 (the "**Prepetition NMTC Loan**" and, together with

the Prepetition Credit Agreement Loan, the "**Prepetition Loans**"). The Prepetition NMTC Loan has a final maturity date of December 29, 2022.

22. The Prepetition NMTC Loan served as the source loan for a series of transactions relating to the allocation of certain new markets tax credits (the "**NMTCs**") in favor of USBCDC Investment Fund 158, LLC ("**USBCDC**") under Section 45D of the Internal Revenue Code of 1986. A chart reflecting the structure of the NMTC transactions is attached hereto as Exhibit B. Orchids used the proceeds of the Prepetition NMTC Loan to make a leverage loan of $11,109,050 to USBCDC. USBCDC suballocated the NMTCs to U.S. Bancorp Community Development Corporation, as NMTC investor, in exchange for an equity investment. USBCDC then used proceeds of the equity investment and leverage loan to make equity investments in RDP 27 LLC and USBCDE Sub-CDE 146, LLC (collectively, the "**Sub-CDEs**"). The Sub-CDEs then made loans to Orchids Lessor SC so it could acquire the new QRT tissue paper machine and converting lines (the "**Barnwell Equipment**") at the Barnwell, South Carolina facility owned by Orchids South Carolina. Orchids Lessor SC leases the Barnwell Equipment to Orchids, and the lease payments are used to service the secured loans owed to the Sub-CDEs. The loans by the Sub-CDEs are secured by liens on the Barnwell Equipment and the lease of such equipment by Orchids Lessor SC to Orchids.

23. The Prepetition NMTC Loan is secured by a first-priority lien on and collateral assignment of (the "**Prepetition NMTC Loan Agreement Liens**" and, together with the Prepetition Credit Agreement Liens, the "**Prepetition Liens**") the loan documents evidencing the leverage loan by Orchids to USBCDC (the "**Prepetition NMTC Loan Agreement Collateral**" and, together with the Prepetition Credit Agreement Collateral, the "**Prepetition Collateral**").

24. The Prepetition NMTC Loan to Orchids is guaranteed by Debtor Orchids South Carolina (but not Debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico.

**Amendments to Prepetition Credit Agreement and Prepetition NMTC Loan Agreement**

25. Between November 6, 2016, and November 21, 2018, Orchids and the Prior Prepetition Credit Lenders entered into ten separate amendments to the Prepetition Credit Agreement, and Orchids and the Prior Prepetition NMTC Lender entered into seven separate amendments to the NMTC Loan Agreement. Certain of the amendments were necessitated by the fact the Debtors were out of compliance with various financial covenants due to its faltering financial performance as detailed more fully below, which constitute defaults under the agreements, including the following:

(a) On February 28, 2018, the parties entered into Amendment No. 7 to the Prepetition Credit Agreement and Amendment No. 4 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the advance rates under the Borrowing Base (as defined therein) were adjusted to provide the Company more liquidity; (ii) Orchids was obligated to retain financial consultants reasonably acceptable to USB; and (iii) Orchids was obligated to retain consultants and/or advisors to assist Orchids to formulate a strategic plan with viable alternatives to facilitate repayment of the obligations under the Prepetition Credit Agreement in full with certain milestone dates relating thereto;

(b) On April 19, 2018, the parties entered into Amendment No. 8 to the Prepetition Credit Agreement and Amendment No. 5 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the Revolving Commitment (as

defined therein) was increased by approximately $21 million; (ii) Orchids was required to retain a CSO to report to the Board; and (iii) Orchids agreed to continue to retain an Investment Banker (Guggenheim Securities LLC ("**Guggenheim**"), which was retained after Amendment No. 7) to assist in the sale of Orchids' business with certain milestone dates relating thereto;

(c) On August 3, 2018, the parties entered into Amendment No. 9 to the Prepetition Credit Agreement and Amendment No. 6 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, the milestones relating to a sale of Orchids' where extended; and

(d) On November 21, 2018, the parties entered into Amendment No. 10 to the Prepetition Credit Agreement and Amendment No. 7 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the milestones relating to a sale of Orchids' business were extended; (ii) the Revolving Commitment was increased by $5.9 million; and (iii) Orchids agreed to retain Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**") as its replacement Investment Banker.

The Prior Prepetition Lenders charged various fees under the foregoing amendments, some of which remain unpaid.

**<u>Assignment of Prepetition Loan Documents</u>**

26. On or about December 24, 2018, the Prior Prepetition Lenders assigned their interests under the Prepetition Loan Documents to Orchids Investment LLC (the "**Prepetition Secured Lender**"). On the same date, USB resigned as Administrative Agent and the Prepetition Secured Lender appointed Black Diamond Commercial Finance, L.L.C. as the new Administrative Agent. Thus, the Prepetition Secured Lender is the current owner and holder of

the Prepetition Loans and the Prepetition Loan Documents, and the beneficiary of the Prepetition Liens against the Prepetition Collateral held by the Administrative Agent.

**Additional Amendments to Prepetition Credit Agreement and Prepetition NMTC Loan Agreement**

27. On or about January 23, 2019, the parties entered into Amendment No. 11 to the Prepetition Credit Agreement and Amendment No. 8 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the milestones relating to a sale of Orchids' business were extended; and (ii) the maximum Revolving Commitment under Amendment No. 10 was maintained at $51,903,846. Orchids agreed to pay various fees under the foregoing amendments, some of which remain unpaid.

**Appointment of Successor Administrative Agent**

28. On or about February 15, 2019, Black Diamond Commercial Finance, L.L.C. resigned as Administrative Agent under the Prepetition Credit Agreement, and Ankura Trust Company, L.L.C. was appointed as successor Administrative Agent.

## II. EVENTS LEADING TO THE CHAPTER 11 FILINGS

29. At its new Barnwell, South Carolina facility, the two converting lines became operational in the first and third quarters of 2016, respectively. However, cost overruns in the construction of the facility and start-up inefficiencies with the operation of the converting lines and mill were, and continue to be, significant drains on the Company's liquidity. The facility is still not running efficiently or producing product at the original equipment manufacturer's goals. The Company continues to work with the original equipment manufacturer to address the operational issues with the converting lines and mill.

30. Compounding these problems have been significant industry wide price increases on various raw materials among other things. Specifically, the price of the various pulp grades

and fiber substitutes used to manufacture the Company's tissue products at both facilities has risen significantly in 2018. The RISI index for Northern Softwood Kraft pricing increased from January 2018 to November 2018 by approximately 18.5%, from $1,210 per ton to $1,435 per ton. The RISI index for Eucalyptus increased from January 2018 to November 2018 by approximately 4.6%, from $1,180 per ton to $1,235 per ton. Both of these grades were significant components of raw material usage at the Barnwell facility throughout 2018 and in early 2019. A majority of the Company's tissue products are manufactured utilizing a variety of pulp substitutes including post-consumer sorted office products. From January 2018 to October 2018, the average recycle mix increased in price by about 39%. While all pulp and pulp substitute pricing began to ease at the end of 2018 and has continued to ease through February 2019, current pricing of the Company's average recycle mix is about 30% higher than at the beginning of 2018. At the same time there were driver shortages in the transportation industry, which have increased the Company's freight costs and negatively impacted service levels to customers, sometimes resulting in customer penalties and chargebacks.

31. Significantly, on or about July 30, 2018, the Company received notice from a major customer that it intended to consolidate its supplier base and transition all of its product orders to a new supplier effective March 2019. This customer represented approximately 19% of the Company's converted product sales. Subsequently, on or about September 2018, the Company learned that an important, yet less significant customer as a percent of sales, intended to reduce its business. On or about December 2018, the Company learned a significant customer would be pulling its towel business effective April 2019. These customer losses were not a result of product quality or customer service problems. In each instance, according to interactions with the Company's sales personnel and management, these and other customers had expressed

ongoing concern about the Company's uncertain future based on its deteriorating financial condition as reported quarterly in the Company's public filings.

32. Further exacerbating the Company's deteriorating operating and financial condition, certain suppliers of raw materials and related manufacturing items moved the Company to CIA or significantly reduced credit terms in response to the Company's public financial reporting. Approximately ten vendors forced the Company into CIA or reduced credit terms so the Company was effectively on CIA.

33. In addition to the negative pressure on margins caused by increasing raw material costs, the Company has experienced headwinds due to competitive pressures and industry conditions. The Company has been forced to reduce prices for converted product due to market forces. In particular, manufacturers in the highly competitive tissue market, especially the larger competitors, have fought for market share by reducing their prices. The Company is generally unable to set its own prices due to its smaller size and instead takes prices set by its larger competitors.

34. The impact of these developments on the Company's financial performance has been profound. Comparing the nine month periods ending September 30, 2017, and 2018:

(a) although sales improved approximately $23.9 million (20%) for a total of approximately $142.8 million, that improvement was offset by an increase in the Company's cost structure;

(b) gross profit decreased 41% from approximately $6.2 million to $3.7 million;

(c) cash flow (deficit) from operations decreased 238% from approximately $8.3 million to ($11.4 million); and

(d) net income (loss) decreased 1,044% from approximately ($2.2 million) to ($25.2 million).

35. Due to these significant operational and financial difficulties, the Company required significant and ongoing liquidity support. In summary, the Company accessed through its various Prepetition Credit Agreement Amendments approximately $26.9 million in additional borrowing capacity, of which it used $24 million. In addition, beginning with Amendment No. 9, the Company was able to defer payment of principal and interest, as well as amendment fees, enabling it to better focus its cash resources on maintaining its operations to avoid disruptions in production and customer service. For these reasons, and as required by Amendment Nos. 8-11 to the Prepetition Credit Agreement and Nos. 5-8 to the Prepetition NMTC Loan Agreement, the Company undertook a process to evaluate potential strategic options, including a sale of the Company or the refinancing of the Company's secured debt.

36. In March 2018, the Company retained Guggenheim to market a sale of the equity or assets of the Company or replacement financing sufficient to repay the obligations under the Prepetition Loan Documents in full. Guggenheim canvassed both strategic and financial buyers which led to numerous strategic and financial buyers executing confidentiality agreements and commencing some level of due diligence. In June 2018, the Company received certain indications of interest and thereafter commenced negotiating with the interested buyers. Due to the Company's faltering financial performance and the loss of the significant customer and subsequent sales losses mentioned previously, however, the interested buyers ultimately withdrew their indications of interest.

37. In September and October 2018, Guggenheim obtained additional indications of interest, each of which proposed a cash purchase price far below the total amount of the Company's secured debt.

38. In early November 2018, the Company terminated Guggenheim and after interviewing several candidates, selected Houlihan Lokey as its replacement investment banker. Houlihan Lokey thereafter contacted the two interested parties that had submitted indications of interest to commence negotiations regarding one of them acting as the stalking horse purchaser of the Company's assets. Houlihan Lokey also contacted other prospective buyers that had previously signed confidentiality agreements as well as additional strategic and financial buyers that had not participated in Guggenheim's prior marketing process.

39. In early December 2018, shortly after the execution of the definitive agreement pursuant to which it agreed to purchase the Prepetition Loan Documents, Orchids Investment LLC advised the Debtors its willingness to act as the stalking horse bidder to acquire substantially all of their assets through a credit bid. The Debtors thereafter commenced negotiations with the Prepetition Secured Lender to act as the stalking horse bidder.

40. In early February 2019, as a final market check Houlihan Lokey issued a teaser and financial supplement to strategic buyers and a process letter to financial buyers that previously executed confidentiality agreements, and requested that indications of interest, including a mark-up of an asset purchase agreement, be submitted no later than February 21, 2019. Despite the Company and Houlihan Lokey's engagement with the targeted buyers, no indications of interest were timely received.

41. Thereafter, the Company received some additional indications of interest from potential buyers, and commenced discussions with those prospects regarding a transaction.

Ultimately, however, none of the prospects made a viable proposal that would result in repayment of the Prepetition Loans as required by the Prepetition Secured Lender. Accordingly, the Company completed negotiations with the Prepetition Secured Lender which resulted in the Stalking Horse Agreement (as defined below) and the related Option Agreement.

42. At the same time, the Debtors and their Investment Banker, Houlihan Lokey, engaged in negotiations with the Prepetition Secured Lender to have the Prepetition Secured Lender serve as postpetition lender (the "**DIP Lender**") to provide debtor-in-possession (DIP) financing necessary for the Debtors to complete the potential sale process in these Chapter 11 Cases under Bankruptcy Code section 363. The Debtors, with the assistance of Houlihan Lokey, have negotiated DIP financing to fund the sale process through Court approval and the potential closing of the sale.

## III. FIRST DAY PLEADINGS

43. In furtherance of the objective of a value-maximizing sale of the Debtors' assets, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request the Court consider entering the Proposed Orders granting such First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

44. I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits and schedules thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to

their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

**A. *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion")**

45. Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their three (3) Chapter 11 Cases for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

**B. *Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Prime Clerk LLC as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* (the "Claims Agent Application")**

46. Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC ("**Prime**") as the claims and noticing agent for the Debtors in their Chapter 11 Cases. Prime is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related administrative aspects of chapter 11 cases. Given the complexity of these cases and the number of creditors and other parties in interest involved, I believe appointing Prime as the claims and noticing agent in these Chapter 11 Cases will maximize the value of the Debtors' estates for all their stakeholders.

**C. *Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of***

***Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices* (the "<u>Cash Management Motion</u>")**

47. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' bank accounts and existing checks and business forms, (ii) granting the Debtors a temporary suspension of certain bank account and related requirements of the U.S. Trustee to the extent such requirements are inconsistent with the Debtors' practices under their cash management system or other actions described herein, (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices, and (iv) authorizing and directing all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

48. In the ordinary course of their business, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer cash as needed to respond to the cash requirements of the Debtors.

49. The Cash Management System is managed by the Debtors at their headquarters in Brentwood, Tennessee, where they oversee the administration of the various bank accounts to effectuate the collection, disbursement, and movement of cash. The Debtors' oversight ensures accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the four accounts, which are described in further detail on the schedule attached to the Cash Management Motion as <u>Schedule 1</u> (collectively, the "**Debtors' Bank**

**Accounts**"). Three of the Debtors' Bank Accounts are held at U.S. Bank National Association ("**USB**") with one account at RCB Bank ("**RCB**"). Each of the Debtors' Bank Accounts is held in the name of the Debtors.

50. The Debtors maintain one primary operating account (Account No. 9304) (the "**Operating Account**"). The Operating Account is used to receive funds, wires, ACH transfers, and checks from various external sources, including the Debtors' customers; and other sources into the Cash Management System. The Operating Account also serves as the Debtors' primary payables account, through which the Debtors' disbursements (including payroll) are funded via ACH, wire or auto draw. The Operating Account also manually funds the account with RCB Bank (Account No. 4964) (the "**Supplemental Payroll Account**") to cover check presentments on an as-needed basis for supplemental payroll checks, owed on account of reconciliations due to hourly employees.

51. In the ordinary course of business, the Debtors process vendor check runs weekly which are initiated at the corporate office. The Debtors maintain a check disbursement account (Account No. 8196) (the "**Check Disbursement Account**") to pay applicable vendors. Each week, the Check Disbursement Account is manually funded from the Operating Account based on the sum of vendor check disbursements that the Debtors cut and release for that week.

52. Debtor Orchids Lessor SC, LLC maintains a separate special purpose account with USB in connection with the new market tax credits loan (the Prepetition NMTC Loan Agreement) (the "**Lessor Account**"). The Lessor Account is generally used for Debtor Orchids Lessor SC, LLC to collect rent payments from Orchids Paper Products Company and to pay debt service and quarterly fees payable to certain community development entities under the new market tax credits arrangement.

53. As the foregoing overview reflects, the Cash Management System is specifically designed for administering the Debtors' businesses, and I believe that it cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. The Debtors, therefore, request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the ordinary transfer methods in accordance with the agreements governing the Debtors' Bank Accounts, including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements (collectively, the "**Bank Account Agreements**").

54. The Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**").

55. For the aforementioned reasons, I believe maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and

all interested parties. Accordingly, the Debtors request they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

**D.** ***Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers*** **(the "Employees and Wages Motion")**

56. Pursuant to the Employees and Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition claims and honor obligations incurred or related to compensation obligations, withholding obligations, incentive programs, vacation policies, reimbursable expense obligations, employee benefits obligations, workers' compensation claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including administrative fee obligations) (collectively, the "**Employee Obligations**") and (ii) maintain, continue, and honor, in the ordinary course of business, incentive programs, vacation policies and holiday pay policies, postpetition reimbursable expense obligations, employee benefits plans, and workers' compensation claims (collectively, the "**Employee Plans and Programs**").

57. As described above, In connection with the operation of their business, the Debtors currently employ approximately 464 full-time employees and 1 part-time employee (collectively, the "**Employees**"). The Employees are largely employed across the Debtors' three locations in Barnwell, South Carolina; Pryor, Oklahoma; and Brentwood, Tennessee (each, a "**Facility**"). Seven of the Debtors' Employees work remotely across the United States as part of the Debtors' sales team.

58. In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. Approximately 84 Employees are paid a fixed salary and approximately 381 Employees are paid on an hourly basis. The Debtors pay Employees on a weekly basis. The Debtors' fixed salary Employees are paid current while the hourly Employees are paid one week in arrears.

59. The Debtors' weekly gross payroll on account of the Employees averages approximately $530,000. The next scheduled payroll date for Employees is April 5, 2019 and will include salaries and wages earned prepetition. The Debtors estimate that, as of the Petition Date, they owe approximately $320,000 on account of accrued and unpaid prepetition salaries and wages (the **"Employee Compensation Obligations**"). To the best of my understanding, none of the Employees are owed more than $13,650 in accrued and unpaid general prepetition wages or salaries.

60. The Employees are critical to the Debtors' business, and their value cannot be overstated. To a significant extent, the Debtors' success depends on the Debtors' ability to attract and retain qualified personnel. I believe that the loss of certain Employees will impede the Debtors' plant and sales operations and seriously harm the ability to successfully implement their bankruptcy strategy. Furthermore, replacing Employees can be difficult for the Debtors given the skills and experience required to successfully process, manufacture, convert, and sell the Debtors' high-quality consumer tissue products. If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Compensation Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material

adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

61. As of the Petition Date, all Employees have elected to have their payroll administered via direct deposit. The Debtors use Paycom Payroll ("**Paycom**") to process their payroll and coordinate the payment of Withholding Obligations (as defined below). Occasionally, the Debtors need to issue reconciliations with respect to their hourly Employees. The Debtors elect payment through checks for reconciliations. The ongoing services of Paycom are imperative to the smooth functioning of the Debtors' operations and payroll system. On average, the Debtors pay Paycom approximately $9,400 per month. As of the Petition Date, the Debtors do not owe Paycom outstanding fees in connection with Paycom's services.

62. In connection with the services provided by Paycom, the Debtors pay Paycom certain administrative fees. Additionally, as discussed in more detail below, the Debtors also owe certain additional administrative fees and obligations (collectively, the "**Administrative Fee Obligations**") relating to the Debtors' employee benefit programs for eligible Employees, including, without limitation: (a) medical, dental, vision, life, accidental death and dismemberment, and disability insurance; (b) flexible reimbursement plans and healthcare reimbursement accounts; and (c) 401(k) retirement plans, as well as COBRA medical coverage for former employees. Such programs are administered by the Debtors' individual carriers or other third party administrators. As of the Petition Date, the Debtors do not believe that they owe outstanding prepetition Administrative Fee Obligations.

63. Notwithstanding, the Debtors seek authorization, but not direction, to continue paying the Administrative Fee Obligations postpetition in the ordinary course of business. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment

requests that were given in payment of Administrative Fee Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

64. For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein, including an Employee's share of health care benefits, insurance premiums, 401(k) contributions, legally-ordered deductions, union dues, and other miscellaneous deductions (collectively, the **"Deductions**"). The Debtors withhold approximately $67,500 per week in the aggregate from Employees' wages on account of Deductions, which the Debtors remit to the appropriate third-party recipients and/or retain on account of "self-insured" benefit programs as further described below.

65. In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes from Employees' wages (collectively, the **"Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**," and together with Employee Withholding Taxes, the "**Payroll Tax Obligations**"). Each pay cycle, the Debtors withhold applicable Employee Withholding Taxes from the Employees' wages, and Paycom remits the same to the applicable taxing authorities. The Debtors withheld Employee Withholding Taxes of

approximately $450,000 on average for the first three months of 2019, and the Debtors' paid Employer Payroll Tax Obligations of approximately $200,500 on average for the first three months of 2019. The amounts in satisfaction of the Payroll Tax Obligations are transferred to Paycom in advance of the relevant payroll processing day.

66. As mentioned above, the Debtors' Pryor Facility located in Pryor, Oklahoma employs approximately 323 Employees of which about 73 are members of the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, on behalf of its Local Number 13-930 (the "**Mill Union**") and 120 are members of the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, on behalf of its Local Number 13-1480 (the "**Converting Union,**" and together with the Mill Union, referred to herein as the "**Pryor Unions**"). In the ordinary course of business, the Debtors withhold applicable dues from the respective Employees and remit those amounts due (the "**Dues**") to the Pryor Unions on a weekly basis. As of the Petition Date, the Debtors estimate that they owe approximately $14,000 in outstanding Dues to the Pryor Unions.

67. Pursuant to the Employees and Wages Motion, the Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy the Payroll Tax Obligations and Dues (collectively, the "**Withholding Obligations**") and to remit amounts withheld on behalf of third parties postpetition in the ordinary course of business.

68. In the ordinary course of business, the Debtors have typically maintained an incentive program for Employees. Specifically, the Debtors have historically maintained a stock incentive plan (the "**Stock Incentive Plan**"). In the aggregate, as of the Petition Date, there were approximately 629,560 shares to be issued and/or vest upon exercise of outstanding options and

rights issued pursuant to such Stock Incentive Plan. The Stock Incentive Plan is structured to incentivize and award recipients to deliver superior performance to the Debtors at no cost to the Debtors' creditors. These non-cash awards align Employee and board member interests with the interests of the Debtors' financial stakeholders by linking compensation to the Debtors' performance. Moreover, the awarded equity's ratable vesting schedule stresses long-term corporate growth and stability over short-term gains. Employees are therefore encouraged to take steps to improve the Debtors' performance in accordance with its objectives. Accordingly, the Debtors seek authority, but not direction, to continue the Stock Incentive Plan to provide for continued vesting and issuance of already outstanding options and rights after the Petition Date.

69. Like other companies, the Debtors offer their Employees paid vacation time and holiday pay. I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the bankruptcy process. Thus, pursuant to the Employees and Wages Motion, the Debtors request that they be authorized, but not directed, to continue to honor vacation time, and holiday pay policies going forward, including during the administration of these Chapter 11 Cases, and any vacation time that accrued prepetition.

70. Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Employees for reasonable and legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("**Reimbursable Expense Obligations**"). Reimbursable Expense Obligations typically include expenses for, among other things, travel, meals, parking, mileage, and certain other business and travel related expenses. All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy. Over the past year, the Debtors have paid approximately $5,000 – $14,000 per month on account of

Reimbursable Expense Obligations. As of the Petition Date, I estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations will not exceed $14,000.

71. Additionally, in the ordinary course of business, the Debtors implement various benefit plans and policies for their Employees that can be divided into the following categories: (a) medical benefits, dental benefits, and vision care; (b) basic life and accidental death and dismemberment insurance, short- and long-term disability insurance, and other voluntary insurance plans; (c) a retirement savings 401(k) plan; (d) flexible spending plans; (e) an employee assistance program (collectively, the "**Employee Benefits Plans**"). In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans. All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "**Employee Benefits Obligations**."

72. As further provided in the Employees and Wages Motion, obligations relating to certain Employee Benefits Plans remain unpaid as of the Petition Date. The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits Obligations that have already accrued. The Debtors estimate that the aggregate accrued amount of such prepetition Employee Benefits Obligations is approximately $599,100.

73. Lastly, it is important to note that the Debtors maintain a six-member board of directors, comprising of 5 independently appointed individuals (each, a "**Director**"). Each of the Directors is compensated annually at a flat sum, payable quarterly and also compensated at a flat rate when Directors spend time participating in special committee meetings, board meeting and audit meetings (the "**Director Compensation**"). I believe that the Directors' service is necessary for the continued management of the Debtors, and accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the

Directors. The Debtors estimate that they owe approximately $24,000 with respect to Director Compensation as of the Petition Date. The Debtors request the authority to pay any Director Compensation in the ordinary course and honor such payments owed regardless of when such obligations arose.

74. The Debtors' ability to successfully operate is contingent on a reliable and loyal workforce. As stated above, competition for qualified employees is intense in the Debtors' industry. Thus, it is essential to assure the Employees that the Debtors will honor their obligations and continue and maintain the employment and pay and programs in the ordinary course of business throughout these Chapter 11 Cases. I believe that a failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or the decision to not complete work for the Debtors or accept future hiring proposals. I believe that the loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

**E. *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* (the "<u>Utilities Motion</u>")**

75. Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting Utility Providers (as defined below) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (ii) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers

providing services to the Debtors; and (iii) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

76. In conjunction with its day-to-day operations, the Debtors receive traditional utility services from various utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, telecommunications, gas, water, electricity, and similar utility products and services (collectively, the "**Utility Services**"). The Utility Providers include, without limitation, the entities set forth on the list annexed to the Utilities Motion as Exhibit C (the "**Utility Providers List**").

77. The Debtors paid an average of approximately $1.1 million per month on account of all Utility Services over the last twelve-month period. As "adequate assurance," the Debtors propose to segregate on their books and records, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $515,620.00), calculated based on the historical data for the last twelve months (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

78. I believe uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to consummate a sale through chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11

cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**F. *Motion of Debtors for an Order Authorizing Payment of Prepetition Taxes and Fees* (the "Taxes Motion")**

79. Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing them to pay, in their sole discretion any prepetition tax and fee obligations including, without limitation, income and franchise taxes, property taxes, sales and use taxes, business license fees, annual report taxes, and other taxes and fees (collectively, the "**Taxes and Fees**") owing to those federal, state, provincial, and local governmental entities in the United States, including as listed on Exhibit B attached to the Taxes Motion (the "**Taxing Authorities**"). The Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Taxes Motion to $100,000 unless further authorization is obtained from this Court.

80. Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial, and local governments in the United States. Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due. Certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year. In the last twelve months prior to the Petition Date, the Debtors paid approximately $730,000 on account of all Taxes and Fees.

81. I believe the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects

for a successful chapter 11 process. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (i) the obligations are priority, secured, or unsecured in nature, (ii) the obligations are proratable or fully prepetition or postpetition, and (iii) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

82. Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

83. I believe failure to pay the Taxes and Fees to the Taxing Authorities in full and on time, thereby risking the cessation of normal relations between the Taxing Authorities and the Debtors, will make these estates worse off than they will be having paid the Taxes and Fees. I believe it is in the best interests of the Debtors' estates that the Taxes and Fees be paid on time so as to avoid administrative difficulties. Failure to timely pay, or a precautionary withholding by the Debtors of payment of, the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including an increase in audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.

84. The Chapter 11 Cases are complicated due to the nature of the Debtors' business, and the Debtors' focus should be on addressing their operational and financial issues in a manner that will maximize recoveries. In this context, the payment of the Taxes and Fees is insignificant and will have no meaningful effect on the recoveries of creditors in the Chapter 11 Cases, particularly in view of the priority or secured status of a significant portion of such obligations. Moreover, the payment amount will likely be offset in no small part by the amount of postpetition resources that the Debtors will conserve by obviating the need to spend time and money to address disputes with the Taxing Authorities that are unnecessary and wasteful of the resources of the Debtors and this Court.

**G. *Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay, (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations, and (V) Authorizing the Debtors to Continue Surety Bond Program* (the "Insurance Motion")**

85. Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (i) continue and renew their Insurance Policies (defined below), or obtain new insurance policies, as needed in the ordinary course of business, and (ii) honor all of their prepetition and postpetition obligations, including payment of all outstanding prepetition Insurance Obligations (defined below), under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, including premiums arising under the Insurance Policies and the Broker Fees (defined below). Additionally, pursuant to the Insurance Motion, the Debtors also seek entry of an order (i) authorizing the banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of

the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion, and (ii) preventing the Insurers (defined below) from giving any notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining relief form the automatic stay.

86. In the ordinary course of their business, the Debtors maintain approximately18 insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general liability, automobile liability, director and officer liability, workers compensation liability, crime coverage, automobile liability, stop loss excess coverage, and property liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in Exhibit B annexed to the Insurance Motion.

87. The Debtors have incurred approximately $2,600,000 in the aggregate in premiums under the terms of their existing Insurance Policies as well as other obligations, including the Broker Fees (defined below) and other related fees and costs (collectively, the "**Insurance Obligations**") in the last year. In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

88. The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily (i) pre-paid in full at a policy's inception or renewal; (ii) financed through a premium financing company; or (iii) paid in installments to a broker over the term of the policy.

89. Debtors' Pre-Paid Policies. Generally, these Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. In the ordinary

course of business, the Debtors renew annual coverage under many of their policies, including those related to director and officer liability, employment practices liability, crime liability, and fiduciary liability, and the Debtors pay the full amount of the premiums owed for such policies due at renewal. Accordingly, as of the Petition Date, the Debtors do not owe unpaid premium amounts on account of policies that require payment in full at the inception of the applicable policy period.

90. Premium Financing Agreement. Generally, the Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. However, it is not always economically advantageous for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of business, the Debtors finance premiums on their property liability policy pursuant to a certain premium financing agreement (the "**PFA**") with AFCO (the "**Financier**"). The Debtors entered into the PFA with the Financier in order to finance the insurance premiums for the property policy as detailed in Exhibit C attached to the Insurance Motion. Under the PFA, the Debtors are obligated to make, in addition to a predetermined down payment, interval installment payments. The Debtors have paid the down payments and have continued to pay the installments as they have come due prior to the Petition Date. The next monthly installment payment for the current policies on account of the PFA will be due on or around April 10, 2019. If the Debtors are unable to continue making payments on the PFA, the Financier may be permitted to terminate the PFA. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such Insurance Policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if the Financier was not permitted to terminate

the PFA, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies. In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing their insurance premiums, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the PFA and, as necessary, renew or enter into new such agreements.

91. The Debtors' Insurance Broker Services. The Debtors retain the services of Willis Towers Watson ("**Willis**") as the broker to assist them with the procurement and negotiation of certain Insurance Policies. Willis assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. Willis also provides ongoing support through the policy periods. The Debtors pay Willis a commission for the services rendered which is included in the installment monthly premium amounts paid. As of the Petition Date, the Debtors do not believe that they owe any outstanding amounts to Willis on account of fees, commissions, or any other prepetition obligations beyond the broker amounts already contained in the next monthly payment that will come due in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek authority to continue honor any amounts owed to Willis to ensure uninterrupted coverage under their Insurance Policies.

92. The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks,

including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe any or all of these consequences could cause serious harm to the Debtors' business. While the Debtors believe that they are current on their Insurance Obligations, in an abundance of caution, the Debtors agree that should payments need to be made at a later date on account of prepetition Insurance Obligations, such payments shall not exceed $100,000 and payment to Willis on account of prepetition broker obligations shall not exceed $7,300, without further order of the Court. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

**H. *Motion of Debtors for Entry of an Order Authorizing the Debtors' to (i) Honor Prepetition Obligations Pursuant to Their Customer Programs; and (ii) Continue the Same in the Ordinary Course of Business (the "Customer Programs Motion").***

93. Prior to the Petition Date and in the ordinary course of their business, the Debtors engage in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace.

94. As detailed above, the Debtors manufacture parent rolls, convert the parent rolls into finished tissue products, and supply an array of tissue products throughout the country. In some instances, the Debtors sell the products directly to end-users, and in other instances, the Debtors supply products to big box and other retailers. In the ordinary course of their business, the Debtors engage in a variety of marketing and sales practices designed to develop and sustain

customer satisfaction and loyalty (the "**Customer Programs**"). On account of the Customer Programs, the Debtors incur various obligations to customers and distributors, including but not limited to, discounts, incentives, and allowances (collectively, the "**Customer Obligations**") in order to attract and maintain positive relationships. The Customer Programs seek to encourage customers to increase purchasing frequency and volume, which, in turn, results in larger net revenues for the Debtors.

95. Specifically, the Debtors maintain deductions and allowances for the benefit of certain customers. For example, if a customer purchases a certain amount of product within a designated time period, the Debtors issue a credit to such customer. The Debtors settle these credits via deductions and allowances against the outstanding invoices on an annual basis.

96. At their core, these Customer Programs aim to meet competitive pressure, enhance customer satisfaction, generate goodwill for the Debtors, and, ultimately, allow the Debtors to retain current customers, attract new customers, and increase revenue and profitability. To effectuate a smooth transition into and out of chapter 11, I believe that the Debtors must maintain and honor the Customer Programs and fulfill the Customer Obligations as the Debtors deem appropriate.

97. Given the ongoing nature of the Debtors' sales, it is difficult to calculate the exact amount of deductions and allowances accrued prior to the Petition Date. Notwithstanding, the Debtors estimate that the aggregate value of accrued prepetition Customer Obligations is approximately $743,000 for accrued deductions and allowances. I believe that paying or otherwise honoring the Debtors' these prepetition obligations, and continuing the Customer Programs postpetition, is imperative to the Debtors' going concern prospects.

**I.** ***Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Critical Vendors*** **(the "Critical Vendors Motion")**

98. Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition claims (the "**Critical Vendor Claims**") of certain vendors, suppliers, service providers, and other similar parties that are essential to maintaining the going concern value of the Debtors' business (the "**Critical Vendors**") in an amount not to exceed $3,784,500 on an interim basis and $7,569,000 on a final basis, which amounts include approximately $3,565,800 on account of claims entitled to administrative priority under Bankruptcy Code section 503(b)(9) (with respect each of the interim and final periods, as applicable, the "**Critical Vendor Cap**").

99. In the ordinary course of business, the Debtors depend on the uninterrupted flow of raw materials, inventory and other goods through their supply and distribution network. To that end, the Debtors also purchase essential goods and utilize services from certain vendors and suppliers that are unaffiliated with the Debtors without whom the Debtors could not operate. The Critical Vendors are essential to maintaining business continuity, delivering essential services to customers in a timely manner and, ultimately, maintaining customer satisfaction.

100. Because the Debtors will benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoiding the severe disruption to the Debtors' operations that would occur if the Debtors were to lose certain vendors, I believe it is prudent for the Debtors, at their discretion, to pay selected Critical Vendors some or all of their prepetition claims (including Critical Vendors with claims under Bankruptcy Code section 503(b)(9)). Consistent with these needs, and to ensure that the Debtors' liquidity is preserved as they transition their business into chapter 11, the Debtors seek authority to implement procedures

that will assist them in securing favorable terms and to deal with any vendors that may repudiate or otherwise refuse to honor existing obligations to the Debtors.

101. The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. Toward that end, the Debtors have carefully estimated all potential vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that the ability to satisfy Critical Vendor Claims is absolutely necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtors. To be clear, the Debtors are aware of the need to seek relief only for those vendors truly critical to the Debtors' ongoing operations. Furthermore, the Debtors believe that a portion of the Critical Vendor Claims may be entitled to administrative priority under Bankruptcy Code section 503(b)(9), and that payment of those Critical Vendor Claims would merely expedite the treatment they are otherwise entitled to and abides by the priority scheme of the Bankruptcy Code.

102. The Debtors reviewed over 400 vendors to determine, among other things, (i) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (ii) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (iii) which suppliers would be prohibitively expensive to replace, (iv) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, and (v) the extent to which suppliers may have an administrative expense claim pursuant to Bankruptcy Code section 503(b)(9). After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.

103. The Critical Vendors generally fall into four broad categories: (i) customer brokers; (ii) materials suppliers (both raw and finished); (iii) parts suppliers and service providers for the facilities; and (iv) foreign vendors.

104. As detailed herein, the Debtors recently completed their multi-million dollar expansion plan in order to become a national supplier of the highest quality, primarily private label, tissue products from a lower cost asset base. The Debtors recently built the Barnwell, South Carolina facility and installed the state-of-the-art 100% QRT Paper Machine (the "**QRT**"), making the Debtors the only private-label manufacturer in the United States using the new ultra-premium tissue capability development, designed and fabricated by Valmet Corporation. Due to the extensive design and proprietary requirements associated with operating and maintaining the QRT, the Debtors are highly dependent on suppliers and servicers familiar with the QRT (the "**QRT Suppliers and Servicers**"). Any attempt by the Debtors to re-source a part or component or shift business from the QRT Suppliers and Servicers to a different vendor after the Petition Date would likely be futile because such alternative sources are simply not readily available. Moreover, to the extent alternative suppliers are available, renegotiating orders and service agreements would be unnecessarily time-consuming for the Debtors and risk delay or stoppage in the production line. Further, the Debtors also transact substantial business through their strategic partnership with the Mexican entity, FAPSA, whereby the Debtors have a supply agreement gaining access of up to 19,800 tons of converted tissue. This relationship is critical to the Debtors as they pivot towards a successful sale of substantially all of their assets. Lastly, as is common in the industry, the Debtors frequently rely on the use of commissioned brokers ("**Sales Brokers**") to contact and solicit orders from, among others, wholesalers, distributors, and direct buying chains and outlets (collectively, the "**Customers**"). In fact, certain Customers require that

the Debtors use their preferred Sales Brokers before such Customers will even consider engaging in transactions with the Debtors. Additionally, the Sales Brokers serve to bring new customers to the Debtors as well as reduce the need for additional sales employees.

105. As detailed herein, the Debtors spent significant time reviewing and analyzing their books and records to identify truly critical suppliers of goods and services relating to the QRT as well as the Debtors' general operations. The vendors described above are critical to the Debtors' operations where the lack of, or even delay, of goods or services (even for a short duration), would severely disrupt the Debtors' operations and irreparably harm business as the Debtors move towards a sale of substantially all of their assets through these Chapter 11 Cases.

106. The relief requested in the Critical Vendors Motion is specifically designed to accomplish the Debtors' sale efforts. In contrast, the Debtors will suffer irreparable harm if essential goods and services are not provided by the Critical Vendors. The Debtors cannot take the material risk that the Critical Vendors will refuse to perform postpetition if their prepetition claims are not paid.

107. While the Debtors have historically enjoyed productive working relationships with these vendors and some may have contracts with the Debtors, the limited number of vendors who can supply the Debtors with the quantity and quality of goods and services that meets the Debtors' operational needs provides such vendors with considerable bargaining power in the event of non-payment by the Debtors. So while the Debtors have the benefit of the automatic stay afforded through section 362 of the Bankruptcy Code, not only may the Debtors suffer legitimate business risk if they are forced to wait for this Court to compel performance from domestic vendors under applicable contract terms, but there is serious risk that the foreign vendors holding claims against the Debtors may consider themselves outside of the reach of this

Court and disregard the automatic stay provisions. At this critical time following the filing of these Chapter 11 Cases, the loss of such vendors will significantly impair the Debtors' ability to maximize value for the benefit of all stakeholders.

108. I believe the Critical Vendors are so essential to the Debtors' business that the absence of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and client satisfaction. I believe this irreparable harm to the Debtors and to the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the Critical Vendor Claims.

**J. *Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Claims of Shippers and Warehousemen (the "Shippers/Warehousemen Motion".***

109. The Debtors' operation of their business and the success of the Debtors' efforts to sell their assets depend upon the transport, delivery, and/or storage of the Debtors' supplies, finished goods and inventory that, in the ordinary course of business, are presently in the possession and control of the Debtors' Shippers and Warehousemen (each as defined below).

110. In the ordinary course of business, the Debtors depend on the uninterrupted flow of raw materials, inventory and other goods through their supply and distribution network. Implicit in this business is the Debtors' reliance on (A) warehouses and storage facilities to maintain and store both raw materials and finished goods prior to delivery to customers; and (B) dedicated common carriers, freight forwarders, and shippers to (i) transport wood and pulp raw materials and other supplies to and between the Debtors' storage and manufacturing facilities ("**Facilities**"), and (ii) deliver the Debtors' finished tissue products from their Facilities to customers' warehouses, storage facilities or distribution centers. This complex network (each, a "**Shipper and Warehouseman**," and collectively, the "**Shippers and Warehousemen**") is

critical to ensure the specialized storage, maintenance, and ultimately, safe shipping of the Debtors' tissue products.

111. On account of the Chapter 11 Cases, certain Shippers and Warehousemen that are holding Debtors' materials and products (collectively, the "**Goods**") for delivery to or from the Debtors may refuse to release such Goods without payment for prepetition services, which would debilitate the Debtors' reliable and efficient supply and distribution system, thereby causing irreparable harm to the Debtors' estates. Thus, the Debtors are in critical need of the services of the Shippers and Warehousemen, and cannot easily, economically or quickly replace them. Moreover, under applicable laws, Shippers and Warehousemen with possession or control of the Debtors' Goods may take steps to assert possessory liens, to secure charges and expenses incurred in connection with the transportation or storage of the Goods, further disrupting shipment and delivery of such Goods.

112. A material disruption along the path of the Debtors' supply and distribution chain, would immediately impact the Debtors' ability to maintain control over their Goods, collect receivables relating to the fulfillment of customer orders for tissue products or parent rolls in transit or stored at warehouses, and successfully operate and complete a sale of their business. It is likely that if prepetition invoices remain unpaid, (i) certain Shippers will withhold deliver of the Debtors' supplies and products and may refuse to ship outright, and (ii) Warehousemen may prevent access to the Debtors' goods and products. Either of these two potential punitive self-help measures would severely disrupt the Debtors' operations and curtail their ability to maximize value for the benefit of all parties in interest in these Chapter 11 Cases.

113. The Debtors wish to avoid any disruption in their supply and distribution chain and, thus, are seeking authority to pay the prepetition amounts necessary to cause their Shippers

and Warehousemen to continue transporting, storing, distributing, and delivering the Debtors' products and supplies. Such parties could potentially assert administrative and/or secured claims with respect to the Debtors' property in their possession. Additionally, the value of goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released are likely to greatly exceed the amount of such Shipping and Warehouse Claims. As of the Petition Date, the Debtors estimate approximately $1,830,000 in prepetition amounts have accrued to Shippers and Warehousemen with respect to prepetition claims, all of which will become due and payable postpetition (collectively, referred to herein as the "**Shipping and Warehouse Claims**"). Thus, I believe that it is necessary and essential to the value of the Debtors' estates that they be permitted to make payments on account of certain Shipping and Warehouse Claims.

**K. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Debtor-in-Possession Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and (VI) Granting Related Relief* (the "Cash Collateral and DIP Motion")**

114. As of the Petition Date, the Debtors have approximately $2.9 million of cash and cash equivalents (the "**Cash Collateral**") on hand.

115. Pursuant to the Cash Collateral and DIP Motion, the Debtors seek authority to, among other things: obtain postpetition loans from the DIP Lenders in an aggregate amount not to exceed $11 million; enter into the DIP Loan Documents (as defined in the Cash Collateral and DIP Motion); grant the DIP Lenders certain liens upon the Debtors' estates; provide adequate protection to the Prepetition Secured Parties; and use Cash Collateral.[3]

[3] Notwithstanding anything to the contrary herein or in the Cash Collateral and DIP Motion, Debtor Orchids Lessor SC is not a borrower under or guarantor of the DIP Loan, is not pledging any of its assets as collateral to secure the

116. The Debtors are unable to sufficiently generate cash to operate their business or satisfy their obligations under, among other things, the Prepetition Loan Documents. Given the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors have an immediate need to obtain the DIP Loan and to use Cash Collateral to permit the Debtors to, among other things, continue the orderly operation of their business, maximize and preserve their going concern value, make payroll and satisfy other working capital and general corporate purposes, and pay other costs, fees and expenses associated with administration of the Chapter 11 Cases. In the absence of the authority of this Court to borrow under the DIP Loan Documents and use Cash Collateral, the Debtors' estates would suffer immediate and irreparable harm.

117. On behalf of the Debtors, Houlihan Lokey led the negotiations with the DIP Lenders regarding the economic and certain other terms of the proposed DIP Loan. Houlihan Lokey also contacted other potential lenders to provide debtor-in-possession financing. As set forth more fully in the Declaration of Jeffrey Lewis of Houlihan Lokey filed in support of the Cash Collateral and DIP Motion, none of the other lenders was willing to provide postpetition financing on similar or better terms as those offered in the DIP Loan and the final terms of the DIP Loan are fair and reasonable under the circumstances.

118. After considering all alternatives, the Debtors have concluded, in their sound business judgment based upon analysis and the recommendations of Houlihan Lokey and the Debtors' other professionals, that the DIP Loan Documents provide the best opportunity for postpetition financing on the most favorable terms available.

---

DIP Loan, and is not otherwise a party to any of the DIP Loan Documents. Likewise, the Prepetition Secured Parties are not receiving a replacement or adequate protection lien against or any other rights with respect to Orchids Lessor SC or its assets.

119. I believe the DIP Loan is necessary to preserve and administer the Debtors' estates, and therefore, will benefit all creditors. The DIP Loan allows the Debtors to continue operations and maintain the value of the estates for an anticipated sale of all or substantially all of their assets under Bankruptcy Code section 363.

120. I believe the Debtors will face immediate and irreparable harm without the entry of an interim order approving the Cash Collateral and DIP Motion.

**L. *Motion of Debtors for Entry of (I) An Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "Sale and Bid Procedures Motion")**

121. Subject to their right to determine an alternative course of action is preferable, the Debtors currently intend to sell substantially all of their assets in the Chapter 11 Cases. In that regard, the Debtors seek authority to enter into (i) that certain Asset Purchase Agreement with Orchids Investments LLC (the "**Stalking Horse Bidder**"), a copy of which is attached to the Sale and Bid Procedures Motion as Exhibit A (the "**Stalking Horse Agreement**"), pursuant to which the Stalking Horse Bidder seeks to purchase the Acquired Assets (as defined in the Stalking Horse Agreement) from the Debtors pursuant to a credit bid and other consideration as set forth therein and (ii) that certain Option Agreement with the Stalking Horse Bidder, a copy of which is attached to the Sale and Bid Procedures Motion as Exhibit B (the "**Option Agreement**"), pursuant to which the Stalking Horse Bidder granted the Debtors the option, but not the obligation, to enter into the Stalking Horse Agreement in exchange for certain bid protections. Importantly, the Debtors have not agreed to sell any of their assets to the Stalking

Horse Bidder, or to complete the sale process, if another course of action is determined to be more beneficial for the Debtors' stakeholders.

122. As part of the proposed sale process, the Debtors, through Houlihan Lokey and their other professionals, will continue to engage in the robust marketing effort for their assets, which started well before the Petition Date, including contacting previously identified and new financial and strategic buyers regarding a potential sale. All interested parties will be given an opportunity to execute a confidentiality agreement and be given access to the data room maintained by the Debtors. Those parties that execute a confidentiality agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

123. I believe a prompt sale of the Debtors' assets represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases, subject to the Debtors' right to determine another course of action is preferable.

124. Pursuant to the Sale and Bid Procedures Motion, the Debtors request the Court approve the following general timeline:

(i) **Contract Cure Objection Deadline**: Objections to the potential assumption and assignment of any Contract will be filed and served no later than **May 14, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure or Assignment Objection**").

(ii) **Bid Deadline**: Bids for the assets, including a marked-up form of the Stalking Horse Agreement as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bidding Procedures) must be received by no later than **June 6, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

(iii) **Auction**: The Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on or about **June 10, 2019 at 10:00 a.m. (prevailing Eastern Time)**, or such

other location as identified by the Debtors after notice to all Qualified Bidders.

(iv) **Sale Objection Deadline**: Objections to the Sale will be filed and served no later than **4:00 p.m. (prevailing Eastern Time) on June 5, 2019**.

(v) **Sale Hearing**: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **June 12, 2019**.

125. I believe this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing the bankruptcy estates. Given the Debtors' extensive prepetition marketing efforts, I believe the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. I believe the relief requested in the Sale and Bid Procedures Motion is in the best interests of the Debtors' creditors, their other stakeholders, and all other parties in interest, and should be approved.

126. The Stalking Horse Agreement submitted by the Stalking Horse Bidder provides the Company will continue to operate as a going concern. As part of its bid, the Stalking Horse Bidder negotiated for the timeline requested herein. The Debtors believe the proposed sale process will minimize any further deterioration of their assets and is in the best interests of all stakeholders. Thus, the Debtors have determined pursuing the Sale in the manner and within the time periods prescribed in the bidding procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## IV. CONCLUSION

127. The Debtors' goal in these Chapter 11 Cases is the maximization of estate value through a sale of the business as a going concern, preserving value for the Debtors' creditors, employees and other parties-in-interest. In the near term, however, the Debtors' immediate objective is to continue operating their business during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of substantially all of the Debtors' assets will be substantially enhanced.

128. I hereby certify the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2019.

**Orchids Paper Products Company, *et al.***

Debtors and Debtors in Possession

*/s/ Richard S. Infantino*

Richard S. Infantino
Interim Chief Strategy Officer

# EXHIBIT A

## Company's Organizational Structure

**Orchids Paper Products Company**

Entity Organizational Chart




*Entity will file as a debtor in the chapter 11 cases.

# EXHIBIT B

## NMTC Transaction Structure

**ORCHIDS PAPER BARNWELL FACILITY NMTC TRANSACTION**
**(PROJECT # 24349)**
**FINANCIAL FORECAST**
**FLOW CHART - ALL IN**

