# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ORCHIDS PAPER PRODUCTS COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 19-10729 (MFW)<br>(Joint Administered)<br>**Hearing Date: May 1, 2019, at 10:30 a.m.**<br>**Objections Due: April 24, 2019 at 4 p.m.**<br><br>Dkt. No. 25 |

**OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE OPTION AGREEMENT AND THE STALKING HORSE AGREEMENT, (E) APPROVING BID PROTECTIONS, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

Andrew R. Vara, Acting United States Trustee for Region Three ("U.S. Trustee"), through his undersigned counsel, files this Objection (the "Objection") to the Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Orchids Paper Products Company, a Delaware corporation (6944), Orchids Paper Products Company of South Carolina, a Delaware corporation (7198), and Orchids Lessor SC, LLC, a South Carolina limited liability company (7298). The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.

the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment Of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear Of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief (Docket No. 25) (the "Motion"), and in support of that objection states as follows:

## PRELIMINARY STATEMENT

1. The Motion seeks approval of the sale of substantially all of the Debtors' assets to the stalking horse bidder, which, upon information and belief, is an entity established by the holders of the Debtors' prepetition and post-petition debt (the "Lenders"). By way of the stalking horse, the Lenders have made a credit bid of $ 175 million of the more than $ 187 million the Debtors stipulate was owed to the Lenders as of the petition date. The Lenders will also be credit bidding the amount of the outstanding DIP financing.

2. The U.S. Trustee objects to those portions of the Motion that seek to pay the Lenders, if outbid at auction, (a) a Break-Up Fee of $5,250,000 (which is 3% of the credit bid), plus (b) an Expense Reimbursement with a cap of $ 2 million. When added together with an initial overbid of $500,000, all other interested bidders will have to bid $7,750,000 over the amount of the Lenders' credit bid in order for their bid to be considered.

3. Break-up fees and expense reimbursements are intended to be incentives for a party to invest time and money to do the due diligence necessary to make a stalking horse bid, knowing it might be outbid at the auction and therefore out-of-pocket for its expenses. The Lenders, who purchased the Debtors' debt only three months before the Debtors filed for bankruptcy, did not need to undertake any additional due diligence to make a bid, did not need

an incentive to make a bid, and will not need to be compensated if they are not the winning bidder at the auction. This is because, regardless of the outcome of the auction, the Lenders will benefit.

4. Because the Lenders did not need any incentive to make the stalking horse bid, the Break-Up Fee and Expense Reimbursement are not "actually necessary to preserve the value of the estate," as required under Third Circuit law. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 535 (3d Cir. 1999), discussed below.

5. Nor is any expense reimbursement necessary. The Interim DIP Financing Order in this case provides that the Debtors shall pay, both as a cost of the DIP financing, and as adequate protection, the professional fees and other expenses of the Lenders. *See* Interim DIP Financing Order, Dkt. No. 44, ¶¶ 8 (b) and 19 (c). The Lenders will likely take the position that such expenses include those related to the sale. There is therefore no reason to chill bidding by requiring each of their competitors to include in their bid $ 2 million to cover the expenses of the Lenders.

6. Even if the Lenders were not getting their expenses reimbursed through the DIP Financing Order, an expense reimbursement of $ 2 million is excessive. Any such fees should be capped at no more than $500,000, and the Lenders should be required to provide support for all such expenses to the Debtors, the Committee, and the U.S. Trustee, who should have the same review and objection rights set out in the Interim DIP Financing Order for reimbursement of Lender expenses.

7. Finally, the U.S. Trustee objects to treating any break-up fee or expense reimbursement allowed by the Court as a super-priority administrative claim, because there is no support in the Bankruptcy Code for such treatment.

8. For these reasons, set forth in more detail below, the U.S. Trustee respectfully requests this Court to issue a ruling denying the Motion.[2]

## JURISDICTION

9. Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this Objection.

10. Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the U. S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U. S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

11. Under 11 U.S.C. § 307, the U. S. Trustee has standing to be heard on the issues raised by this Objection.

---

[2] The U.S. Trustee has other issues with the bid procedures that are not addressed here, but which the U.S. Trustee believes will be consensually resolved. To the extent such issues are not fully resolved by the hearing, the U.S. Trustee reserves the right to raise them at that time. The U.S. Trustee also reserves the right to assert any objection to the sale itself, to the form of the sale order, and to the proposed assumption and assignment of any plan or agreement providing for bonuses or severance to the Debtors' insiders, in accordance with any sale objection deadline to be set by this Court.

## BACKGROUND

12. On April 1, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

13. The U.S. Trustee appointed an official committee of unsecured creditors in these cases on April 15, 2019.

14. On the Petition Date, the Debtors also filed the Motion, which seeks, among other things, approval of certain bid procedures for the sale of substantially all of the Debtors' assets through a bidding and auction process. *See* Dkt. No. 25.

15. The stalking horse is an entity named Orchid Investments, LLC, which, upon information and belief, is a special purpose entity the Lenders established to purchase the Debtors' assets.

16. The Lenders, through the stalking horse, have made a credit bid for the Debtors' assets, consisting of (a) $ 175 million of the over $ 187 million that the Debtors stipulate the Lenders were owed as of the petition date, plus (b) the amount of outstanding DIP financing as of the closing of the sale. *See* Motion, ¶ 11 ("Purchase Price") and Interim DIP Financing Order, Dkt. No. 44, ¶ C (Debtors' stipulation as to principal amount owed as of the petition date). The maximum amount of the DIP Facility is to be $ 11 million on a final basis. *See* Dkt. No. 44, p. 1.

**Proposed Bid Protections**

17. By the Motion, the Debtors seek approval of (a) a Break-Up Fee of $5,250,000, plus (b) an Expense Reimbursement of "the lesser of (i) $2,000,000, and (ii) the

aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by the Stalking Horse Bidder or those of the Stalking Horse Bidder's subsidiaries that will receive title to any Acquired Assets pursuant to the transactions contemplated by the Stalking Horse Agreement." *See* Motion, ¶ 6 (e). The Break-Up Fee and Expense Reimbursement are payable to the Lenders in the event they are outbid at the Auction, and an alternate transaction closes.

18. Under the bid procedures proposed by the Debtors, each bidder, other than the Lenders, must submit a bid that exceeds the Lenders' credit bid by $ 7,750,000, consisting of the Break-Up Fee of $5,250,000, the $ 2 million expense reimbursement, plus an additional $500,000. *See id.*

19. The proposed order approving the bid procedures provides that "[t]he Break-Up Fee and Expense Reimbursement shall constitute an allowed superpriority administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 363, 364(c)(1), 503(b), 507(a)(2), and 507(b)." *See* Ex. C. to Motion, ¶ 9.

20. The Bid Procedures are not the only place that provides for payment of the Lenders' professional and other expenses. On April 4, 2019, this Court entered an interim order approving DIP financing and other relief (the "DIP Financing Order"). *See* Dkt. 44. The DIP Financing Order provided that the "Debtors shall pay the reasonable and documented prepetition and postpetition fees and expenses of the attorneys and advisors . . . for the DIP Agent and the DIP Lenders as provided under the DIP Loan Documents," as part of the cost of DIP financing, and to pay the same type of expenses to the Prepetition Agent and the

Prepetition Lenders, as part of adequate protection for the diminution in value of the Lenders' interests in the pre-petition collateral.  *See id.,* ¶ 8 (b) and ¶19 (c).[3]

## ARGUMENT

### A.  The Lenders Are Not Entitled to Bid Protections

21.  The U.S. Trustee objects to the Motion because a Break-Up Fee and Expense Reimbursement are not reasonable or appropriate under relevant Third Circuit law where, as here, the stalking horse is an entity controlled by the Debtors' pre-petition secured lenders.

22.  To award a break-up fee or expense reimbursement to a potential bidder, the Court must determine that the fee was an actual and necessary cost and expense of preserving the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit Court of Appeals held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *Id.* at 535.

23.  The burden is on a debtor to prove the necessity of, and benefit to the estate from, any proposed expense reimbursement.  In addition, although "the considerations that underlie the Debtors' judgment may be relevant to the bankruptcy court's determination on a request for break-up fees and expenses," "the business judgment rule should not be applied as such in the bankruptcy context."  *Id.*

24.  Moreover, as recognized by the Third Circuit in *O'Brien*:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose.  For example, in some cases a potential purchaser *will bid whether or not break-up fees are offered* . . . .  In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

---

[3]  All capitalized terms used in this paragraph have the meaning set forth in the DIP Financing Order.

181 F.3d at 535 (emphasis added).[4]

25. That is the situation presented here. As the pre-petition lenders, the Lenders almost certainly would have made a bid whether or not the Break-Up Fee or Expense Reimbursement was offered, because, regardless of the outcome of the auction, the Lenders will benefit. Either the Lenders will be the winning bidder, or, if they are outbid, the additional proceeds of the sale will be used to pay down the Lender's pre-petition claims and DIP financing claims. Because the Lenders did not need an incentive to make the stalking horse bid, the Break-Up Fee and Expense Reimbursement are not "actually necessary to preserve the value of the estate," as required under *O'Brien.*

26. Even the cases cited by the Debtors in connection with their request for approval of the Break-Up Fee and Expense Reimbursement support denial of the same here. For example, in the Motion, the Debtors quote *In re 995 Fifth Ave. Associates, L. P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) for the proposition that bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." The Debtors also cite *In re Integrated Resources, Inc.*, 147 B.R. 650, 660-61 (S.D.N.Y. 1992), for the proposition that bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid." *See* Motion, ¶ 40.

27. The rationale of *995 Fifth Ave* and *Integrated Resources* simply do not apply here, because the Lenders are heavily invested in achieving a successful sale of the Debtors' assets at the highest price possible. The Lenders are not the "white knight"

---

[4] *See also In re Reliant Energy Channelview LP*, 200 F.3d 594 (3d Cir. 2010) (affirming disallowance of retroactive grant of break-up fee that was sought after the stalking horse bidder had already bid for the assets).

referenced in *995 Fifth Ave* that undertakes a new risk.  Rather, the Lenders made the stalking horse bid to lessen their pre-existing risk in purchasing the Debtors' secured debt.  Nor are the Lenders likely to "retract [their] bid," because attracting other bidders will ultimately benefit the Lenders by paying off more of their pre-petition debt.  In fact, it appears that the Lenders are the principal, and possibly the only, party who will benefit from the sale of the Debtors' assets.

28. The proposed Break-Up Fee and Expense Reimbursement are not truly bid protections, but rather blocking devices to make it more costly for other bidders to propose a qualified bid.  Approving a Break-Up Fee and Expense Reimbursement of $ 7,250,000 to be paid by any winning bidder other than the Lenders will chill the bidding process, making such cost impermissible under the *O'Brien* standard.

**B.    In the Alternative, the Amount of the Break-Up Fee and Expense Reimbursement Is Excessive, and the Expense Reimbursement <u>Duplicative of What May be Reimbursable Under the DIP Financing Oder</u>.**

29. Even if the stalking horse was an entity independent from the Lenders, the Break-Up Fee and Expense Reimbursement should not be approved for the reasons set forth below.

30. First, given that the Debtors had difficulty attracting potential purchasers pre-petition, requiring any interested bidders to top the stalking horse's bid by $7,250,000 plus another $500,000 as an overbid, will do nothing to attract potential purchasers.  Even looking at the Expense Reimbursement alone, $ 2 million is excessive, considering that the Lenders had no need to undertake any significant due diligence to make a stalking horse bid.  This is because the Lenders had undoubtedly performed extensive due diligence when they purchased the Debtors' secured debt just three months earlier.

31.     Second, the Lenders will likely seek to have the Debtors pay all of the Lenders' prepetition and post-petition professional fees and other costs and expenses related to the sale under the DIP Financing Order, which provides for the Debtors to pay the Lenders' expenses as both the cost of obtaining DIP financing, and for adequate protection.  There is therefore no need to chill bidding by requiring the Lenders' competitors to include $ 2 million in their bids to pay such expenses.  It could be argued that the professional fees, and other fees and expenses of the Lenders in their role as stalking horse are not reimbursable under the DIP financing Order because they do not relate to DIP Financing or adequate protection.  If the Lenders were to agree with such view, then an expense reimbursement could be considered as a bid protection, provided it is capped at a reasonable figure of not more than $500,000.

32.     Finally, any expense reimbursement that is permitted by the Court must be subject to adequate documentation, which should be provided to the Debtors, the Committee and the U.S. Trustee, and subject to the same review and objection rights as set forth for reimbursement of the Lenders' fees and expenses under the Interim DIP Financing Order.  *See* Dkt. No. 44, ¶¶ 8 (b) and 19 (c).

C.  **The Break-Up Fee and Expense Reimbursements Are Not Entitled to Super-Priority Treatment Under the Bankruptcy Code.**

33.     Lastly, the Debtors are seeking to have the Break-Up Fee and Expense Reimbursement treated as super-priority administrative claims.  Even if the Court were to approve some portion of the Break-Up Fee or Expense Reimbursement, there would be no basis under the Bankruptcy Code to have claims for such amounts treated as super-priority administrative claims.

34.     The Third Circuit has ruled that break-up fees must be sought and analyzed under Section 503(b).  *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d

Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]" (citing *O'Brien*, 181 F.3d 527 (3d Cir. 1999))). The analysis of break-up fees under Section 503(b) "must be made in reference to *general administrative expense jurisprudence*." *O'Brien*, 181 F.3d at 535 (emphasis added). Further, the Court "do[es] not have the authority to 'create a right to recover from [a] bankruptcy estate where no such right exists under the Bankruptcy Code.' As a result, termination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]" *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (*petition for cert. filed*, --- U.S.L.W. ---- (U.S. Jan. 18, 2019) (No. 18-957) (quoting *O'Brien*, 181 F.3d at 535).

35. Section 503(b) does not provide for super-priority status. Such status is provided for only in Sections 364(c)(1) and 507(b) of the Code. Those sections are addressed exclusively to (a) claims of entities providing post-petition financing, and (b) claims of pre-petition secured lenders for adequate protection for diminution in value of their collateral during the bankruptcy case. Break-up fees and expense reimbursements in connection with sales do not fall under either of these two categories, and therefore cannot receive super-priority administrative claim status under the Bankruptcy Code.

36. "The filing of a petition for bankruptcy protection under Chapter 11 of the Code . . . precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code. This statutory control over the right to recover property from the debtor's estate is integral to the purposes and goals of federal bankruptcy law." *O'Brien*, 181 F.3d at 532 (citations omitted).

37. Permitting the Lenders, as the stalking horse, to prime other administrative expense claimants has no basis in the Bankruptcy Code, is inconsistent with Third Circuit precedent, and should not be allowed.

38. The U.S. Trustee leaves the Debtors to their burden and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE,** the United States Trustee respectfully requests this Court to deny the Motion, and award such other relief as this Court deems appropriate under the circumstances.

Dated: April 24, 2018
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**REGION THREE**

By: */s/ Juliet Sarkessian*
Juliet Sarkessian, Esquire
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
Juliet.M.Sarkessian@usdoj.gov