## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 19-10729 (MFW) |
| ORCHIDS PAPER COMPANY, *et al.*,[1] | (Jointly Administered) |
| Debtors. | Re: Docket No. 25 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE OPTION AGREEMENT AND THE STALKING HORSE AGREEMENT, (E) APPROVING BID PROTECTIONS, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND (C) <u>GRANTING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the bankruptcy cases of the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>"), by and through its proposed counsel, files this objection (the "<u>Objection</u>") to the Debtors' proposed bid procedures (the "<u>Bid Procedures</u>") set forth in the *Motion of Debtors For Entry of (I) An Order (A) Approving Bid Procedures In Connection with the Potential Sale of Substantially all of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Orchids Paper Products Company, a Delaware corporation (6944), Orchids Paper Products Company of South Carolina, a Delaware corporation (7198), and Orchids Lessor SC, LLC, a South Carolina limited liability company (7298). The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.

*Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases and (C) Granting Related Relief* (the "Sale Motion") [Docket No. 25].  In support of this Objection, the Committee respectfully states as follows:*

## PRELIMINARY STATEMENT

1.      By the Bid Procedures and Sale Motion, the Debtors are proposing a sale of substantially all of their assets to the Stalking Horse Bidder (which is also the Prepetition Lender and the DIP Lender) via a bid chilling $175 million credit bid that cannot possibly lead to higher or better offers.  While the Committee supports a fair and competitive auction process intended to encourage all prospective bidders to put their best bid forward, protect jobs, and maximize value for all constituents—simply put, this is not that process.

2.      The sale process proposed by the Debtors is riddled with serious defects that, if not corrected, may chill bidding and otherwise prevent the Debtors from achieving their purported goal for these Chapter 11 Cases; to realize the maximum value for their business.  The abbreviated sale process proposed by the Debtors is designed to guarantee that the Prepetition Lender/DIP Lender will be the Successful Bidder.  If the Prepetition Lender (which is also the DIP Lender) intends to use the chapter 11 process to simply liquidate its collateral, it must fund a process that is fair and equitable to all parties in interest. Otherwise, these cases should be converted to chapter 7 cases or dismissed.

3.      The Committee was just appointed and its review of the Chapter 11 Cases remains ongoing. However, the Committee is concerned with the Debtors' extremely short sale timeline

and proposal to use a highly-contingent Stalking Horse Agreement[2] and Option Agreement as the benchmark for bids for the sale of the Debtors' assets, award the Stalking Horse Bid Protections – regardless of whether such Bid Protections may chill bidding – and run a sale process solely for the benefit of the Prepetition Lender/ DIP Lender that otherwise leaves the Debtors' estate administratively insolvent.

4.    While the Committee does not oppose the Sale in principle at this time, several aspects of the Bid Procedures and Stalking Horse Agreement chill participation in the bidding process and thus prevent realization of maximum value for the Debtors' assets.  Specifically, the key defects identified by the Committee include:

- Failure to Provide for Administrative Solvency:  The Motion allows for the DIP Lender to purchase the assets via the Credit Bid, assume certain post-petition trade payables and 503(b)(9) Claims (up to a $2.5 million Accounts Payable Cap), and pay the Debtors an extremely limited amount of cash consideration for a wind down and the funding of a plan of liquidation. There is no indication that the cash received by the Debtors through the Cash Component and the Wind Down Payment will be sufficient to cover all administrative claims, including 503(b)(9) Claims and professional fees remaining after the Sale to the Stalking Horse closes. In sum, *as currently proposed, the Stalking Horse Bid leaves the Debtors' estates administratively insolvent.*

- Credit Bidding should not be Pre-Approved and must be Subject to Committee's Challenge Rights: The Proposed Order fails to include any reservation of rights for the Committee to exercise its challenge rights.  The Committee's right to object to the Stalking Horse Credit Bid should be preserved given that under the proposed Final DIP Order, the Prepetition Lender's liens remain subject to the Committee's challenge deadline.

- Unreasonable Conditions Precedent: The conditionality of the Stalking Horse Bid (which is really nothing more than an offer as opposed to a binding agreement) belies the notion that the DIP Lender's bid could serve the traditional purpose of a stalking horse bid - that is, to serve as a catalyst for other bids and to act as the definitive transaction in the event no other bidders surface.  Moreover, the Stalking Horse Bid fails to set an easily identifiable bid floor for the Minimum Overbid.  Here, the contingent nature of the Stalking Horse Agreement creates instability and uncertainty,

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

which may further chill competitive bidding and deter prospective purchasers.

- **The Bid Protections are Inappropriate and Chill Bidding:**  Under the circumstances, the Stalking Horse Bid Protections are wholly improper. The Break-Up Fee and Expense Reimbursement are not actually necessary to preserve the value of the Debtors' estates as required by Third Circuit law. The Stalking Horse Bidder already maintains a lien on substantially all of the assets of the Debtors by way of serving as the Prepetition Lender and the DIP Lender and is essentially using the bankruptcy process to conduct a friendly foreclosure to obtain a "free and clear" sale order.  There is also no justification in the Bankruptcy Code for the superpriority administrative expense status awarded to the Break-Up Fee and Expenses Reimbursement.

- **Approval of the Sale and Option Agreement is Premature:**  The provisions of the Sale Motion seeking approval of the Stalking Horse APA and Option Agreement are premature and should be denied.  As the Committee was recently formed on April 15, 2019, the Committee has not yet completed its review of the Stalking Horse APA, Option Agreement and related sale documents.  As the sale hearing is not scheduled to occur until early June, the Debtors' request that the Court approve the Stalking Horse APA and the Option Agreement at this juncture is premature and should be denied.

5.      The Committee retained counsel on April 15, 2019.  On April 17, 2019, the Committee served informal document requests on the Debtors and Prepetition Lender. The Committee is still working to review the diligence and other materials provided to prospective purchasers so that it can effectively evaluate the proposed Sale timeline and whether it is reasonable in these Chapter 11 Cases.  The Debtors assert that substantial prepetition marketing efforts were undertaken.  However, at this time the Committee does not know what it does not know.  There are numerous items the Committee expected to see as part of the sale diligence including, expert, technical, or other engineering reports related to the Debtors' Barnwell, South Carolina facility.  While the Committee has requested these items, they still have not been received from the Debtors.  The Committee obviously supports a fulsome sale process, however, at this juncture, the Committee must reserve its rights to subsequently seek to modify this process as it gets up to speed on information.

6.     The Debtors contemplate a liquidation and winding-up shortly after the completion of the Sale, and thus have no incentive to ensure anything more than a quick sale process – regardless of whether the sale is designed to produce the best recovery for all parties-in-interest, particularly unsecured creditors.  On the face of the Bid Procedures and the not-yet-binding Stalking Horse Purchase Agreement, there is far too much uncertainty about whether the proposed transaction will ever close, let alone, whether it sets a meaningful floor that will stimulate the sale process or give potential bidders enough clarity to know what it will take to submit a bid that is considered "higher or otherwise better." Accordingly, the Bid Procedures Motion cannot be granted unless modified as set forth herein.

## BACKGROUND

7.     On April 1, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  No trustee or examiner has been appointed in these Chapter 11 Cases.

8.     On the Petition Date, the Debtors filed the Sale Motion seeking, as an initial matter, the approval of the Bid Procedures, including approval of the Stalking Horse Agreement and the Option Agreement pursuant to which the Debtors will sell substantially all of their assets to Orchids Investment LLC ("Orchids Investment"), as Stalking Horse Bidder, for a purchase price of approximately $175,500,000 (subject to certain adjustments) plus assumption of certain liabilities (the "Purchase Price" or "Stalking Horse Bid"), subject to higher and better bids. Substantially all of the Purchase Price is a credit bid of outstanding prepetition debt.

A. ***The Stalking Horse Purchase Agreement***

9.      Under the Stalking Horse Agreement, the Debtors' Prepetition Lender/ DIP Lender have agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder" or "Stalking Horse") for the Purchase Price which includes a credit bid in the amount of $175 million plus such other amounts outstanding under the DIP Loan (the "Credit Bid"), the assumption of the assumed liabilities set forth in section 2.3 of the Stalking Horse Agreement (the "Assumed Liabilities"), cash in the amount outstanding under the DIP Loan (if any) (the "Cash Component"), and a cash payment in the amount of $500,000 (the "Wind Down Payment").[3]  *See* APA[4] § 3.1.  The Stalking Horse Agreement is coupled with the Option Agreement which provides the Stalking Horse with various Bid Protections and other benefits.

10.      The Sale Motion provides that the Stalking Horse Bidder will acquire all assets (the "Acquired Assets") related to the Debtors' operations as more specifically set forth in section 2.1 of the Stalking Horse Agreement.  The Stalking Horse Bidder will not be acquiring certain assets, namely: any benefit or pension plans, current and prior D&O policies, environmental obligations and liabilities, certain tax liabilities, rejected contracts, intercompany indebtedness and certain other employee liabilities and undisclosed property and assets and certain other employee liabilities and undisclosed property and assets (collectively, the "Excluded Assets" and "Excluded Liabilities").  *See* APA §§ 2.2 and 2.4.[5]

11.      The Stalking Horse Bidder's Assumed Liabilities include (a) certain liabilities arising after Closing, (b) obligations from Assigned Contracts, (c) up to $2.5 million of post-

---

[3] The Wind Down Payment remains subject to the conditions set forth in Section 6.20 of the Stalking Horse Agreement and any amounts remaining in the Wind-Down Account re-vest in the Stalking Horse Purchaser after payment of certain claims as agreed to between the Debtors and Purchaser.

[4] For ease of reference, citations to the Stalking Horse Purchase Agreement will reference such document as simply the "APA".

[5] The Stalking Horse Agreement proposes to leave behind various Excluded Liabilities but leaves the Debtors with no financial ability to address such Excluded Liabilities.

petition trade payables and 503(b)(9) Claims, (d) certain liabilities with respect to Transferred Employees, (e) certain obligations associated with the NMTC arrangements and (f) the Houlihan Transaction Fee.

12.    The Stalking Horse Agreement and Option Agreement contain numerous provisions which favor the Stalking Horse Bidder over other potential purchasers.  It rewards the Stalking Horse Bidder with substantial Bid Protections.  If the Stalking Horse is outbid, the Debtors must pay the Stalking Horse a break-up fee of 3% of the Purchase Price or $5.25 million (the "Break-Up Fee") and an expense reimbursement up to $2 million (the "Expense Reimbursement"). Option Agreement § 4.6.  As a result, and with a Minimum Overbid Increment of $500,000, any Initial Overbid must be $7.75 million or approximately 4.4% higher than the Stalking Horse Credit Bid and up to 15x the cash provided to the Debtors under the Stalking Horse Agreement.

13.    Additionally, the Stalking Horse Agreement requires the occurrence of several conditions precedent to the consummation of a sale, including the Debtors' exercise of the Option pursuant to the terms of the Option Agreement.  The Debtors' failure to exercise the Option (and otherwise comply with the Covenants in Section 3 of the Option Agreement) relieves the Stalking Horse of its obligations to perform under the Stalking Horse Agreement.

14.    Despite other protections afforded to it, various provisions in the Stalking Horse Agreement and Option Agreement allow the Stalking Horse to terminate the agreement or refuse to fulfill its obligations thereunder.  These provisions include, without limitation:

- Breach by Purchaser:   The Purchaser can breach the Stalking Horse Agreement and the Debtors' sole remedy is the entitlement to $1 million of liquidated damages which shall be payable by Purchaser by the forgiveness of Prepetition Credit Agreement Indebtedness.  Option Agreement § 4.5.

- Failure to Comply with Milestones:   Purchaser can terminate the Stalking Horse Agreement if any of the Milestones are changed.  APA § 11.1(c)(ix)-(xiii).

- **Continuity of Supply:** The Purchaser can refuse to close the transaction if it has reason to believe that any of the goods supplied by Dixie Pulp and Paper, Inc., Itochu Pulp and Paper Corp., Cmpc Usa, Inc., Resolute FP US, Inc. and Fabrica de Papel San Francisco, S.A. de C.V. will not be available to Purchaser on contractual terms satisfactory to Purchaser post-Closing. APA § 8.13.

- **Cash Flow Compliance:** Purchaser can refuse to close the transaction if immediately prior to the Closing, Sellers are not in compliance with the Approved Budget then in effect under the DIP Credit Agreement.  APA § 8.17.

- **Continuous Access to Supply of Materials:**  Purchaser can terminate the Stalking Horse Agreement if at any time prior to the Auction, Purchaser determines there is a reasonably possibility of losing continuous supply under and delivery of the goods and services purchased under Contracts set forth on Schedule 2.6(a).  APA § 11.1(c)(xiv).

- **Credit Bid:** Purchase can terminate the Stalking Horse Agreement, if, for any reason, the Purchaser is unable to credit bid the full amount of the Liabilities under the Prepetition Credit Agreements and the DIP Credit Agreement in satisfaction of all or any of the Purchase Price in accordance with section 363(k) of the Bankruptcy Code. APA § 1.11(c)(xvi).

15.     Unsecured creditors are to receive no meaningful recovery under the Stalking Horse Agreement.  The only "Cash Component" of the Purchase Price includes any undrawn amounts under the DIP Loan plus the Wind Down Amount, in the amount of up to $500,000.  *See* APA § 3.1.  No cash consideration or equity is set aside for unsecured creditors.

## B.     *The Bid Procedures*

16.     At a minimum, each bid (a "Bid") seeking to acquire all of the Debtors' assets that are the subject of the Stalking Horse Bid must have a Purchase Price that has a monetary value equal to or greater than the Purchase Price (*i.e.*, the Credit Bid, Cash Component, Assumed Liabilities and Wind-Down Payment), plus an initial overbid of up to $7,750,000 (the "Initial Overbid"), consisting of the sum of the Break-Up Fee, the Expense Reimbursement, and $500,000. The Debtors seek approval of bid protections (the "Bid Protections") comprised of the Break-Up Fee equal to 3% of the Purchase Price ($5,250,000) and an expense reimbursement of all actual and necessary costs, expenses, and fees incurred by the Stalking Horse or the Stalking Horse's

subsidiaries that will receive title to any of the Acquired Assets in an amount up to $2 million. Subsequent overbid increments will be in the amount of $500,000 (the "<u>Minimum Overbid Increment</u>").  *See* Bid Procedures ¶ 3(7).

17.     The Proposed Bidding Procedures Order (the "<u>Proposed Order</u>") provides that the Stalking Horse Bidder may credit bid to the fullest extent possible under section 363(k) of the Bankruptcy Code, in its sole and absolute discretion, any portion of and up to the entire amount of Obligations owing under the Prepetition Loan Documents and the DIP Loan Documents, in the full amount of such obligations outstanding as of the date of the Auction.  *See* Proposed Order ¶ 17.  This language provides the Stalking Horse Bidder with an approximate $25 million[6] cushion that allows it to increase its Credit Bid if faced with a competing bid.

18.     The key dates and deadlines (collectively, the "<u>Milestones</u>") the Debtors seek approval of in the Sale Motion are as follows: (a) a bid deadline of June 6, 2019, at 4:00 p.m. EST (the "<u>Bid Deadline</u>"); (b) a sale objection deadline of June 5, 2019, at 4:00 p.m. (EST) (the "<u>Sale Objection Deadline</u>");  (c) an Auction date of June 10, 2019, at 10:00 a.m. (EST); and (d) a Sale Hearing date of June 12, 2019 for the Court to consider approval of the Sale to the successful bidder (the "<u>Successful Bidder</u>").[7]

---

[6] The Debtors stipulated that they owed more than $187 million to the Prepetition Lender as of the Petition Date. *See Interim DIP Financing Order*, ¶ C [Docket No. 44].  The DIP Loan includes an additional $11 million of availability, plus adequate protection payments and other claims the DIP Lenders could credit bid.

[7] While at first blush these Milestones may not appear unreasonable, in the context of these cases, where there are significant and challenging operational issues to be analyzed and potentially remedied, the proposed sale Milestones represent artificial deadlines designed to force the Debtors to hastily sell all of their assets – a sale intended exclusively to hand the Debtors' assets over to the DIP Lender/Prepetition Secured Lender – before the Debtors' operational problems can be fully identified, analyzed, and addressed.  The Committee reserves all of its rights to challenge the Milestones in these Chapter 11 Cases.

## **OBJECTION**

19.     The ultimate goal of an auction in a sale pursuant to section 363 of the Bankruptcy Code is the maximization of value realized by the bankruptcy estate.  The Court does not have to take the Bid Procedures as an all-or-nothing proposition that the Court must accept or reject *in toto*.  Rather, the Court can modify the Bid Procedures to ensure an open, fair sale process that will maximize the value to be realized by the Debtors' estates.  Unless modified as suggested herein, the Committee asserts that the Court should deny the Sale Motion at this juncture.

**A.    THE STALKING HORSE PURCHASE AGREEMENT IS NOT DESIGNED TO MAXIMIZE VALUE TO THE ESTATES AND RESULTS IN ADMINISTRATIVE INSOLVENCY.**

20.     The Stalking Horse Bid fails to provide sufficient funds to ensure the administrative solvency of these cases.  Moreover, the budget attached to the Interim DIP Financing Order (the "Budget") does not include line items for many categories of administrative claims, including those arising under Bankruptcy Code Section 503(b)(9) ("503(b)(9) Claims").[8]   Despite such a completely unacceptable outcome from the estates' and Committee's perspectives, the DIP Lender could walk away with the assets having used the chapter 11 forum and the provision of DIP Financing exclusively for their own benefit and to the detriment of all other creditors and interest holders.

21.     Here, the DIP Lender seeks to take the proposed assets with a bid chilling $175 million Credit Bid that cannot possibly lead to higher or better offers. What the DIP Lender  really seeks is the equivalent of a state law foreclosure action, but with the benefits of a "so called" section 363 free and clear order and without the burdens imposed by the Bankruptcy Code.

---

[8] The Stalking Horse Agreement includes a $2.5 million Accounts Payable Cap on certain post-petition trade payables and 503(b)(9) Claims and a $1 million Cure Amount Cap on cure payments.  APA §§ 8.15, 8.18.

22.     One thing is clear, however, the DIP Lender/ Stalking Horse Bidder should not get a free option to run a sale process solely for their benefit while leaving other creditors of the Debtors holding the proverbial empty bag.  The DIP Lender made the affirmative choice to fund the bankruptcy and serve as the DIP Lender. They must, in turn, be required to ensure that the Debtors' estates are administratively solvent following the sale process where they propose to take their assets in return for rich Bid Protections and very little, to no, additional cash to the Debtors. Accordingly, as part of the sale process and Stalking Horse Agreement there should be a specific post-closing budget and waterfall that sets forth all anticipated administrative expenses and confirms that the Debtors' estates will have sufficient cash to make payments for all administrative expenses not assumed as part of the Sale.

23.     The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).  The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.  *See e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).  To accomplish that goal, bankruptcy courts have discretion and latitude in approving how such sale is conducted.  *See In re Wintz Companies*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets.").

24.     Section 363 asset sales should not be used to circumvent the protections for unsecured creditors mandated by the Bankruptcy Code.  *In re WestPoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005), *aff'd in part, rev'd in part on other grounds,* 600 F.3d 231 (2d Cir. 2010)

(stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures"); *In re Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.")).

25.    In addition, the Court should not allow the bankruptcy process to be used if it only benefits a secured creditor.  *See In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *see generally In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (reversing order authorizing section 363 sale of substantially all of a debtor's assets because if sale was approved there would be "little prospect or occasion for further reorganization."); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (bid procedures motion finding that section 363 sale served no legitimate business purpose when debtor admitted that it would convert the case to chapter 7 following the sale and not have adequate funds to proceed with an administratively solvent estate).

26.    Consistent with these themes, Courts have held that a secured lender cannot benefit from a section 363 sale unless they are willing to "pay the freight."  In other words, to obtain the benefits of bankruptcy, the secured lender must ensure that the debtor's estate is administratively solvent after the sale.  *See In re Golden Cnty. Foods, Inc., et al.,* Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015), ECF No. 175 (final DIP financing order required that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt); Hr'g Tr. at 11:22-24, *In re Family Christian, LLC et al.*, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) (the Court

stated: "I think we'll have a problem at the sale hearing if the administrative expenses are not to be paid in connection with the sale.");[9] Hr'g Tr. at 100:17-20, *In re NEC Holdings Corp., et al.* Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate.");[10] Hr'g Tr. at 23:25-24:22, *In re Townsends, Inc., et al.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (in response to the statement of debtors' counsel that section 503(b)(9) claims would not be paid in full, the Court stated: "***Well, we've got a problem.   Not going to run an administratively insolvent estate.***" (emphasis added).[11]

27.    The Prepetition Lender/DIP Lender should not be permitted to use this Court and the chapter 11 process to liquidate or foreclose on their collateral for their sole benefit.  *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 54, 56, 58 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and which would render the estate administratively insolvent, noting that an "asset sale can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own"). Not only will the proposed sale process and Bid Procedures lead to the Debtors' eventual liquidation and wind down either through conversion to chapter 7 or a plan of liquidation,[12] but the Debtors <u>appear</u> to admit that even prior to a sale closing, the Debtors will be administratively insolvent.  While the Committee is hopeful that the Debtors and the Stalking Horse will provide a proposal that will:  (a) satisfy all chapter 11 administrative expenses,

---

[9] A copy of the relevant pages of the transcript is annexed hereto as **Exhibit A**.
[10] A copy of the relevant pages of the transcript is annexed hereto as **Exhibit B**.
[11] A copy of the relevant pages of the transcript is annexed hereto as **Exhibit C**.
[12] Based on the amount of the Wind Down Payment, the Debtors will have no means to fund a liquidating plan process or to achieve confirmation of a liquidating plan.

including, but not limited to, 503(b)(9) Claims, and (b) provide for a recovery to unsecured creditors—until at least one of these parties agrees to backstop the payment of all administrative expenses, neither the Bid Procedures, the Stalking Horse Agreement, the Option Agreement nor any sale should be approved.

**B.     CREDIT BIDDING SHOULD NOT BE PREAPPROVED AT THIS TIME AND ANY CREDIT BID MUST BE SUBJECT TO THE COMMITTEE'S CHALLENGE RIGHTS.**

28.     In the Sale Motion, the Debtors assert the DIP Lender is entitled to credit bid some or all of the claims secured by its collateral, pursuant to section 363(k) of the Bankruptcy Code. Sale Motion, ¶ 80.  The Proposed Order provides the Stalking Horse can credit bid its debt to the fullest extent allowed by section 363(k) of the Bankruptcy Code. Propose Order, ¶ 17.   The Proposed Order fails to provide for any reservation of rights with respect to the rights of parties in interest, namely the Committee, to exercise challenge rights.

29.     At a minimum, to the extent the Court allows the Prepetition Lender to credit bid and the Bid Procedures to go forward, the Committee's right to object to the credit bid should be preserved given that under the proposed Final DIP Order, the Prepetition Lender's liens remain subject to the Committee challenge rights.

30.     Where the Prepetition Lender's liens have not been proven valid, courts have prevented or conditioned the lender's ability to credit bid or put in place certain protections that safeguard a debtor's unsecured creditors.  Moreover, this Court has previously exercised its authority under section 363(k) of the Bankruptcy Code to restrict credit bids for "cause."  *See, e.g., In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60–61 (Bankr. D. Del. 2014) ("the right to credit bid is not absolute"); *See also e.g., In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (capping lender's credit bid in light of questionable liens); *In re RML Development, Inc.*, 528 B.R. 150, 157 (Bankr. W.D. Tenn. 2014); *In re Akard*

*St. Fuels, L.P.*, No. CIV.A.3:01-CV-1927-D, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid and allowing sale free and clear of all liens under section 363(f)(4) where lender's liens were subject to a challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996), *subsequently aff'd sub nom. McMullan v. Nat'l Bank of Commerce*, 162 F.3d 1164 (8th Cir. 1998) ("At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interests under [section 363(k)] because the validity of its liens and security interests are unresolved"); *In re Miami Gen. Hosp., Inc.*, 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens).   While the risk of chilling bidding, by itself, might not be sufficient to restrict credit bidding, credit bidding should not be permitted to the extent that a purchaser seeks to use credit bidding as a means of depressing the sale price of the Debtors' assets.   *See In re: Aéropostale, Inc.*, 555 B.R. 369, 417–18 (Bankr. S.D.N.Y. 2016).

31.   As more fully discussed in the Committee's Objection to the Debtors' DIP Financing Motion (filed contemporaneously herewith), there are numerous issues related to the Debtors' proposed DIP financing in this case and the woefully inadequate Budget which fails to account for all of the 503(b)(9) Claims, (ii) accrued postpetition trade payables, (iii) accrued expenses and professional fees, including the Transaction Fee for the Debtors' investment banker, (iv) a wind-down post-closing budget, and (v) the Committee's professional fees.   Given the display of inequitable conduct demonstrated by the DIP Lender's unwillingness to commit to fund these Chapter 11 Cases at a level that will avoid administrative insolvency, cause exists to deny the DIP Lender/ Stalking Horse Purchaser the right to credit bid.

32.     Additionally, based on the foregoing, the Committee requests the Court exercise its power under section 363(k) of the Bankruptcy Code to preserve the Committee's right to investigate the Prepetition Lender's liens and object to any Credit Bid submitted in these Chapter 11 Cases.  Otherwise, entry of an order permitting a Credit Bid is tantamount to an order approving the nature, extent and validity of the lien claim and may also prevent litigation against the DIP Lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling or other litigation claims.  *See generally In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006).  For the same reasons, the Prepetition Lender/ DIP Lender should not receive payment from the proceeds of any Sale until such time as their liens are determined to be valid and not subject to challenge.

33.     The relief requested herein is particularly appropriate in these chapter 11 cases. The Committee was only recently formed on April 15, 2019 and the Committee has not had adequate time to investigate the extent, validity, priority, and perfection of the Prepetition Lender's alleged liens.  The Committee's challenge and lien review period will not expire until shortly after the contemplated Auction and Sale hearing.  Moreover, any action challenging the Prepetition Lender's liens (or asserting other causes of action) brought by the Committee will most likely not be resolved until after any closing of a Sale.

34.     Accordingly, the Committee merely seeks to preserve the status quo pending completion of its lien review, and the Proposed Order should be modified to reflect that (1) the Committee's right to object to the Stalking Horse Credit Bid is preserved and (2) any Credit Bid is limited to the amount of the DIP Claim which is ***not*** subject to a challenge or pending challenge deadline.

C.    **THE CONDITIONALITY OF THE STALKING HORSE BID WILL CHILL BIDDING.**

35.    The Stalking Horse Agreement, according to the Debtors, constitutes an agreement with the Stalking Horse to sell substantially all of the Debtors' assets.  Indeed, in the Sale Motion, the Debtors submit that "a prompt sale of the Assets may represent the best option available to maximize value for all stakeholders in these Chapter 11 Cases."  Sale Motion, ¶ 12.  Any conclusion, however, that the Stalking Horse Agreement guarantees a final sale of the Debtors' assets is incorrect.  The terms of the Stalking Horse Agreement contradict the stated goal of closing the Sale.  Note only is the Stalking Horse Bid merely an "offer" at this juncture, as set forth above, the Stalking Horse Purchaser has numerous "outs" including the ability to breach the Stalking Horse Agreement and the Debtors' only remedy for such breach is liquidated damages in the form of a $1 million reduction in the Prepetition Credit Agreement Indebtedness.  The Stalking Horse is essentially free to walk away from the Stalking Horse Agreement and renegotiate its deal at any time.

36.    The conditionality of the Stalking Horse Bid (including exercise of the Option under the Option Agreement) belies the notion that the DIP Lender's bid could serve the traditional purpose of a stalking horse bid - that is, to serve as a catalyst for other bids and to act as the definitive transaction in the event no other bidders surface.

37.    Moreover, the Stalking Horse Bid fails to set an easily identifiable bid floor, and as a result may further chill bidding.  The Stalking Horse Agreement sets a Purchase Price which is a moving target and is comprised of a Credit Bid in the amount of $175 million plus additional amounts outstanding under the DIP Loan, in addition to the assumption of the Assumed Liabilities, the Cash Component and the Wind Down Payment.  The Initial Overbid provision requires that each Bid must have a monetary value equal to or greater than the Purchase Price (i.e., the Credit

Bid, the Assumed Liabilities, the Cash Component and the Wind-Down Payment), plus $7.75 million in cash.  *See* Bid Procedures ¶ 3(7).  Because no estimates are included on the Assumed Liabilities or Cash Component, and there are no caps on the amount of the Credit Bid, it is nearly impossible for potential bidders to understand or identify the bidding floor and calculate their Initial Overbid.  This issue is magnified by the fact that the Stalking Horse has an additional $25 million cushion (or more)[13] that allows it to increase its Credit Bid when faced with a competing bid.

38.    The collective culmination of these items is that the contingent nature of the Stalking Horse Agreement creates instability and uncertainty, which may further chill competitive bidding and deter prospective purchasers.

## D.    THE BID PROTECTIONS ARE INAPPROPRIATE, CHILL BIDDING, AND CANNOT BE APPROVED.

39.    In light of the conditional nature of the Stalking Horse Bid and the various outs described herein, the Stalking Horse Agreement's Break-Up Fee and Expense Reimbursement are completely inappropriate and warrant denial of the Sale Motion.  The Committee understands that incentives are often employed to encourage a potential purchaser to act as a stalking horse bidder, and are sometimes necessary to the sale process.  Stalking horse bidders invest time, money and effort to perform due diligence and negotiate a deal.  Nonetheless, bidding incentives must benefit the estate and encourage bidding.  Here, the Debtors propose to reward the Stalking Horse handsomely for no real commitment and lessening value for the estates.

---

[13] The Interim DIP Order states "(i) the DIP Agent shall have the exclusive right to use the DIP Obligations, DIP Liens and DIP Superpriority Claim to credit bid with respect to any bulk or piecemeal sale of all or any portion of the DIP Collateral, and (ii) the Prepetition Agent (or its designee or subagent, including any Prepetition Lender or the DIP Agent) shall have the exclusive right to use the Prepetition Secured Obligations and the Adequate Protection Liens and Section 507(b) Claims to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Prepetition Collateral."  Interim DIP Order, ¶ 31 [Docket No. 44].

40.     Courts may approve only those bidding procedures that foster, and will not chill, bidder participation in the sales process. *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."). Courts must not approve bidding procedures that "undermine principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value." *In re Jon. J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).  In order for bidding procedures to encourage participation, minimum bid and bidding increments must be reasonable. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (finding minimum bid increment bearing no relation to purchase price "arbitrary and unreasonably high"); 3 COLLIER ON BANKRUPTCY ¶ 363.02[8] (16th ed. 2012) (noting that "a disproportionate bid increment would be more likely to chill bidding" than it would be to promote a fair and equitable bidding process).

41.     Here, the Stalking Horse Agreement will chill and discourage competitive bids and undermine the paramount goal of maximizing the value of the estates.

42.     Third Circuit precedent treats break-up fees and expense reimbursements identically to all other post-petition administrative expenses, and bankruptcy courts thus may award such payments only insofar as they represent "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b).  The "[a]llowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. S*ee In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).  As the *O'Brien* court noted, "[n]ot all of the purposes that break-up

fees serve in corporate transactions are permissible in bankruptcy." *Id.* at 535.  The *O'Brien* court explained that

> [a]lthough the assurance of a break-up fee may serve to induce an initial bid (permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to other bidders (an impermissible purpose).

*Id;. see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (considering "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders.").  Break-up fees, moreover, should be reasonable in light of the stalking horse bidder's risks related to the transaction.  *In re Integrated Resources, Inc.*, 147 B.R. at 662 ("A break-up fee … should be reasonably related to the *risk*, effort, and expenses of the prospective bidder.") (emphasis added).

43.    A break-up fee may be necessary to preserve the value of a debtor's estate, and thus permissible as an administrative expense, where the fee is required to induce an initial bid.  *In re Reliant Energy Channelview LP*, Case No. 09-2074, 2010 U.S. App. LEXIS 956, *12-*13 (3d Cir. 2010); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d at 535.  However, where the bidder in question would have bid anyway (or could simply foreclose on its lien on the assets), the fee is not a necessary expense of preserving the estate and is therefore impermissible under section 503(b) of the Bankruptcy Code. *See Reliant Energy Channelview LP*, 594 F.3d 200, 206-07 (3d Cir. 2010) ("[A] break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee.").

44.    The Proposed Order includes a finding of fact that the Break-Up Fee and Expense Reimbursement is an actual and necessary expense of preserving the Debtors' estates (Proposed

Order, ¶ J(b)), a paragraph approving and directing payment of the Break-Up Fee and Expense Reimbursement (Proposed Order, ¶ 8) and a paragraph ordering that the Break-Up Fee and Expense Reimbursement shall constitute allowed superpriority administrative claims (Proposed Order, ¶ 9).  The Bid Procedures Motion argues and the Proposed Order states as a finding of fact that the Break-Up Fee and Expenses Reimbursement payments are appropriate because "the Stalking Horse Bidder is unwilling to commit to purchase the Acquired Assets under the terms of the Stalking Horse Agreement without approval of the Bid Protections."  (Proposed Order, J(f)).

45.      In this case, the Break-Up Fee and Expense Reimbursement serve no purpose. Payment of such amounts cannot be necessary to entice initial interest from a party that is already serving as the Prepetition Lender and DIP Lender in these Chapter 11 Cases.  The Stalking Horse is not an independent, third party white knight coming in to set the floor for bidding at the Auction – instead it's a prepetition lender continuing to strong-arm the Debtors and deplete estate resources at every turn.  And yet, by the Sale Motion, the Debtors essentially posit that its good judgment to offer oversized Bid Protections to the Stalking Horse Bidder, a party that refuses to absorb the risks related to its prepetition investment in the Debtors.[14]  It is clear -- the Break-Up Fee does not preserve the value of the estates but rather depletes it.  The Bid Protections solely ensure that the Stalking Horse Bidder is the successful purchaser by chilling the bidding and deterring other bidders from participating in a fulsome sale process.  Moreover, there is no justification in the Bankruptcy Code to award the Bid Protections superpriority administrative status.  Accordingly, the Court should deny approval of the Bid Protections.

---

[14] The Expense Reimbursement is also inappropriate because the Stalking Horse should not be compensated for "performing due diligence activities necessitated by the Sale transactions." Sale Motion, ¶ 42. Presumably a significant amount of diligence were performed in conjunction with Orchid Investment LLC's decision to invest in the Debtors' assets and take an assignment of the Prior Prepetition Lenders' interest under the Prepetition Loan Documents on December 24, 2018.  To reimburse the Stalking Horse to do additional diligence at this time is a waste of resources and further chills the bidding.

E.      **OTHER MISCELLANEOUS OBJECTIONS.**

46.      In addition to the foregoing, while the Committee raised several of the below issues with the Debtors prior to the filing of this Objection, the Committee has not yet received assurances that the issues will be addressed in the Proposed Order.  Accordingly, out of an abundance of caution, the Committee raises the following additional objections to the Bid Procedures:

- The Stalking Horse should not be excused from making a deposit when all other bidders are required to make a 7% cash deposit.  The Bid Procedures, Bid Order and Stalking Horse Agreement must be revised to reflect that all Qualified Bidders, including the Stalking Horse, are required to make a deposit.

- A 7% cash deposit is too high and has the potential to chill bidding.  All Qualified Bidders should be required to make a deposit equal to 5% of their respective proposed purchase price.

- The Bid Procedures should be modified to provide a mechanism for evaluation of partial bids as compared to the Stalking Horse Bid.

- The Stalking Horse Agreement should be revised to clarify the amount of 503(b)(9) liabilities the Stalking Horse intends to assume in connection with the sale.

- The Stalking Horse Agreement should be modified to remove the $2.5 million Accounts Payable Cap.

- The Stalking Horse Agreement should be modified to remove the $1 million Cure Amount Cap.

- The Proposed Order must clarify that the Stalking Horse Bidder is not excused from serving as a Backup Bidder.

- In it unreasonable to require bids to be irrevocable until two (2) days following the Closing (estimated at August 16, 2019) in light of the other requirements in order to be a Qualified Bid.

- The Assumption and Assignment Notices & Procedures in the Debtors' Proposed Order should be modified to provide that any party not included on the May 14th list and which are subsequently identified shall have five (5) business days after the filing of any subsequent assumption list which identifies their contract to file a

Contract Objection (to mirror language contained in section 2.6(b) of the Stalking Horse Agreement).

- Parties should be entitled to know whether there are any Qualified Bidders before filing Sale Objections.

- The Debtors should be required to consult with the Committee prior to implementing mid-stream changes to the Bid Procedures or Auction procedures.

## **RESERVATION OF RIGHTS**

47.     The Committee reserves its right to supplement or amend this Objection and to raise additional issues with the Sale Motion and the Proposed Order at the hearing on the same, and to present evidence and/or rely on evidence that may be presented by others at the hearing on the Bid Procedures and/or at any sale hearing(s).

48.     Additionally, because the identity of the Successful Bidder(s) and the ultimate terms of any winning bid(s) are not presently before the Court, the Committee reserves the right to object to any proposed sale(s) at the appropriate time.  For the avoidance of doubt, to the extent the Court deems any issues, including, without limitation, concerning the Successful Bidder, the final terms of any asset purchase agreement(s) with respect to the Assets, successor liability, and similar claims against non-debtor third party buyers are premature and not ripe for judicial decision, the Committee reserves its rights to object to any sales or sale order(s) at the appropriate time.

**[***Remainder of this page intentionally left blank.***]**

**WHEREFORE**, unless the Bid Procedures are modified as set forth in this Objection, the Committee respectfully requests that this Court enter an order granting its Objection and denying the approval of the Sale Motion as it relates to the Bid Procedures, the Stalking Horse Agreement and Option Agreement and granting such further relief as may be just and proper.

Dated: April 26, 2019

**CKR LAW LLP**

*/s/ Marc J. Phillips*
Marc J. Phillips (No. 4445)
1000 N. West Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 367-7834
Email: mphillips@ckrlaw.com

-and-

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Jennifer Kimble, Esq.
Nicole Fulfree, Esq.
1251 Sixth Avenue, 17th Floor
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: krosen@lowenstein.com
Email: mseymour@lowenstein.com
Email: jkimble@lowenstein.com
Email: nfulfree@lowenstein.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*