## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ORCHIDS PAPER PRODUCTS COMPANY, *et al.,*[1] | Case No. 19-10729 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: April 26, 2019 at 12:00 p.m.**<br>**Hearing Date: May 1, 2019 at 10:30 a.m.** |
| | **D.I. 18 & 44** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' TO THE MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, BANKRUPTCY RULES 2002, 4001, 6004 AND 9014 AND LOCAL BANKRUPTCY RULES 2002-1, 4001-1, 4001-2 AND 6004-1 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the chapter 11 bankruptcy cases (the "<u>Chapter 11 Cases</u>") of the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>"), by and through its undersigned proposed counsel, hereby submits this objection (the "<u>Objection</u>") to the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1, 4001-2 and 6004-1 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing The Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orchids Paper Products Company, a Delaware corporation (6944), Orchids Paper Products Company of South Carolina, a Delaware corporation (7198) and Orchids Lessor SC, LC, a South Carolina limited liability company (7298). The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.

*Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. No. 18] (the "DIP Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If the Debtors and the DIP Lender[3] (which is also the Prepetition Lender and the Stalking Horse Bidder) get their way, approval of the DIP Motion on a final basis is the first step in handing the Debtors' business over to the DIP Lender/Prepetition Lender at the expense of all other stakeholders in these cases.  It is abundantly clear that the sole purpose of this proposed DIP Facility is to fund an expedited "friendly foreclosure" sale of the Debtors' assets for the exclusive benefit of the DIP Lender/Prepetition Lender rather than the estates as a whole.  More troubling, the proposed DIP Facility is insufficient, does not provide adequate funding to pay all administrative expenses that will be incurred by the Debtors' estates and leaves the Debtors' estates administratively insolvent.  Most troubling, the Debtors and the DIP Lender know that the DIP Facility is inadequate and will leave these estates administratively insolvent, yet they continue to pursue final approval of the DIP Motion without addressing the administrative insolvency.  If the Prepetition Lender (which is also the DIP Lender) intends to use the chapter 11 process to liquidate its collateral, it must fund a process that is fair and equitable to all parties in interest. Otherwise, these cases should be converted to chapter 7 cases or dismissed.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Motion, or the order granting the DIP Motion on an interim basis [D.I. No. 44] (the "Interim Order"), as applicable.

[3] Although the DIP Motion and the DIP Credit Agreement references DIP Lenders, the Committee understands that Orchids Investment LLC is the only signatory to the DIP Credit Agreement. Orchids Investment LLC is an entity owned by Black Diamond Capital Management, L.L.C. and Brant Paper Investment Company LLC.

2.      In addition to the overarching issue of administrative insolvency of these estates, under the currently proposed DIP Facility, the DIP Lender seeks various protections (and improvements to its position as the Prepetition Lender) while leaving the unsecured creditors with little chance of any recovery or confirmation that all valid administrative claims will be paid.  The DIP Facility is in direct contravention of numerous tenets of the Bankruptcy Code and will leave these estates administratively insolvent. If the DIP Facility is approved in its current form, not only will it grant the DIP Lender over-market fees but will also grant liens on all of the Debtors' remaining unencumbered assets in favor of the DIP Lender and the Prepetition Lender (which is the same entity).

3.      Given the scope of assets to be purchased by the DIP Lender under its Stalking Horse Agreement (as that term is defined in the Debtors' Sale Motion), it appears the only assets that would realistically be available for a distribution to general unsecured creditors in these cases are unencumbered assets as they existed on the Petition Date. These unencumbered assets include claims and causes of action under Chapter 5 of the Bankruptcy Code ("Avoidance Actions") and the proceeds of same, and commercial tort claims. However, the DIP Facility proposes to grant liens and superpriority claims covering all of the unencumbered assets to the DIP Lender and the Prepetition Lender for any diminution in value of the Prepetition Collateral. Further, the limited remaining available cash balance projected at the end of the budget period as set forth in the Approved Budget provides insufficient cash to fund all administrative expense claims, much less a wind-down process and exit plan for these chapter 11 cases.

4.      Pursuant to the DIP Motion, the Debtors seek authorization to obtain up to $11 million in post-petition senior secured financing (the "DIP Facility") at a real cost of 17% in interest and fees (not including the 5% Commitment Fee at a per annum rate equal to 5% on the

average daily Available Commitment through DIP Facility Termination Date) to the Debtors' estates for the commitments of new money under a revolving loan. After payment of the above-market interest and fees required by the DIP Facility, the Debtors will have access to $10 million of new money under the DIP Facility. The end result is that the Debtors are left without adequate working capital to fund their Chapter 11 cases and will be left administratively insolvent at the conclusion of the abbreviated sale process which is designed to guarantee that the Prepetition Lender/DIP Lender will be the successful bidder.

5.    Moreover, the Approved Budget attached to the Interim Order is deficient in many fundamental respects. The Approved Budget was filed with an administrative "hole" for (i) section 503(b)(9) claims, (ii) accrued postpetition trade payables, (iii) accrued expenses and professional fees, including transaction fees for the Debtors' investment banker, (iii) a wind-down post-closing budget, and (iv) the Committee's professional fees (the line item for the Committee's professionals in the Approved Budget is approximately 10% of the total amount budgeted for the professionals retained by the Debtors and the DIP Lenders). There is nothing in the DIP Motion nor the Approved Budget that contemplates payment of 503(b)(9) claims, critical vendor claims or accrued post-petition trade payable and other administrative claims outstanding at the time the proposed sale of the Debtors' assets closes. As a result, administrative claimants will bear the risk that they will be paid by the DIP Lender (in its capacity as the Stalking Horse Bidder) but only if it is the successful bidder.[4] Despite this inadequacy with the DIP Facility and the Approved Budget, the Debtors have agreed to grant a permanent section 506(c) waiver for

---

[4] The Stalking Horse Agreement submitted by the DIP Lender/Prepetition Lender provides that the Stalking Horse will purchase substantially all of the Debtors' assets for a purchase price of approximately $175,000,000 (subject to certain adjustments) plus assumption of certain liabilities, including up to $2.5 million of post-petition trade payables and 503(b)(9) Claims. *See* Stalking Horse APA, §§ 2.2, 2.4 and 8.15.

the DIP Lender and Prepetition Secured Parties who will now be free from any surcharge at any time in these cases, leaving the estates with no ability to fund the unpaid administrative costs that are being incurred to maintain their collateral pending the sale.

6.      While the Debtors and DIP Lenders have downplayed the Committee's concerns with the very real issue of administrative insolvency in these cases, the reality is that the Debtors lack the negotiating leverage to negotiate a DIP Facility that provides for the payment of all administrative expenses. Regardless, the Debtors should not be allowed to shirk their fiduciary duties by approving their entry into the DIP Facility absent material modifications to the DIP Facility and the Approved Budget.

7.      The DIP Facility also proposes to drastically expand the Prepetition Secured Lender's (who is now the DIP Lender) existing collateral package to include superpriority administrative claims and liens on previously unencumbered assets, including the proceeds of chapter 5 causes of action, while at the same time, assessing excessive fees and interest on the very modest amount of new money being provided by the DIP Facility. It also appears from the DIP Motion that the amount of new money actually being advanced under the DIP Facility is less than $11 million.  On the other hand, the value of new collateral being obtained by the DIP Lender and the Prepetition Secured Parties is unclear.  At a minimum, this important fact should be disclosed.

8.      The proposed DIP Facility further handcuffs the Debtors by imposing very restrictive time frames for the marketing and sale of the Debtors' assets.  The DIP Facility has a maturity date of no greater than six months and imposes milestones which require the Debtors to conduct a sale process and obtain Court approval of a sale in 73 days from the Petition Date. While at first blush these Milestones may not appear unreasonable, in the context of these cases,

where there are significant and challenging operational issues to be analyzed and potentially remedied, the proposed case Milestones represent artificial deadlines designed to force the Debtors to hastily sell all of their assets – a sale intended exclusively to hand the Debtors' assets over to the DIP Lender/Prepetition Secured Lender – before the Debtors' operational problems can be fully identified, analyzed, and addressed. This control-type mechanism by the DIP Lender should not be permitted.

9.      Additionally, the costs and fees of the DIP Facility are above market rate and must be modified to be brought in line with average terms of recent DIP facilities. The Debtors' concessions on above market fees and interest, combined with the failure to disclose the administrative insolvency, combined with the overreaching Adequate Protection package to the Prepetition Secured Parties, the control provisions and short Milestones, are evidence of a lack of good faith on the part of the DIP Lender, the Prepetition Secured Parties and the Debtors.

10.      In addition, certain other aspects of the relief requested in the DIP Motion are blatant overreaching by the DIP Lender at the expense of, and to the prejudice of, unsecured creditors.  It is clear that the DIP Facility will not provide for the payment of the already existing administrative expenses of these estates including, but not limited to, accrued trade payables, section 503(b)(9) claims, critical vendor payments and potential success fees sought in the retention applications of the estates' professionals.  Despite these budgetary deficiencies, the DIP Facility requires the waivers of: (i) the right to surcharge collateral for the cost and expenses associated with the preservation and disposition of the collateral under Bankruptcy Code section 506(c); (ii) the power of this Court to prevent prepetition liens from extending to post-petition proceeds of collateral "based on the equities of the case" under Bankruptcy Code § 552(b); and

(iii) the marshalling doctrine. A waiver of such critical rights is wholly inappropriate where, as here, known administrative claims are not provided for in the Approved Budget.

11. The Committee further objects to the Adequate Protection package provided to the Prepetition Secured Lender and Prepetition Agent, including the grant of replacement liens on proceeds of Avoidance Actions, superpriority administrative expense claims payable from the proceeds of Avoidance Actions, and reimbursement of fees and expenses charged by the Prepetition Secured Parties' professionals. The Prepetition Secured Parties are more than adequately protected already and should not be entitled to adequate protection liens on the proceeds of Avoidance Actions, a Section 507(b) Claim or the reimbursement of professional fees on account of their prepetition liens and interests.

12. In addition to the above, the Committee objects to the following terms and provisions of the DIP Facility and/or final order, which must be modified and/or removed:

- The releases of the Prepetition Secured Parties and/or their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees by the Debtors is too broad and the Prepetition Secured Parties or the Debtors must specifically identify the parties to be released. *See* Interim Order at ¶ 15(d).

- The Committee's Challenge Period to challenge the Prepetition Lien and Claim Matters as well as other liens, rights, claims, and interests of the Prepetition Secured Parties should be extended from 60 to 90 days from the date of the Committee formation and should be expressly subject to extension by agreement of the parties. The Committee should be granted authority and automatic standing to commence any Challenges or other proceedings to pursue any other causes of actions against the Prepetition Secured Parties, DIP Lender and their respective Agents. The Committee's budget to investigate and, if necessary, commence such a Challenge or proceeding, should be increased from $25,000 to $100,000. This amount would cover both the investigation and initiation of a Challenge or other adversary proceeding. *See* Interim Order at ¶¶ 16(a), 17.

- The absolute and exclusive right to credit bid granted to the DIP Agent, DIP Lender, Prepetition Agent and Prepetition Secured Lender is overbroad and unlimited and should not include the right to credit bid DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Section 507(b) Claims. The Committee's right to object to any credit bid by the DIP Lender, DIP Agent or

Prepetition Secured Parties, including for cause, prior to the expiration of the Challenge Deadline must be expressly preserved.  *See* Interim Order at ¶ 31.

● The proposed indemnification in favor of each Indemnified Party (as defined in the Interim Order) is too broad. The Debtors, DIP Agent and/or DIP Lender should identify the litany of parties that are the beneficiaries of indemnification as the Committee may have claims against such parties. Further, the Debtors should not indemnify and of the Indemnified Parties for any conduct arising from a successful Challenge.  *See* Interim Order at ¶ 21.

● The provision of the Interim Order allowing for amendments or modifications of the Approved Budget without further order of this Court and without notice to any parties in interest should be modified. The Debtors and DIP Lender should be required to provide the Committee at least 3 business days' notice with an opportunity to object before any amendment or modification would be effective. *See* Interim Order at ¶ 4(b), DIP Credit Agreement, § 6.25.

● The additional broad events of default that favor the DIP Lender and allow it to control the outcome of the Chapter 11 Cases including, but not limited to, events of default for violating any of the Milestones, selling assets without paying the DIP Obligations and Prepetition Secured Obligations in full.  *See* Interim Order at ¶ 29, DIP Credit Agreement, Art. 7.

● The Committee must be permitted to seek extensions of the Milestones even if they are approved by the Bankruptcy Court.

● The Debtors must be required to contemporaneously provide the Committee with all financial and other reports that the Debtors are required to provide to the DIP Lenders or the Prepetition Secured Parties (or their respective Agents) under the final order and the DIP Credit Agreement, as well as all notices provided by the DIP Lender, DIP Agent or the Prepetition Secured Parties to the Debtors.

● The Committee should be entitled to seek copies of invoices containing detailed time records of any DIP Lenders' Advisors or DIP Agent's Advisors. *See* Interim Order at ¶ 8.

● The post Carve-Out Trigger Date cap on Retained Professionals' fees is insufficient and should be increased. *See* Interim Order at ¶ 12(c).

● The proposed budget and Carveout for Committee's professional fees is inadequate.

● The provision of the Interim Order which provides for the waiver of (i) the right to surcharge the collateral of the DIP Lender or the Prepetition Secured Parties under Section 506(c) and the (ii) "equities of the case" claims or other claims under Section 552(b) also appears to insulate the DIP Lender and Prepetition Secured Parties from any obligations to fund any amounts set forth in the

Approved Budget. This inconsistency must be clarified in any final order. *See* Interim Order at ¶ 13.

Accordingly, for the reasons set forth above and in further detail below, the DIP Motion should not be approved on a final basis unless the issues raised in this Objection are adequately addressed through upsizing of the DIP Facility, modifications to the Approved Budget and modifications in any final order.

## BACKGROUND

13.     On April 1, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  No trustee or examiner has been appointed in these cases.

14.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

15.     After a hearing held on April 3, 2019 (the "First Day Hearing"), the Bankruptcy Court entered an order permitting the Debtors, *inter alia*, to borrow up to $4 million in DIP Financing (the "Interim DIP Order") [D.I. No. 44].  A hearing to approve the DIP Motion on a final basis was scheduled for May 1, 2019 at 10:30 a.m. (the "Final Hearing").

16.     On April 15, 2019, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See* D.I. 65.  The Committee is comprised of five members: (a) Dixie Pulp & Paper, Inc.; (b) Cellmark Paper, Inc.; (c) Little Rapids Corporation; (d) Packaging Corporation of America; and (e) United Steelworkers.

17.     Information regarding the Debtors' history and business operations, capital and debt structure, and the events leading up to the commencement of these cases can be found in the *Declaration of Richard S. Infantino, Interim Chief Strategy Officer of Debtors, In Support of Chapter 11 Petitions and First Day Pleadings* ("Infantino Decl.") [D.I. 19].

A.      **The Debtors' Prepetition Debt**

(i)      Prepetition Credit Facility

18.      According to the Debtors, on or about June 25, 2015, debtor Orchids Paper Products Company ("Orchids"), as borrower, U.S. Bank National Association ("USB"), as administrative agent, arranger, sole book runner and lender and the other lenders party thereto ("Prior Prepetition Credit Lenders") entered into that certain Second Amended and Restated Credit Agreement (as amended, restated, or otherwise modified from time to time, the "Prepetition Credit Agreement", and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "Prepetition Credit Loan Documents"), pursuant to which the Prior Prepetition Credit Lenders provided Orchids with an aggregate financing commitment up to $187.3 Million, consisting of a term loan commitment up to $47.3 million, a revolving loan commitment up to $25 million and a draw loan commitment up to $11.5 million (the "Prepetition Credit Agreement Loan"). The Prepetition Credit Agreement Loan has a final facility termination date of June 25, 2020.  *See* Infantino Decl. ¶ 18.

19.      The Debtors allege that the obligations under the Prepetition Credit Agreement are secured by perfected, first-priority liens ("Prepetition Credit Agreement Liens") on substantially all of the assets of Debtors Orchids and Orchids South Carolina and non-debtors Orchids Mexico Holdings, Orchids Mexico Member and OPP Acquisition Mexico, and except as otherwise permitted in the Prepetition Credit Loan Documents, have priority over all other liens. The obligations of Orchids under the Prepetition Credit Agreement are guaranteed by Debtors Orchids and Orchids South Carolina (but not debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member and OPP Acquisition Mexico. *See* Infantino Decl. ¶¶ 19-20.

      (ii)     <u>Prepetition New Market Tax Credits Loan</u>

20.     According to the Debtors, Orchids, as borrower and USB, as lender (the "<u>Prior Prepetition NMTC Lender</u>") entered into that certain Loan Agreement (as amended, restated, or otherwise modified from time to time, the "<u>Prepetition NMTC Loan Agreement</u>", and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "<u>Prepetition NMTC Loan Documents</u>")[5], pursuant to which the Prior Prepetition NMTC Lender provided Orchids with a financing commitment equal to $11,109,050 (the "<u>Prepetition NMTC Loan</u>").[6] The Prepetition NMTC Loan has a final maturity date of December 29, 2022. *See* Infantino Decl. ¶¶ 21-22.

21.     According to the Debtors, the Prepetition NMTC Loan served as the source loan for a series of transactions relating to the allocation of certain new market tax credits (the "<u>NMTCs</u>") that ultimately resulted in a loan to Orchids Lessor SC so it could acquire a new tissue QRT tissue paper machine and converting lines (the "<u>Barnwell Equipment</u>") at the Barnwell, South Carolina facility owned by Orchids South Carolina. Orchids Lessor SC leases the Barnwell Equipment to Orchids, and the lease payments are used by Orchids Lessor SC to service the secured loans. These secured loans are secured by liens on the Barnwell Equipment and the lease of such equipment by Orchids Lessor SC to Orchids. *See* Infantino Decl. ¶ 22.

22.     The Debtors further allege that the Prepetition NMTC Loan was secured by a first-priority lien on and collateral assignment of (the "<u>Prepetition NMTC Loan Agreement Liens</u>") the loan documents evidencing the leverage loan by Orchids to USBCDC (the

---

[5] The Prepetition Credit Loan Documents and the Prepetition NMTC Loan Documents are collectively the "Prepetition Loan Documents".

[6] The Prepetition NMTC Loan and the Prepetition Credit Agreement Loan are collectively the "Prepetition Loans".

"Prepetition NMTC Loan Agreement Collateral").[7] *See* Infantino Decl. ¶ 23. The Prepetition NMTC Loan to Orchids is guaranteed by Orchids South Carolina, (but not Debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member and OPP Acquisition Mexico. *See* Infantino Decl. ¶ 24.

23.     According to the Debtors, both the Prepetition Credit Agreement and the Prepetition NMTC Loan Agreement have been amended on multiple occasions as detailed in the Infantino Declaration. *Id.*, ¶¶ 25, 27.  Among other things, the Prepetition Credit Agreement was amended to:

- Obligate Orchids to retain financial consultants acceptable to Prior Prepetition Lenders and to retain consultants and/or advisors to assist Orchids to formulate a strategic plan to facilitate repayment of obligations under the Prepetition Credit Agreement with certain milestone dates;

- Require Orchids to retain a Chief Strategy Officer ("CSO") to report to the Board of Directors and to continue to retain Guggenheim Securities LLC as an investment banker to assist with the sale of Orchids' business with certain related milestones;

- Extended the milestones related to a sale; and

- Require Orchids to retain Houlihan Lokey Capital, Inc. ("Houlihan") as a replacement investment banker.

24.     Subsequent to the assignment of the Prepetition Loan Documents by the Prior Prepetition Lenders to Orchids Investment LLC, the Prepetition Credit Agreement and NMTC Loan Agreement were both amended to, among other things, extend the milestones related to a sale of Orchids' business. *See* Infantino Decl. ¶ 27.

---

[7] The Prepetition NMTC Loan Agreement Collateral and the Prepetition Credit Agreement Collateral are collectively the "Prepetition Collateral".

(iii)    <u>Assignment of Prepetition Loan Documents</u>

25.    On or about December 24, 2018, the Prior Prepetition Lenders assigned their interests under the Prepetition Loan Documents to Orchids Investment LLC (the "<u>Prepetition Secured Lender</u>") and the Prepetition Secured Lender appointed Black Diamond Commercial Finance L.L.C as the new Administrative Agent (the "<u>Administrative Agent</u>," and together with the Prepetition Secured Lender, the "<u>Prepetition Secured Parties</u>"). The Prepetition Secured Lender is now the current owner and holder of the Prepetition Loans and the Prepetition Loan Documents and the beneficiary of the Prepetition Liens against the Prepetition Collateral. *See* Infantino Decl. ¶ 26.

26.    In the Interim Order, the Debtors stipulated that, as of the Petition Date, the aggregate principal amount owed by the Debtors under the Prepetition Financing Documents (as that term is defined in the Interim Order) was not less than $187,845,838.04, plus all accrued or accruing and unpaid interest and fees and any additional amounts, charges, fees and expenses (including any attorneys' fees, accountants' appraisers' and financial advisors' fees and expenses) now or hereafter due under the Prepetition Financing Documents.  *See* Interim Order, ¶ C, ¶ 15(c).

27.    In the Interim Order, the Debtors also stipulated that with respect to the Prepetition Collateral, the Prepetition Secured Parties have valid, duly-authorized, perfected, enforceable, non-voidable and binding security interests in, and liens on, substantially all of the Prepetition Collateral as of the Petition Date, (with the Prepetition Secured Parties holding junior liens on all Collateral), including Cash Collateral.   *See* Interim Order, ¶ C, ¶ 15(a).

28.    Neither the DIP Motion nor the Infantino Declaration provide any details as to any other prepetition indebtedness of the Debtors as of the Petition Date and the Debtors have

not yet filed their schedules of assets and liabilities and statements of financial affairs (the "Statements and Schedules")[8].

29.     According to the Debtors, the Company had total cash on hand as of the Petition Date of approximately $2.9 million. Infantino Decl. ¶114.

**B.      The DIP Motion**

30.     On the Petition Date, the Debtors filed the DIP Motion.  On April 4, 2019, the Court entered the Interim Order approving the DIP Motion on an interim basis.  The Interim Order authorized the Debtors to borrow up to $4 million on an interim basis (the "Interim DIP Facility") and to use Cash Collateral of the Prepetition Secured Parties (which shall not include loan proceeds of the DIP Facility) in accordance with the Approved Budget.  The Debtors assert that the DIP Facility and use of Cash Collateral is necessary to, among other things, pay the costs and expenses associated with administering the Chapter 11 Cases, continue the orderly operation of the Debtors' business, maximize and preserve the Debtors' going concern value, make payroll and satisfy other working capital and general corporate purposes, in accordance with the Approved Budget. Interim Order, ¶ D; DIP Motion, ¶ 5; Infantino Decl. ¶ 116.

31.     The essential terms of the proposed DIP financing and use of Cash Collateral include:

Milestones/Termination Date: The DIP Facility terminates on September 30, 2019, or any earlier date on which the Aggregate Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

The proposed DIP Credit Agreement also contains several key milestones for the Debtors (the "Milestones") which include:

---

[8] On the Petition Date, the Debtors filed a motion to extend the time to file their Statements and Schedules (the "Extension Motion") for a period of thirty (30) days. If the Extension Motion is granted, the Statements and Schedules will not be filed until May 29, 2019.

- file a sale motion by April 1, 2019,

- obtain Court approval of bidding procedures by May 5, 2019,

- obtain bids by June 6, 2019,

- conduct an auction by June 10, 2019,

- obtain Court approval of the Sale Motion by June 12, 2019, and

- effectuate a closing on the sale by no later than August 16, 2019.

<u>Interest Rate and Fees</u>:   The Debtors agree to pay to the Administrative Agent the following interest and fees:

- Interest Rate:  per annum rate equal to 12.0%;

- Default Rate:  per annum rate equal to 2% higher than non-default rate;

- Commitment Fee: per annum rate equal to 5% on average daily Available Commitment through DIP Facility Termination Date;

- Closing Fee: 2.5% of aggregate principal amount of Commitments as of DIP Loan  closing date;

- Termination Fee: 2.5% of aggregate principal amount of Commitments, payable on DIP Facility Termination Date; and

- payment of the prepetition and postpetition fees and expenses of professionals and advisors for both the Prepetition Secured Parties and the DIP Lenders (the "<u>Lenders Professional Fees</u>").

<u>Prepetition Agent and Prepetition Secured Parties Adequate Protection Package</u>:

- Prepetition Agent and Prepetition Secured Parties would receive adequate protection in the form of:

  - Adequate Protection Liens;
  - Section 507(b) Claims; and
  - Payment of fees and expenses of attorneys and advisors to the Prepetition Secured Parties.

<u>Liens and Superpriority Claims on Avoidance Actions and Other Claims</u>:  The DIP Facility and Interim Order provides for the granting of liens and superpriority claims on the proceeds of all Chapter 5 causes of action (the "Avoidance Actions").

<u>Carve Out</u>:  The post-default Carve-Out for professional fees of the Retained Professionals of the Debtors and Committee is $500,000.

Challenge Deadline:  The lien challenge deadline is 60 days from formation of the Committee and the Committee's investigation budget is $25,000.  The Committee is not granted standing to prosecute a Challenge.

Waivers:  The Interim Order includes waivers of the right to surcharge collateral under sections 506(c) and 552(b) and the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

## OBJECTION

32.     Courts recognize that parties negotiating post-petition financing have unequal bargaining power, and a debtor often is not the best party to ensure that the proposed terms of a DIP facility are fair and in the best interest of all of its creditors, particularly its unsecured creditors.  *See, e.g., In re Texlon Corp.*, 596 F.2d 1092, 1098 (2d Cir. 1979) ("The debtor in possession is hardly neutral.  Its interest is in its own survival, even at the expense of equal treatment of creditors.").

33.     Post-petition financing should be approved only if "the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."  *In re Ames Dep't Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Courts considering whether to approve postpetition financing have "focused their attention on proposed terms that would tilt the conduct of the bankruptcy case [and] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors[.]"  *See Id.* at 37-38.  *See also In re MidState Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

34.     Application of these legal principles to the facts of these cases demonstrates that the terms of the DIP Facility are unduly prejudicial to the rights of both administrative creditors and unsecured creditors and are not in the best interests of the Debtors' estates.  In fact, approval of the DIP Motion and the DIP Facility on a final basis only benefits the DIP Lender (who is also the Prepetition Lender and Stalking Horse Bidder) because it also effectively means the Milestones for the sale of the Debtors' assets are approved, which Milestones are designed to solely benefit the Stalking Horse Bidder.  Similarly, approval of the DIP Facility on a final basis also means administrative creditors will effectively be financing these cases and will bear all of the risk that there will be funds available to pay their claims at the conclusion of the sale process. Finally, approval of the DIP Motion and DIP Facility as currently proposed also guarantees that unsecured creditors will be left with virtually no recovery on account of their prepetition claims. Thus, in its current form, the DIP Facility should not be approved.

35.     The Committee has learned that the Approved Budget submitted with the Interim Order does not include line items for many categories of administrative claims and does not provide for the payment of various administrative expenses, and therefore, does not account for all accrued post-petition trade payables that accrue during the Chapter 11 Cases. As the DIP Credit Agreement and the Interim Order specifically provide that the Debtors shall not pay any expenses other than those set forth in the Approved Budget, the exclusion of these line items in the Approved Budget means the DIP Lender will have no obligation to pay them.

36.     Further, based on the Committee's estimates, which have been reviewed with the Debtors' professionals, the DIP Facility is inadequate to satisfy the current estimate of accrued post-petition trade payables, section 503(b)(9) claims, critical vendor claims and other costs of administration of these estates.  This is particularly problematic here as the DIP Lender, which is

also the Prepetition Lender and the Stalking Horse Bidder, intends to "purchase" the Debtors'
assets through a credit bid of the DIP Obligations, DIP Liens, DIP Superpriority Claim,
Prepetition Secured Obligations, Adequate Protection Liens and Section 507(b) Claims, leaving
little to no funds available for the estates post-sale.

37.    The Prepetition Lender/DIP Lender should not be permitted to use this Court and
the chapter 11 process to liquidate or foreclose on their collateral for their sole benefit. *See In re
Encore Healthcare Assocs.*, 312 B.R. 52, 54, 56, 58 (Bankr. E.D. Pa. 2004) (denying bidding
procedures motion because court would not approve the sale, "the sole purpose of which was to
liquidate assets for the benefit of the secured creditor," and which would render the estate
administratively insolvent, noting that an "asset sale can easily be accomplished outside of
bankruptcy either with the consent of the secured creditor or by abandoning the asset to the
secured creditor to sell on its own"). Because the Prepetition Secured Lender/DIP Lender is
benefitting by liquidating or purchasing its collateral through the Chapter 11 Cases, they should
in turn be required, at the very least, to ensure that the Debtors' estates are administratively
solvent.

38.    Several courts in this district and others have concluded that adequate provision
must be made to assure that administrative expenses will be paid in full before debtor-in-
possession financing can be approved.  For example, in *In re Townsends, Inc.*, when the debtors
proposed DIP financing that would pay most administrative claims but leave section 503(b)(9)
Claims behind, Judge Sontchi stated, "if it appears that the case is administratively insolvent, I
would be inclined to . . .  either convert or dismiss the case . . . . " Tr. at 23:25-24:22, *In re
Townsends, Inc.*, et al., Case No. 10-14092 (Bankr. D. Del. January 21, 2011).[9]  *See, e.g.,* Tr. at

---

[9] A copy of the relevant pages of the transcript is attached hereto as **Exhibit A**.

100:17-20, *In re NEC Holdings Corp.*, *et al.,* Case No. 10-11890 (Bankr. D. Del. July 13, 2010)[10]; Tr. at 10:1-12:22, *In re Family Christian, LLC et al.*, Case No. 15-00643 (Bankr. W.D. Mich. April 14, 2015).[11]  As a result of the *Townsends Court's* refusal to approve DIP financing that did not provide for payment in full of Section 503(b)(9) Claims, the court approved the DIP financing based on a revised budget that included a carve-out with sufficient funds to pay the Section 503(b)(9) Claims in full.  *See In re Townsends, Inc.*, et al., No. 10-14092*, Docket No. 227 (Bankr. D. Del. Jan. 28, 2011); *see also In re Golden County Foods, Inc., et al.,* Case No. 15-11062 (KG), Docket No. 175 at ¶ 31(Bankr. D. Del. June 22, 2015) (final DIP financing order required that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of alleged prepetition secured debt).

39.    While the Committee is hopeful that the Debtors, DIP Lender and Prepetition Secured Parties will propose and agree to an amended  budget that will:  (a) satisfy all chapter 11 administrative expenses, including, but not limited to, accrued post-petition trade payables, Section 503(b)(9) Claims, and professional fees, and (b) provide for a recovery to unsecured creditors — the DIP Facility should not be approved on a final basis until there is an assurance that these Chapter 11 Cases will be administratively solvent.  The Prepetition Secured Parties cannot use the bankruptcy process to liquidate their collateral if they do not "pay the freight."

A.    **The DIP Facility Inappropriately Grants Liens and Superpriority Claims on Previously Unencumbered Assets, including Avoidance Actions and Proceeds.**

40.    The Committee objects to liens, superpriority claims, adequate protection claims and any other claims being granted upon entry of a final DIP order on any previously unencumbered assets, including, but not limited to, (i) Avoidance Actions, (ii) proceeds of

---

[10] A copy of the relevant pages of the transcript is attached hereto as **Exhibit B**.

[11] A copy of the relevant pages of the transcript is attached hereto as **Exhibit C**.

Avoidance Actions; (iii) any assets of the Debtors located abroad; (iv) any assets excluded from the Prepetition Credit Agreement; (v) any assets of foreign affiliates; (vi) causes of action against directors and officers, related insurance policies and the proceeds of those policies; (vii) property and business interruption insurance proceeds; (viii) commercial tort claims; and (ix) NOLs and tax refunds, if any.  To the extent that the DIP Facility includes a provision requiring the Final Order to grant the DIP Agent, on behalf of the DIP Lender, as well as Prepetition Secured Parties, a lien or superpriority claim on such unencumbered assets, such provision is objectionable and should not be included in a final order.  The value of previously unencumbered assets, including Avoidance Actions and the proceeds thereof, should be preserved for the benefit of the Debtors' general unsecured creditors.

41.    It is well established that avoidance actions can only be exercised for the benefit of the Debtors' estates.  *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002).  The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors.  *In re Integrated Testing Prods. Corp*., 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . ."  Given that avoidance actions and their proceeds are designed to protect the interests of all creditors, the final order should not grant liens or superpriority claims on such assets.

**B.    The Milestones and Term of the DIP Facility Are Unreasonably Short.**

42.    One of the most troubling and prejudicial features of the DIP Facility are the expedited Milestones, case controls and unreasonably short maturity date in light of the circumstances specific to these cases.  Rather than engage in an expedited sale process, as part of

their chapter 11 proceedings, the Debtors should conduct a comprehensive <u>operational</u> analysis and assessment of the ongoing problems at their recently opened facility in Barnwell, South Carolina (the "<u>Barnwell Facility</u>") and the Barnwell Equipment in order to determine the time and costs to address those issues. The Milestones for effectuating a sale of the Debtors' assets, including the Barnwell Facility, along with the other deadlines contained in the DIP Facility, do not allow sufficient time for the Debtors or the Committee to undertake the necessary review and analysis to address the operational issues or to fully develop a plan that considers all strategic alternatives, rather than the hasty "friendly foreclosure" process required by the DIP Facility.

43.     In short, the Milestones are artificial deadlines that provide no benefit other than to the DIP Lender and Prepetition Secured Parties by granting them unfair dominance and control over the chapter 11 cases and ensuring that the sale process benefits them. Such provisions have no place in the DIP Facility.  The DIP Lender is being well compensated (and even overcompensated) – in the form of interest, numerous fees, professional fees, new collateral and superpriority claims, among others – for providing minimal post-petition financing to the Debtors.  They should not also be permitted to use the DIP Facility as a means to seize control over the sale process and other fundamental decisions regarding how these Chapter 11 Cases should proceed.  For these reasons, the Court should not approve the DIP Motion on a final basis unless the Milestones and control provisions are removed.

**C.     The Interest and Fees Charged under the Proposed DIP Facility are Above Market and Unwarranted.**

44.     The Debtors must demonstrate that they have exercised reasonable business judgment in seeking approval of the DIP financing.  *In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011).  As set forth herein, the Committee questions the adequacy of the proposed financing on the terms set forth by the Debtors.  It is clear that the interest and fees

being charged under the DIP Facility (the "DIP Pricing") are above-market compared to other recent DIP financing facilities and should be reduced.

45.     When one considers the amount of new money being drawn on the DIP Facility over the eighteen week period according to the Approved Budget and assuming average borrowings of $5.4 million during that time frame and the amount of interest and fees being paid on that amount, the Debtors will effectively be paying a 50% annualized rate on those funds. This effective annualized rate is simply too high and should be reduced.

46.     The Committee believes that the proposed fees and interest to be charged by the DIP Lenders are higher than those charged in comparable Chapter 11 cases filed during the past year.

47.     Further, as adequate protection under the DIP Facility, the Debtors will be required to pay professional fees and expenses to various professionals, including advisors to the DIP Agent and DIP Lender, as well as advisors to the Prepetition Agent and Prepetition Lenders. Interim Order, ¶¶ 8(b),19(c).   This appears excessive given that the DIP Lender and the Prepetition Lender is the same party and is the party that stands to benefit most from approval of the DIP Facility, including through the improved lien and collateral position with respect to unencumbered assets.

48.     Moreover, the Debtors will also be obligated to pay success/completion fees for the Debtors' financial advisor and investment banker as well.   The Committee understands that such fees have not been included in the Approved Budget.

49.     Given that the DIP Lender is being more than adequately protected through the DIP Facility, it should not also be entitled to above-market interest and fees.   Accordingly, the

DIP Motion should not be approved unless and until the interest and fees to be charged are reduced in the DIP Facility to market based rates.

**D.      The DIP Facility is Not Proposed in Good Faith.**

50.     Moreover, the failure to provide for payment of all administrative expenses, the fees and interest, the Milestones and the control provisions being imposed by the DIP Lender are evidence of a lack of good faith.  In determining whether to approve a postpetition financing proposal, the Court must also examine, among other things, whether the financing was negotiated in good faith and at arm's length by the debtor, on the one hand, and the lender, on the other hand.  *See, e.g., In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). "Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code," credit is not being extended in good faith.  *See In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982).  Additionally, where a lender extends credit with an "ulterior purpose," such extension is not in good faith.  *Id*. at 949.  The party seeking to establish good faith bears the burden of proof.  *Colad Grp.* 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005) (finding that debtor failed to carry affirmative burden to establish good faith of the proposed financing transaction; the presence of offensive terms and conditions in the financing agreement created uncertainty as to lender's intent and rendered inappropriate a finding of good faith); *see also In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990) (good faith under Bankruptcy Code section 364(e) should not be presumed); *In re Tamojira, Inc.*, 212 B.R. 824, 826 (Bankr. E.D. Va. 1997) (same).

51.     In *In re The Colad Group*, the proposed postpetition priming loan included fees that did not represent any reasonable cost to the lender and an excessive interest rate, both of which might increase the amount that the lender could credit bid in connection with a later sale of the debtor's assets.  324 B.R. at 221-23.  The *Colad* Court stated that "such machinations

would be commercially unreasonable outside bankruptcy.  Investors may not use the bankruptcy process to obtain respectability for otherwise suspect efforts to influence a bidding process." *Id*. at 223.  The Court therefore rejected the proposed financing.  *Id*.

52.    Here, the Debtors and the DIP Lender cannot carry their burden of proof with respect to the good faith of the DIP Facility.  The DIP Facility's above-market fees, outcome determinative provisions and inadequate funding of all administrative expenses represent lender overreaching.  The various restrictive terms and Milestones proposed by the DIP Lender and accepted by the Debtors evidence an "ulterior purpose" by the DIP Lender/Prepetition Lender/Stalking Horse Bidder to acquire the Debtors at below market value while trampling the rights of all junior creditors in chapter 11. This precludes a finding of good faith and the DIP Lender and Prepetition Secured Parties are not entitled to the protections of Section 364(e).

**E.    The DIP Facility and Budget Must Provide for the Payment of Administrative Expense Claims, or No Waivers of (a) Surcharge Rights under Bankruptcy Code § 506(c), (b) Rights Under Bankruptcy Code § 552(b) Related to the "Equities-of-the-Case", and (c) the Marshalling Doctrine Should be Permitted.**

53.    The Committee objects to waivers of:  (i) the Debtors' right to surcharge for the cost and expenses associated with the preservation and disposition of Prepetition Secured Parties' prepetition collateral, (ii) the power of the Court to prevent prepetition liens to extend to post-petition proceeds of collateral "based on the equities of the case", and (iii) the marshalling doctrine.  *See* Interim DIP Order, ¶¶ 13, 32.

54.    The Bankruptcy Code § 506(c) waiver serves no purpose other than to eliminate a potential avenue of recovery for the Debtors' estates by ensuring that the costs of the Debtors' restructuring will be borne by the unsecured creditors alone.  A chapter 11 case should not be administered for the sole benefit of secured lenders.  *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process from

one designed to benefit all creditors to one designed for unwarranted benefit of the postpetition lender"). *See also In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991) (prohibiting benefiting a lender at the expense of the other unsecured creditors); *In re Ames Dep't. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.*, 104 B.R 562, 568 (Bankr. D.N.H. 1989); *Kivitz v. CIT Group/Sales Fin., Inc.,* 272 B.R. 332, 334 (D. Md. 2000) (creditors should not be required to bear the cost of protecting property that is not theirs; the secured party must bear the cost of preserving or disposing of its own collateral).

55.     Courts routinely reject attempted waivers of surcharge rights under section 506(c) of the Bankruptcy Code.  Moreover, the waiver contravenes the intent behind section 506(c) of the Bankruptcy Code.  *In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *see also In re Motor Coach Indus. Int'l, Inc.*, Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [D.I. No. 244] (removing a section 506(c) waiver from the final post-petition financing order after the creditors' committee objected to its inclusion); *In re Fedders North America, Inc.,* Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [D.I. No. 272] (a section 506(c) waiver in the interim post-petition financing order was removed from the final post-petition financing order after the creditors' committee objected to its inclusion).

56.    The effect of the section 506(c) waiver is inappropriate, especially here where the

Approved Budget does not provide for payment of all administrative claims such as 503(b)(9)

claims and potentially all professional fees, including success fees of the Debtors' professionals.

*See, e.g., Hartford Fire Ins. Co. v. Bank Minn (In re Lockewood Corp.)*, 223 B.R. 170, 176 (8th

Cir. B.A.P. 1998) (holding that provision in financing order purporting to shield the post-petition

lender from surcharges under section 506(c) was unenforceable); *In re Colad Grp.,* 324 B.R. at

224 (refusing to approve post-petition financing agreement to the extent that the agreement

purported to modify statutory rights and obligations created by the Bankruptcy Code by

prohibiting any surcharge of collateral under section 506c)); *In re Sports Authority Holdings,*

*Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del.) [D.I. No. 1699] (denying requests for section

506(c) waiver); *In re Motor Coach Indus. Intl, Inc.*, Case No. 08-12136 (Bankr. D. Del. Oct. 22,

2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) [D.I. No. 244]

(removing a section 506(c) waiver from the final postpetition financing order after the creditors'

committee objected to its inclusion); *In re Fedders North America, Inc.,* Case No. 07-11176

(Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition

Financing) [D.I. No. 272] (a section 506(c) waiver in the interim postpetition financing order

was removed from the final postpetition financing order after the creditors' committee objected

to its inclusion).

57.    The Committee continues to assess the Debtors' ability to pay all administrative

and priority claims – including section 503(b)(9) claims – under all circumstances and is

concerned that the Approved Budget and DIP Facility does not provide for the funding of such

claims.  Therefore, unless the Debtors can provide assurance that all administrative claims

(including section 503(b)(9) claims) will be paid in full, a section 506(c) waiver is not

appropriate at this time. Significantly, in *Sports Authority,* this Court refused to approve a Bankruptcy Code section 506(c) waiver in connection with the debtors' DIP financing facility, reasoning that to the extent administrative claims remained unpaid at the end of the cases, there would be a claim against the lenders for those costs under Bankruptcy Code section 506(c) to the extent necessary for the preservation or realization of the lenders' collateral. *See* Tr. of DIP Hr'g at 194-96, *In re Sports Authority Holdings, Inc., et al*., No. 16-10527 (MFW) (Bankr. D. Del. April 26, 2016)[12] ("And it's clear, I think, in all my prior rulings, that if a case is being run for the benefit of the lenders in order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes professional fees. I think the fix is no 506(c) waiver for anybody. . . . If the lenders won't agree, then I'm prepared to convert the case today because I just -- they can go to State Court and liquidate their collateral, but you can't do it in bankruptcy without paying the freight, as was argued.").

58.    Moreover, provisions in the DIP Facility that provide that the "equities of the case" exception under section 552(b) of the Bankruptcy Code are unwarranted because the Court is not, at this early stage of the case, in a position to determine what the "equities of the case" may be or assess the impact of the elimination of such a remedy. *See In re Terrestar Networks, Inc.*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying request for 552(b) waiver as premature because factual record was not fully developed). *See also In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make. If, in the

---

[12] A copy of the relevant pages of the transcript is attached hereto as **Exhibit D**.

event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it.").

59.     Similarly, as the Committee has just begun its investigation into the Prepetition Secured Parties' liens and security interests, it is unfair at this time for a marshalling waiver to be included in any final DIP order.

**F.     The Prepetition Secured Parties Are Not Entitled To The "Adequate Protection Package" As Currently Structured.**

60.     The Interim Order provides the Prepetition Secured Parties significant benefits and payments under the guise of "adequate protection."  *See* Interim Order at ¶ 19.  The Debtors seek to provide the Prepetition Agent and Prepetition Secured Parties  with new and replacement liens on the Debtors' post-petition collateral (the "DIP Collateral") that are only junior to the Carve-Out, the DIP Liens, DIP Obligations, DIP Superpriority Claims and the Permitted Prior Senior Liens (the "Adequate Protection Lien").  *See* Interim Order, ¶ 19(a).  The Interim Order also provides the Prepetition Agent and Prepetition Secured Parties with superpriority administrative claims pursuant to Section 507(b) "notwithstanding the provision of Adequate Protection hereunder".  *Id.* at ¶ 19(b).

61.     The Debtors also propose to pay to the prepetition and postpetition fees and expenses of the Prepetition Lenders' Advisors (as defined in the Interim Order). The Prepetition Secured Parties will also receive the right to credit bid under section 363(k) of the Bankruptcy Code.  The Debtors have failed to make any showing as to why such Adequate Protection is required under the circumstances.

62.     The purpose of adequate protection is to ensure that a secured creditor is protected from an actual diminution in the value of its collateral during the bankruptcy case.  *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) (citations omitted); *In re Pine*

*Lake Vill. Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."); *see also, In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984). Adequate protection is intended to preserve a secured creditor's proprietary interest following the commencement of a bankruptcy case - not to enhance that creditor's position. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (citations omitted).

63.    Sections 361 through 364 of the Bankruptcy Code provide the framework for the granting of post-petition adequate protection to Prepetition Secured Parties. No provision of the Bankruptcy Code authorizes a chapter 11 debtor to grant its secured lender an adequate protection lien against assets in which that lender had no prepetition security interest. A court's inquiry in determining whether proposed adequate protection is sufficient is relatively narrow in focus. "To determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which the value will decrease during the course of the bankruptcy case." *In re Megan-Racine Assocs*, 202 B.R. 660, 663 (Bankr. N.D. N.Y. 1996) (citations omitted).

64.    The Adequate Protection package proposed by the Debtors is too generous under the circumstances of these cases. As discussed above, the Prepetition Secured Lender allegedly holds valid liens on substantially all of the Debtors' assets. As such, the Prepetition Secured Lender has protection provided by the equity cushion in that collateral. An equity cushion alone is adequate protection of the Prepetition Secured Lenders' interests. *See Wilmington Trust Co. v.*

*AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection."); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted).

65.     Moreover, given the nature of the Debtors' business, maximizing the value of the Prepetition Secured Parties' collateral requires that the Debtors continue operating their business in the ordinary course.   The mere continuation of the Debtors' business is, therefore, also adequate protection in and of itself.  *See 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (holding that value derived from new postpetition borrowings used to preserve and improve a debtor's property constituted adequate protection).   The other requirements of "adequate protection" sought by the Prepetition Secured Lenders serve only to inflate the Debtors' need for postpetition financing.  The Prepetition Secured Lenders' security interests in the Debtors' assets are adequately protected by the equity cushion in their existing collateral and by the preservation of value arising from the Debtors' continued operation of their business.   Nothing more is necessary nor should anything else be required.

66.     The purpose of adequate protection is to ensure that prepetition lenders receive the security they bargained for prior to the Petition Date.  "Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."  *In re Pine Lake Vill. Apartment Co.,* 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982).   The proposed package of "adequate protection" exceeds the risk to the Prepetition Secured Lenders' collateral position.  As discussed above, the mere continuation of

the Debtors' business is adequate protection in and of itself.  Thus, the proposed Adequate Protection package is excessive and should not be granted in a final order.

67.    In particular, the Prepetition Secured Lenders and Prepetition Agent should not be entitled to the reimbursement of fees and expenses of their professionals.  The filing of a bankruptcy petition relieves the debtor of non-bankruptcy obligations to pay professional fees to third parties unless and only to the extent that the Bankruptcy Code provides for such payments. *In re Loewen Group International, Inc.*, 274 B.R. 427, 445, n.36 (Bankr. D. Del. 2002) ("Although a contractual provision providing for the recovery of attorneys' fees and costs may enable an unsecured creditor to pursue recovery of such fees and costs in an action in state court, in the context of bankruptcy, the creditor's right to assert such claims is limited by the provisions of the Bankruptcy Code.").

68.    The scope of the proposed Adequate Protection in these cases extends beyond replacement of collateral securing the potential actual diminution in the value of the Prepetition Secured Parties' prepetition collateral below the amount owed to them.  The expansion of the Prepetition Secured Parties' collateral package under the guise of adequate protection is unnecessary.  The Debtors have also not demonstrated that the payment of the Prepetition Secured Parties' professionals' fees and expenses is proper, much less necessary to protect against actual diminution in the value of their prepetition collateral—or that such collateral will diminish in value at all.  Further—and most importantly—any adequate protection that this Court decides to award should be subject to recharacterization or disgorgement, including but not limited to a challenge from the Committee and subject to Section 506(b).

## G.    The Proposed Budget and Carveout for Professional Fees Is Inadequate.

69.    The professional fee allocation in the Approved Budget attached to the Interim DIP Order provides insufficient funding for the Committee's professionals.  As discussed above,

the DIP Credit Agreement and the Interim Order requires the payment of professional fees of the Prepetition Secured Lenders and Prepetition Agent as Adequate Protection. While the Approved Budget includes line items for "Debtors Professionals", "Lender Professionals" and "Other Professionals CC", the line item for the Committee's professionals is disproportionately less than the other professionals.

70.     While the Committee notes that the payment of professional fees as Adequate Protection is improper, the Committee further submits that to the extent that the Court permits the payment of such fees as Adequate Protection, the budgeted amounts should be allocated amongst the professionals and the Committee's line item for professional fees should be equitable in relation to the other professionals' fees contemplated in these cases. The Committee's professionals should not be precluded from fulfilling their statutory and fiduciary duties due to financial constraints. *See In re Channel Master Holdings, Inc.*, 309 B.R. 855 (Bankr. D. Del. 2004) (reallocating fees to the committee's professionals from other miscellaneous category in debtor-in-possession financing budget when committee carve-out was insufficient). A meaningful budget and Carve-out for Committee professionals is important here, where the Debtors are prohibited from paying any expenses that are not included in the Approved Budget.

71.     Furthermore, the amount and allocation of the post Carve-Out Trigger Date fees needs to be clarified. Any final order granting the DIP Motion should provide a "carve out from a super-priority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system." *In re Ames Department Stores, Inc.*, 115 B.R. 34, 38

(Bankr. S.D.N.Y. 1990).  Here, it is unclear how the post Carve-Out Trigger Date funds will be allocated amongst the Debtors' and the Committee's professionals.

## H.    The DIP Facility's Short Challenge Period and Limited Investigation Budget Cap Unduly Restrict the Committee's Ability to Fulfill Its Fiduciary Duties

72.    The Interim Order includes provisions that would require the Committee to  first obtain standing and then commence an appropriate proceeding asserting a Challenge within 60 days of the Committee's formation or any other party-in-interest "with standing and requisite authority" to assert a Challenge within 75 days after the entry of the Interim Order (the "Challenge Deadline").  *See* Interim Order at ¶ 16.  The Interim Order explicitly states that the Prepetition Lien and Claim Matters are binding on all parties, unless and solely to the extent that a party-in-interest with requisite and authority standing timely files a Challenge by the Challenge Deadline. *Id.*  In the context of these cases, the proposed Challenge Deadline is unreasonably short and includes an added impediment of the Committee first having to obtain an order granting it standing to assert such a Challenge in advance of the expiration of the Challenge Deadline.

73.    The Committee should be granted automatic standing and authority to commence a Challenge in the final DIP order. The Committee and its professionals have been and are in the process of reviewing the validity, extent, priority and enforceability of the claims and liens asserted by the Prepetition Secured Parties under the Prepetition Loan Documents.  Granting such relief at this juncture would simply avoid the unnecessary consumption of resources related to the later filing and prosecution of a motion for standing.  This Court has routinely approved DIP financing and cash collateral orders that granted standing to the creditors' committee without the need to file a standing motion. *See, e.g., In re Lily Robotics, Inc*., Case No. 17-10426 (Bankr. D. Del. June 27, 2017); *In re Rupari Holding Corp*., *et al*., Case No.17-10793 (Bankr. D.

Del. May 12, 2017); *In re Prestige Industries LLC*, Case No. 17- 10186 (Bankr. D. Del. Mar. 13, 2017); *In re Xtera Communications*, Inc., Case No. 16- 12577 (Bankr. D. Del. Dec. 28, 2016); *In re Phoenix Payment Sys., Inc.*, Case No. 14-11848 (Bankr. D. Del. Sept. 3, 2014); *In re Exide Techs.*, Case No., 13-11482 (Bankr. D. Del. Jul. 25, 2013); *In re American Safety Razor, LLC*, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); *In re PCAA Parent LLC*, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009); *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006).

74.    Additionally, the proposed cap of $25,000 on the Committee's budget to investigate the claims and liens of the Prepetition Secured Parties is woefully insufficient and negatively impacts the Committee's ability to fulfil its statutory and fiduciary duties.  In addition to being unnecessary and insufficient, the lien investigation fee cap deliberately forces the Committee's professionals to finance matters related to the Debtors' chapter 11 cases and harms the adversary system characteristic of the chapter 11 process.  *See Tenney Village*, 104 B.R. at 568-69 (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the prepetition lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing); *In re Channel Master Holdings, Inc.*, No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a post-petition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case and, after a thorough review of all the actions of the committee's professionals, determining that the cap on the committee's fees was inadequate to compensate for such activities).

75.     Moreover, the prohibitions set forth in paragraph 17 of the Interim Order on the use of the Carve-Out, any portion or proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral or any disbursements set forth in the Approved Budget by the Committee's professionals to commence or prosecute any Challenge to the Prepetition Lien and Claim Matters or an adversary proceeding or contested matter asserting claims or causes of action against the Prepetition Secured Parties or the DIP Lender are improper.  It is inappropriate to hinder the Committee's statutorily mandated investigation and the Committee should be entitled to conduct as broad an investigation as it believes is warranted under the circumstances. Moreover, the Committee should not be forced to conduct an investigation without the ability to prosecute any claims that are uncovered.  The obvious design of this financial restriction is to prevent the Committee from prosecuting claims for the benefit of the Debtors' estates.  That is improper, and there should not be any restriction on the amount of the Carve-out that is used, in the Committee's discretion, to investigate or to assert Challenges to the Prepetition Secured Lenders' liens or claims or the DIP Lender's liens and claims.

## I.     The DIP Lender and Prepetition Secured Parties Should Not be Granted the Absolute Right to Credit Bid.

76.     Paragraph 31 of the Interim Order authorizes and grants (i) the DIP Agent the exclusive and absolute right to use the DIP Obligations, DIP Liens and DIP Superpriority Claim to credit bid in connection with any sale of all or any portion of the DIP Collateral, and (ii) the Prepetition Agent (or its designee or subagent, including any Prepetition Lender or the DIP Agent) the absolute and exclusive right to use the Prepetition Obligations, Adequate Protection Liens and Section 507(b) Claims to credit bid with respect to any sale of all or a portion of the Prepetition Collateral.

77.     While the right of the Prepetition Secured Parties to credit bid the full amount of their claims may be acceptable after the Challenge Period expires, assuming no successful Challenge is brought, a final order must make clear that the alleged liens and security interests of the Prepetition Secured Parties and the DIP Lender (and their Agents) are not *ipso facto* found valid by the entry of a final order.  According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent and validity of the lien claim of the party asserting a credit bid and also may prevent the prosecution of any money damage claims against that party.  Thus, in order to preserve the Committee's rights, a final order must be revised to include the following language:

> The Official Committee of Unsecured Creditors (the "Committee") preserves and reserves its rights to object to any credit bid put forth by (i) the Prepetition Agent or the Prepetition Secured Parties with respect to the Prepetition Secured Obligations, Adequate Protection Liens and Section 507(b) Claims and (ii) the DIP Agent or the DIP Lender with respect to the DIP Obligations, DIP Liens and DIP Superpriority Claim. The failure of the Committee to object to a bid put forth by the Prepetition Agent, Prepetition Secured Parties, DIP Agent or the DIP Lender or the Court's approval of any such credit bids shall not (a) prejudice or impair the rights of the Committee to challenge the nature, extent, validity, priority, perfection or amount of the alleged liens, security interests and claims of the Prepetition Agent, Prepetition Secured Parties, DIP Agent or DIP Lender or (b) release the Prepetition Secured Parties, the Prepetition Agent, the DIP Agent or the DIP Lender from any Challenge or causes of action which can be brought by or on behalf of the Debtors' estates.

78.     The DIP Facility grants the DIP Lender the absolute right to credit bid the full amount of the DIP Obligations, as well as DIP Liens and DIP Superpriority Claims under section 363 of the Bankruptcy Code.   Section 363(k) of the Bankruptcy Code includes certain requirements, as well as the ability of the Court, to disallow a credit bid for cause.  The DIP Lender and Prepetition Secured Parties should be entitled to no more or less than what is

afforded to them under section 363(k) of the Bankruptcy Code, not a preapproved determination of a right to credit bid.

79.    The Prepetition Secured Parties are not entitled to any benefit of the final order other than adequate protection against any actual and provable diminution in the value of their collateral.  Granting them the right to credit bid may render moot the Committee's ability to pursue a Challenge against them and undercuts the purpose of section 363 of the Bankruptcy Code which requires that a creditor hold an allowed secured claim in order to credit bid.  *In re Merit Group, Inc.*, 464 B.R. 240, 252 (Bankr. D.S.C. 2011) ("The intent of section 363(k) is to permit only those with a valid security claim in property to be sold to a claim a setoff"). "Without a valid interest, the property would be transferred to a putative secured creditor using a credit bid as part of the consideration, only to have that creditor's lien subsequently deemed invalid."  *Id*.   In addition, section 363(k) of the Bankruptcy Code expressly grants the court discretion to deny a creditor's ability to credit bid "for cause."  Cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."  *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).  The Prepetition Secured Parties have not established why the Committee's lien challenge rights provided in paragraphs 16 and 17 of the Interim Order should be stripped through their ability to credit bid.  As presently structured, the Interim Order gives the Committee a right to challenge the liens underlying the Prepetition Obligations and at the same time takes those rights away in paragraph 31 of the Interim Order.

80.    Moreover, cause exists to deny the Prepetition Lender (which is also the DIP Lender) the right to credit bid given the failure to adequately fund the DIP Facility, thereby positioning these cases to be administratively insolvent from the outset.  The DIP

Lender/Prepetition knew that the Debtors filed motions seeking authority to pay approximately $10 Million in various claims (critical vendor claims, Section 503(b)(9) claims) for which there is no funding in the Approved Budget.  As noted herein, the DIP Credit Agreement and Interim Order specifically provide that the Debtors shall not pay any expenses other than those set forth in the Approved Budget and may only use proceeds of the DIP Facility and Cash Collateral for the purposes and in the amounts set forth in the Approved Budget.  Since there are no line items in the Approved Budget for section 503(b)(9) claims, critical vendor claims or accrued post-petition trade payables, none of those claims can be paid under the terms of the Interim Order. Moreover, it is an Event of Default under the DIP Credit Agreement if the Debtors were to make any such payments. This arguably rises to the level of "inequitable conduct" that some courts have found constitutes "cause" sufficient to deny a creditor's right to credit bid. The Debtors and the DIP Lender/Prepetition Lender can cure such inequitable conduct by providing additional financing to avoid administrative insolvency.

**J.    Additional Objections That Must Be Addressed in Any Final Order**

81.    In addition to the objections raised above, the Committee also asserts that the following objections and concerns must be addressed in any final order approving the DIP Motion:

(a)    The Committee must be permitted to seek extensions of the Milestones and any other deadlines set forth in the Interim Order, the Final Order, the DIP Facility Agreement or any other related document.

(b)    The Debtors must be required to (i) contemporaneously provide the Committee with all financial and other reports that the Debtors are required to provide to the DIP Lenders, the Prepetition Secured Lenders (or their respective agents) under the final order and the respective credit agreements, as well as all notices provided by the DIP Lenders, DIP Agent or the Prepetition Secured Lenders to the Debtors;

(c)    The releases sought by the DIP Agent, the DIP Lender and the Prepetition Secured Parties must not impair the Committee's ability to pursue a Challenge or release the DIP Lender, the DIP Agent, the Prepetition Secured Lenders or the

Prepetition Agent with respect to post-petition claims arising under or related to the DIP Facility. Any releases of prepetition conduct must explicitly state that they are without prejudice to the Committee's right to investigate and commence a Challenge during the Challenge period. Further, the proposed releases appear to release parties the Debtors have not identified (i.e., parents, affiliates, agents, officers, attorneys, assigns, subsidiaries, successors) and are not limited to specific roles that parties may have played. It is premature to approve such releases at this time. If these releases are considered at all, they should only be approved in connection with confirmation of a chapter 11 plan, assuming the requisite standards for releases are satisfied. This is important because the proposed releases do not appear to be limited to the monies borrowed by the Debtors under the Prepetition Loan Documents or DIP Facility.

(d)     All budgeted amounts for Committee professionals must be realistic and reasonable and, as such, the Committee should be consulted prior to the Debtors' submission of a longer term Approved Budget (as required by the DIP Credit Agreement) to the DIP Lenders.

(e)     The Prepetition Secured Lenders must not receive any proceeds from a sale of Prepetition Collateral unless and until their liens and security interests are proven valid.

(f)     Paragraph 9 of the Interim Order includes a provision that imposes certain restrictions on the ability of the Debtors and the DIP Lenders to amend or modify the DIP Facility and DIP Credit Agreement without Court order on notice and a hearing. However, this provision allows for certain "immaterial modifications" (without clarifying what "immaterial modifications" are) without notice or Court order provided that notice is given to the U.S. Trustee and Committee. Any Final DIP Order should require that the Committee be provided with prior written notice of any material or immaterial modification to the DIP Facility and/or DIP Credit Agreement.

## **RESERVATION OF RIGHTS**

82.     As of the filing of this Objection, the Committee is in the process of conducting discovery of the Debtors in connection with the DIP Motion and the Approved Budget. The Committee is also still reviewing the DIP Credit Agreement, the Approved Budget, and the Prepetition Loan Documents. While the Committee has attempted to engage in negotiations with the Debtors over the issues raised in this Objection, discovery will continue until the Final Hearing on the DIP Motion. Accordingly, the Committee reserves all of its rights to supplement or amend this Objection at or prior to the Final Hearing on the DIP Motion. The Committee also

reserves all of its rights with respect to any filing by the Debtors or the DIP Lender prior to the Final Hearing.  Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, the Prepetition Secured Parties or the DIP Lender, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

## **CONCLUSION**

83.    For the foregoing reasons, the Committee respectfully requests that the Court deny approval of the DIP Motion on a final basis, unless the Debtors and the DIP Lender address the numerous issues identified in this Objection, including, but not limited to, the inadequacy of the DIP Facility and the administrative insolvency of the Debtors' estates.

[*Remainder of Page Intentionally Left Blank*]

Dated: April 26, 2019                    **CKR LAW LLP**

                                         */s/ Marc J. Phillips*
                                         Marc J. Phillips (No. 4445)
                                         1000 N. West Street, Suite 1200
                                         Wilmington, DE 19801
                                         Telephone: (302) 367-7834
                                         Email: mphillips@ckrlaw.com

                                         -and-

                                         **LOWENSTEIN SANDLER LLP**
                                         Kenneth A. Rosen, Esq.
                                         Mary E. Seymour, Esq.
                                         Jennifer Kimble, Esq.
                                         Nicole Fulfree, Esq.
                                         1251 Sixth Avenue, 17th Floor
                                         New York, NY 10020
                                         Telephone: (212) 262-6700
                                         Facsimile: (212) 262-7402
                                         Email: krosen@lowenstein.com
                                         Email: mseymour@lowenstein.com
                                         Email: jkimble@lowenstein.com
                                         Email: nfulfree@lowenstein.com

                                         *Proposed Counsel to the Official Committee
                                         of Unsecured Creditors*