**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 19-10729 (MFW) |
| ORCHIDS PAPER COMPANY, *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 25, 179** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO (I) THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS AND LEASES AND (C) GRANTING RELATED RELIEF
AND (II) THE CLAIM OF ORCHIDS INVESTMENT, LLC**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the bankruptcy cases of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its counsel of record, hereby files this objection (the "Objection") to the (I) Debtors' *Motion of Debtors For Entry of An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases and (C) Granting Related Relief* (the "Sale Motion") [Docket No. 25] and (II) the claim of Orchids Investment, LLC ("Orchids Investment" or "Stalking Horse").  In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Orchids Paper Products Company, a Delaware corporation (6944), Orchids Paper Products Company of South Carolina, a Delaware corporation (7198), and Orchids Lessor SC, LLC, a South Carolina limited liability company (7298). The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.

## PRELIMINARY STATEMENT

1.    Through the Sale Motion, the Debtors seek approval to sell substantially all of their assets to Orchids Investment[2] (who is also the Debtors' Prepetition Lender and DIP Lender) for a purchase price of approximately $175 million (subject to certain adjustments), plus the assumption of certain liabilities set forth in section 2.3 (the "Assumed Liabilities") of Stalking Horse Asset Purchase Agreement (the "APA"), or to a higher bidder depending on the outcome of the auction sale scheduled for June 27, 2019 (the "Sale").   The Stalking Horse is buying *substantially all* of the Debtors' assets, but only assuming *certain* of the Debtors' liabilities. Significantly, the proposed purchase price in the APA is substantially in the form of a credit bid with no cash payment to the Debtors other than the Wind-Down Payment.[3]

2.    The Committee has no objection to the ability of Orchids Investment to credit bid at the Auction for those assets on which it has valid and perfected prepetition liens and security interests, but with respect to those assets not subject to a valid and perfected pre-petition lien, the Stalking Horse must pay cash.   The Stalking Horse cannot credit bid or pay for these unencumbered assets through the assumption of certain liabilities.   The Stalking Horse can also bid its DIP Liens by waiving the DIP Loan debt, but the DIP Loan will likely be no more than approximately $1 million[4].

3.    As currently proposed, the Debtors' sale is likely to result in an administratively insolvent estate if the Stalking Horse is permitted to purchase substantially all of the Debtors' assets, including cash, cash equivalents and accounts receivable for a cash payment of only $500,000 and leave behind various liabilities with the Debtors and only a limited Wind-Down

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Debtors' Sale Motion [Docket No. 25].

[3] The Wind-Down Payment consists of a payment of $500,000 cash but remains subject to reduction or return to the Stalking Horse as more specifically described in Section 6.20 of the APA.

[4] As of the filing of this Objection, the Debtors have not yet drawn on the DIP Loan at all.

Payment (the $500,000) that is intended to fund all post-sale liabilities and the wind down of the Debtors' estates -- including the filing and confirmation of a plan of liquidation. The proposed transaction is highly unusual in that the APA does not contain a "true-up" mechanism to ensure that the Debtors' estates are not left administratively insolvent. Further compounding the likelihood of administrative insolvency, the APA fails to create any escrows for outstanding professional fee claims, wage or other employee benefit claims and other accrued but unpaid operating expenses of the Debtors as of the Sale closing – including those post-petition trade payables which are not assumed by the Stalking Horse. The proposed Wind-Down Budget contemplates no return to unsecured creditors.

4.      In order to the determine (1) the highest or otherwise best bid for the Debtors' assets; (2) whether the sale is for fair and adequate value; and (3) the waterfall for distribution of sale proceeds, the Court must determine the value of the Debtors' unencumbered assets. The Debtors have conceded that the Stalking Horse does not have a lien on (i) the Barnwell Equipment; and (ii) Avoidance Actions. Additionally, there is a material dispute over whether Orchids Investment's prepetition liens encumber (i) the Debtors' cash; (ii) commercial tort claims and (iii) certain of the Debtors' vehicles. While valuation of unencumbered assets become less of an issue if there is a third-party bidder paying cash, the Court still must determine that fair value is being paid for the Debtors' assets.

5.      Currently, the Debtors have failed to satisfy the standards of section 363 of the Bankruptcy Code which requires that an adequate price is being paid for the assets and that the Sale is being conducted in good faith. The "loan to own" Sale is being run solely for the benefit of Orchids Investment – the Debtors' Prepetition Lender and DIP Lender. The Sale, which is being conducted outside of the context of a plan and disclosure statement, contemplates the sale

of substantially all of the Debtors' assets and provides for *no* recovery to priority and unsecured creditors of the Debtors.  Moreover, the Debtors have offered no evidence of valuation of the unencumbered assets they seek to sell.  Absent evidence that the Purchase Price provides adequate and fair value for the Debtors' assets – including purchase cash for the Debtors' unencumbered assets - the Court cannot approve the Debtors' Sale.  If the Court permits a Sale to go forward to either Orchids Investment or another Successful Bidder, the Court should require the sale proceeds to be escrowed pending resolution of valuation issues related to the unencumbered collateral, Orchids Investment's claim and the Committee's Challenge.

## BACKGROUND

6.      On April 1, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  No trustee or examiner has been appointed in these Chapter 11 Cases.

7.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

8.      On April 15, 2019, the Office of the United States Trustee appointed the Committee pursuant to 11 U.S.C. § 1102(a)(1) [Docket No. 65].  The Committee is comprised of five members: (a) Dixie Pulp & Paper, Inc.; (b) Cellmark Paper, Inc.; (c) Little Rapids Corporation; (d) Packaging Corporation of America; and (e) United Steelworkers.

9.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the *Declaration of Richard S. Infantino, Interim Chief Strategy Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*

[Docket No. 19](the "Infantino Decl.").

10.     On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of (I) An Order (A) Approving Bid Procedures In Connection with the Potential Sale of Substantially all of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases and (C) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. 25].

11.     On May 20, 2019, the Court entered an *Order (I) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter Into the Option Agreement and the Stalking Horse Agreement, (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* (the "Bid Procedures Order") [Docket No. 179].  Paragraph 37 of the Bidding Procedures Order clearly preserves the Committee's challenge rights.

12.     On June 14, 2019, the Committee filed its *Objection to the Right of Orchids Investment to Credit Bid Pursuant to 11 U.S.C. § 363(k)* (the "Objection") [Docket No. 259].  On June 21, 2019, the Committee filed its *Supplemental Objection to the Right of Orchids Investment to Credit Bid Pursuant to 11 U.S.C § 363(k)* (the "Supplemental Objection," and along with the Objection, the "Credit Bid Objection") [Docket No. 274].   All arguments set forth in the

Committee's Credit Bid Objection are incorporated herein by reference.

13.    On June 21, 2019, the Committee also commenced an adversary proceeding by the filing of a complaint (the "Complaint") challenging the extent, validity and priority of the Prepetition Lenders' liens and security interest in certain of the Debtors' assets. *See Unsecured Creditors Committee of Orchids Paper Products Company v. Orchids Investment LLC and Ankura Trust Co., LLC*, Adversary Case No. 19-50264 (Bankr. D. Del. 2019) (the "Committee's Challenge").

14.    The auction sale for the Debtors' assets is scheduled for June 27, 2019.

## OBJECTION

15.    Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). The criteria for approving a sale of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code requires that: (i) a valid business justification exist for the sale, (ii) the price represents fair value, and (iii) the parties negotiated and entered into the sale transaction in good faith. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). The "sound business purpose" test requires the Debtors to establish four elements: (i) adequate notice to interested parties; (ii) that an adequate price is being paid for the assets; (iii) good faith by the parties; and (iv) a sound business judgment for the sale. *See e.g. Abbotts Dairies*, 788 F.2d at 149-50; *Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987)). Courts often rely on the price paid for assets at a competitive public auction to determine whether a purchase price constitutes fair value. *See Abbotts Dairies*, 788 F.2d at 149.

16.     Though a sale of substantially all of a debtor's assets outside the structure of a chapter 11 plan and disclosure statement is not prohibited by the Bankruptcy Code, multiple courts have cautioned that in the absence of the protection and finality offered by a plan and disclosure statement, the court must closely scrutinize the proposed sale. *See In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004); *see also Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003).

17.     Through this lens, the Committee submits that the proposed sale to the Stalking Horse, as presently constructed under the APA, must not be approved for the following reasons: (i) the purchase price does not provide adequate and fair value given that many of the acquired assets are unencumbered; (ii) Orchids Investment must pay cash for the unencumbered assets; and (iii) the sale is not being conducted in good faith because it is likely to leave the Debtors estates administratively insolvent.   In addition, the Committee asserts there are certain issues with the APA, which must be modified if Orchids Investment is the Successful Bidder.

## A.     THE DEBTORS HAVE FAILED TO ESTABLISH THAT AN ADEQUATE PRICE IS BEING PAID FOR THE ASSETS

18.     The Debtors propose to sell substantially all of their assets – many of which are unencumbered.   Significant value exists in the Debtors' unencumbered assets, including avoidance actions under Chapter 5 of the Bankruptcy Code, NOLs, D&O Claims, the Debtors' cash and such other unencumbered assets – including the personal property, machinery, and equipment owned by Debtor Orchids Lessor SC, LLC (the "Barnwell Equipment").[5]   The

---

[5]   The "Barnwell Equipment" includes the personal property, machinery, equipment and other assets owned by Debtor Orchids Lessor SC, LLC ("Orchids Lessor SC") at the Debtors' Barnwell, South Carolina facility (the "Barnwell Facility"). The Barnwell Equipment includes the QRT tissue paper machine, the primary machine that the Debtors operate at their Barnwell Facility.

Stalking Horse has clarified that it is not purchasing the Debtors' NOLs and D&O Claims and has proposed to amend the APA to make clear that it is not purchasing these assets.

19.     The Debtors have conceded that the Stalking Horse does not have a lien on (i) the Barnwell Equipment; and (ii) Avoidance Actions.  Additionally, there is a material dispute over whether Orchids Investment's prepetition liens encumber (i) the Debtors' cash; (ii) commercial tort claims; and (iii) certain of the Debtors' vehicles.  In order to the determine (1) the highest or otherwise best bid for the Debtors' assets; (2) whether the sale is for fair and adequate value; and (3) the waterfall for distribution of sales proceeds, the Court must determine the value of these unencumbered assets.  While valuation of unencumbered assets become less of an issue if there is a third party bidder paying cash for substantially all of the Debtors' assets, the Court still must determine that fair value is being paid for such assets and the waterfall of sales proceeds.

20.     The Committee asserts that the Stalking Horse must pay cash for the Debtors' unencumbered assets.[6]  It is axiomatic that where a "creditor's lien reaches only some of the property to be sold, the creditor cannot credit bid the secured claim for the unencumbered property ***but must pay cash***."  3 *Collier on Bankruptcy* ¶ 363.09[3] (16th ed. 2019) (emphasis added).  *See also In re Akard St. Fuels, L.P.*, No. CIV. A.3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (affirming the bankruptcy court's denial of the creditor's right to credit bid because, inter alia, its alleged liens were in dispute and it was capable of bidding cash at the auction and later recovering the cash if it proved its liens);  *In re Diebart Bancroft*, No. 92-3744, 1993 WL 21423, at *2, *5 (E.D. La. Jan. 26, 1993) (affirming the bankruptcy court's

---

[6] If competing bidders are proposing to assume the same "Assume Liabilities" as the Stalking Horse, plus pay cash for the Debtors' remaining assets, the Assumed Liabilities assumed by the Stalking Horse cannot equal cash and do not result in an offer that is higher or otherwise better.

decision to prohibit the secured creditor from credit bidding its mortgage without also bidding cash equal to the IRS's asserted $270,000 lien on the property).

21.     Each of the items of unencumbered collateral are further discussed in detail below.

(i)     <u>Avoidance Actions</u>

22.     Under the APA, the Stalking Horse proposes to purchase certain avoidance actions under Chapter 5 of the Bankruptcy Code (the "<u>Acquired Avoidance Actions</u>") – which the Debtors have admitted is an unencumbered asset.  The APA fails to identify, with any specificity, the Acquired Avoidance Actions and it does not allocate any of the Purchase Price to the Acquired Avoidance Actions.  The Debtors have offered no evidence as to the valuation of any of the avoidance actions other than the testimony of the Debtors' Chief Strategy Officer at the Credit Bid hearing on June 25, 2019, who testified that he had not completed an analysis, but that he did not believe that there was any value to preference actions from the 90 days prior to the Petition Date.[7]

23.     In addition, the Debtors have failed to provide any analysis of the avoidance actions, potential defenses or other information which would enable the Committee and/or any other interested parties to understand the value of the Acquired Avoidance Actions.  The failure to provide this critical information prevents the Committee or any other interested party or bidder from analyzing or valuing the Sale transaction.  At the May 10, 2019 hearing on bidding procedures, the Court acknowledged this very point noting:

> THE COURT: Well, they currently don't have any lien on avoidance actions so.
> MR. SWITZER: They do not.  The prepetition lender does not have a lien on avoidance actions.  And as we get to in the DIP

---

[7] The Committee reserves it right to challenge the Debtors' position that there are no valuable preference actions.

portion of this, Your Honor, the lenders agree to carve-out avoidance actions and the proceeds of avoidance actions as far as –

THE COURT: The DIP Lien so they won't have any lien, but they're acquiring them in the asset purchase agreement.

MR. SWITZER: That they are seeking to acquire the so-called acquired avoidance actions.

THE COURT: *So, don't we need that valued to determine whether their bid –*

*…*

*Their cash portion of their bid needs to be higher than $500,000.* And it cuts against their assertion that the $500,000 will cover all administrative….

Trans. of May 10, 2019 Hearing at pg. 98, line 15 – pg. 99, line 8 (emphasis added).  The relevant pages are attached hereto as Exhibit A.

24.     In this matter, the Debtors' exercise of the avoidance powers provided under the Code must be for the benefit of the entire creditor body, including the unsecured creditors.  Here, the Committee asserts that there is no evidence that the Stalking Horse is paying fair adequate and fair value *in cash* for the Acquired Avoidance Actions.  Accordingly, the Court must not approve the sale of any avoidance actions of the Debtors.

(ii)     Barnwell Equipment

25.     Pursuant to the Fund Loan Agreement dated as of December 29, 2015 between USBCDC Investment Fund 158, LLC ("Investment Fund") and Orchids Paper Products Company (including a promissory note and pledge agreement), Orchids Paper Products Company provided a leverage loan to the Investment Fund, in the aggregate principal amount up to $11,109,050 (the "Leverage Loan").

26.     The proceeds of the Leverage Loan were to be used by Investment Fund, in addition to an equity investment, to make an aggregate equity investment in the Sub-CDE

Lenders (as defined below). The Sub-CDE Lenders (as defined below) were to then make loans to Orchids Lessor SC to acquire the Barnwell Equipment at the Barnwell Facility.

27.    Pursuant to that certain Credit Agreement dated as of December 29, 2015 (as amended, the "Sub-CDE Credit Agreement") by and among Orchids Lessor SC, as borrower, RDP 27 LLC, an Iowa limited liability company ("RDP"), and USBCDE Sub-CDE 146, LLC, a Missouri limited liability company (together with RDP, collectively as lenders, the "Sub-CDE Lenders"), Sub-CDE Lenders committed to make to Orchid Lessors SC a term loan of $16,200,000 (the "Sub-CDE Loan"). As of the Petition Date, this loan is still held by the Sub-CDE Lenders.

28.    These collective transactions are defined in the Stalking Horse APA as the "NMTC Arrangements."[8]

29.    The proceeds of the Sub-CDE Loans were used to acquire the Barnwell Equipment. Orchids Lessor SC leased the Barnwell Equipment to Orchids, and the lease payments were used to service the secured loans owed to the Sub-CDE Lenders.

30.    Pursuant to the Sub-CDE Credit Agreement, Orchids Lessor SC granted the Sub-CDE Lenders a first priority lien on all the assets of Orchids Lessor SC, the Barnwell Equipment, and on the lease of the Barnwell Equipment by Orchids Lessor SC to Orchids. On December 29, 2015, the Sub-CDE Lenders filed a financing statement against Orchids Lessor SC, leaving the collateral description blank.  On December 31, 2015, the Sub-CDE Lenders again filed a financing statement, not an amendment, against Orchids Lessor SC, listing "all of [Orchids

---

[8] The "NMTC Arrangements" are defined in the APA as (a) the Credit Agreement, dated as of December 29, 2015, by and among Orchids SC, RDP 27 LLC and USBCDE SUB-CDE 146, LLC, (b) the Fund Loan Agreement, dated as of December 29, 2015 between USBCDC Investment Fund 158, LLC and Orchids; and (c) the Loan Agreement, dated as of December 29, 205, between Orchids and US Bank, National Association ("US Bank"), in each case, together with amendments, assignments and other documents, instruments and agreements related thereto.

Lessor SC's] assets" including specifically listing the Barnwell Equipment. A true and correct copy of the December 31, 2015 SUB-CDE financing statement is attached hereto as Exhibit B.

31.     According to the Debtors' bankruptcy schedules, neither the Sub-CDE Lenders, nor the Investment Fund are listed as a lender in these Chapter 11 cases.

32.     Perfecting a security interest in collateral takes two steps. First, the secured party must establish a lien on the subject property.  For general collateral this is done by a security agreement.  Second, the secured party must perfect their lien. To perfect an interest in fixtures of real estate, perfection can be attained through the filing of the deed of trust or filing a UCC financing statement. To perfect an interest in equipment, filing of a UCC financing statement generally suffices.  UCC filings are subject to the same rules of priority, essentially, as deeds of trust.  The first to file on a class of assets has the first right to the collateral.  Each UCC filing is date and time stamped, and that determines a creditor's position in line.

33.     US Bank initially filed a UCC financing statement on June 6, 2014, on all assets of Orchids. On December 30, 2015, US Bank filed an amended UCC financing statement specifically excluding from its perfected collateral the Barnwell Equipment. A true and correct copy of the June 6, 2014 original US Bank Financing Statement and the December 30, 2015 US Bank Amended Financing Statement are collectively attached hereto as Exhibit C. This action by US Bank of removing the Barnwell Equipment from the covered and perfected lien collateral meant that US Bank no longer had a perfected interest in the Barnwell Equipment as of December 30, 2015. Any assignment by US Bank of the UCC financing statement after the specific exclusion of the Barnwell Equipment cannot allow future assignees to claim a perfected security interest in the Barnwell Equipment. US Bank cannot give rights in collateral where no rights exist.

34.     Furthermore, the Sub-CDE Lenders, by (1) executing the Sub-CDE Credit Agreement and (2) filing a UCC on December 31, 2015 on the Barnwell Equipment, secured their right as the first filer after US Bank's exclusion of the Barnwell Equipment. See Exhibit B.

35.     At no point in time after December 31, 2015 did the Sub-CDEs assign their rights in the Barnwell Equipment to Orchids Investment (or Ankura Trust Co. or Black Diamond Capital Management). Furthermore, the Sub-CDEs are not listed a secured lender in these Chapter 11 Cases.

36.     Given that US Bank relinquished its perfected interest in the Barnwell Equipment and the Sub-CDEs have not assigned their perfected interest in the Barnwell Equipment, neither US Bank nor Orchids Investment can assert any rights in the Barnwell Equipment.[9]

37.     Under the APA, the Stalking Horse proposes to assume the NMTC Arrangements by assuming the outstanding loan amount. As set forth above, as a result of the underlying transactions included in the NMTC Arrangements, the Barnwell Equipment is not subject to a lien from either US Bank or Orchids Investment (or Ankura Trust Co. or Black Diamond Capital Management).

38.     It is the Committee's position that the Barnwell Equipment is worth substantially more than the amounts owing under the NMTC Arrangements which the Stalking Horse proposes to assume.  In fact, the Debtors have listed the value of Barnwell Equipment in their amended schedules as $16,878,828.06.[10]  To the extent there is unencumbered value in the

---

[9] Any argument that the Barnwell Equipment is a "fixture" subject to Orchid Investment's lien also fails because even if fixtures were included in the original US Bank mortgage filing on May 12, 2015, US Bank specifically amended its UCC Financing Statement on December 31, 2015 to exclude the Barnwell Equipment.  Therefore, the subsequent December 24, 2018 assignment by US Bank of "all of its rights" to Orchids Investment could not include the Barnwell Equipment as a fixture.

[10] The Committee does not concede that this is the value of the Barnwell Equipment and reserves it right to challenge this valuation.

Barnwell Equipment, the Debtors must establish that the Stalking Horse is paying adequate and fair value *in cash* for the Barnwell Equipment.

(iii)   <u>Cash</u>

39.    The Committee's Complaint alleges that the Stalking Horse does not have a valid or perfected lien or security interest in the Debtors' cash in the approximate amount of $3,347,500 as of the Petition Date because the Stalking Horse does not have possession of the cash or a control agreement with the depository banks as required by 12A Okla. Stat. Ann. § 1-9-203.

40.    There is currently a material dispute over whether the Stalking Horse has a lien on the Debtors' cash that the Court will have to address at a later date.  Here, the Committee asserts that there is no evidence that the Stalking Horse is paying fair adequate and fair value in cash for all of the interest in the Debtors' cash.  Accordingly, the Court must not approve the sale of the Debtors' cash.

(iv)   <u>Commercial Tort Claims</u>

41.    The Committee's Complaint alleges that the Stalking Horse does not have a valid lien or security interest in any commercial tort claims.

42.    As the fiduciary for all creditors, the Committee is tasked with evaluating any claims and causes of action of the Debtors, which would provide a recovery to unsecured creditors in these cases.  While the Committee's investigation remains ongoing,[11] it is in the process of determining, among other claims, whether any commercial tort actions against various entities that were involved in the construction of the Barnwell Facility exist. The commercial tort actions may include, among others, claims for fraudulent inducement, negligent

---

[11] The Committee received the Debtors' first round of production of electronic communications (approximately 7,744 e-mail chain communications) on June 24, 2019.

misrepresentation, and breach of duty of good faith and fair dealing.

43.     The Debtors maintain that any tort claim related to the construction of the Barnwell Facility would be based in contract and is therefore a "general intangible" under the Uniform Commercial Code.[12]  This overbroad assertion by the Debtors is just that – an overbroad, unsupported assertion.  Rather, the scope of potential commercial tort claims could demonstrate, for example, that the Barnwell Facility-related contracts were procured by fraud or misrepresentation of material fact or as a result of other commercial torts.  *See, e.g., In re Aspect Software Parent, Inc.*, 578 B.R. 718, 726 (Bankr. D. Del. 2017) (Walrath, J.) (concluding that the commercial tort claims at issue survived a motion to dismiss – where the movant argued that the tort claims were barred by the parties' contract as a matter of law – given the tort claims were separate and distinct from contract claims).

44.     Based on testimony from the Debtors' investment banker at the May 10, 2019 hearing, the Debtors have not undertaken any analysis of the value of any of the company's claims against Valmet related to the Barnwell Facility.

> MS. KIMBLE: What about potential claims against Valmet; have the debtors undertaken any sort of analysis as to the value of those claims?
>
> MR. LEWIS: I don't think they have.

*See* Trans. from May 10, 2019 hearing at pg. 57 at lines 9-12.  A true and correct copy of the relevant pages of the May 10, 2019 hearing transcript are attached hereto as Exhibit D.

---

[12] Under Article 9 of the Uniform Commercial Code, commercial tort claims are not "general intangibles;" rather, they constitute an independent category of collateral requiring special steps in order to obtain an effective security interest.  *See* UCC § 9-102(a)(42) (indicating that the term "general intangibles" applies to "any personal property, including things in action, other than . . . commercial tort claims"); UCC § 9-102(a)(13) (defining a commercial tort claim as "a claim arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual").

45.     Given the conceptual distinction between the commercial tort claims and any claims arising from the Barnwell Facility-related contracts, the Stalking Horse cannot purchase these unencumbered assets without adequately valuing any such causes of action and paying cash for them.[13]

46.     While the APA references the $500,000 Wind-Down Payment as the cash consideration for unencumbered assets, the Debtors have failed to offer any evidence of the valuation of their unencumbered assets or that the Wind-Down Payment is a sufficient purchase price for these unencumbered assets.  The Committee submits the cash portion of the Stalking Horse bid is inadequate value for these unencumbered assets.[14]

## B.     THE SALE RISKS LEAVING BEHIND ADMINISTRATIVELY INSOLVENT ESTATES

47.     The proposed Sale fails to provide the liquidity need to fund distributions under a confirmable and feasible chapter 11 plan.  Instead, as currently proposed, the Sale may potentially render the Debtors' estates administratively insolvent.  The Stalking Horse proposes to purchase all of the Debtors' cash, accounts receivables and cash equivalents under the APA. While the Stalking Horse Agreement provides for a cash Wind-Down Payment of up to $500,000 to fund the Debtors' wind-down, there is no assurance that the Wind-Down Payment will be sufficient to fund all remaining administrative expenses in these chapter 11 cases.[15]

---

[13] As stated in *Orchids Investment's Response to the Official Committee of Unsecured Creditors' Objection to the Right of Orchids Investment LLC to Credit Bid Pursuant to 11 U.S.C. § 363(k)* [Docket No. 281], the Prepetition Lender are not credit bidding for commercial tort claims.

[14] If the Successful Bidder is a party other than the Stalking Horse, the Court does not necessarily have to determine these valuation issues at the Sale Hearing.  Instead, the Court could require that all, or a portion of, the sale proceeds are escrowed pending a hearing on and resolution of the valuation of the Debtors' avoidance actions, commercial tort claims, Barnwell Equipment, vehicles and the Debtors' cash at closing.

[15] The Debtors' Chief Strategy Officer testified that if the Wind-Down Payment were not sufficient to cover the costs to wind-down the Debtors' estates, the estates would be administratively insolvent.  *See* April 30, 2019 Deposition Transcript of Richard S. Infantino ("Infantino Deposition Transcript") at pg. 142 lines 1-12.  A true and correct copy of the relevant pages from the Infantino Deposition Transcript are attached hereto as Exhibit E.

48.     Further compounding the problem, the APA fails to create any escrows for outstanding professional fee claims, wage or other employee benefit claims and other accrued but unpaid operating expenses of the Debtors as of the sale closing – including post petition trade payables that are not assumed by the Stalking Horse.[16]  Moreover, the Wind-Down Budget contemplates no return to priority or unsecured creditors.[17]

49.     Without understanding the universe of potential administrative expenses and priority and unsecured claims, the Committee's ability to evaluate whether the Sale transaction will render the Debtors' estates' administratively insolvent is impaired.

50.     Section 363 asset sales should not be used to circumvent the protections for creditors mandated in the Bankruptcy Code.  *Abbotts Diaries*, 788 F.2d at 150 (instructing that under the Bankruptcy Code provisions governing the sale of assets, the requirement of good faith is paramount in ensuring that section 363 will not be employed to circumvent the usual creditor protections of Chapter 11); *In re Westpoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding chapter 11's plan confirmation procedures") *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) (citing *In re The Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001)) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.").  A court cannot confirm a chapter 11 plan unless the plan

---

[16] While the APA provides for an "Accounts Payable Cap" and a "Cure Amount Cap" (APA, §§ 8.15, 8.18), these caps are simply conditions to closing – not an obligation of the Stalking Horse to pay all outstanding post-petition accounts payable at the closing of the Sale.  If the Stalking Horse actually intended to pay all post-petition trade payables, it would allow the DIP Loan proceeds to be used for this purpose or would otherwise escrow funds to ensure that ***all post-petition trade payables*** of the Debtors were paid in full as part of the Sale.

[17] The Wind-Down Budget is the Debtors' "best estimate" of the wind-down costs and does not include any funds for post-petition administrative claims or funds for unsecured creditors.  *See* Infantino Deposition Transcript, at pg. 118, lines 3-22; pg. 120, line 8 – pg. 121, line 5.  A true and correct copy of the relevant pages of the Infantino Deposition Transcript are attached hereto as Exhibit F.

provides for payment in full, in cash, of all administrative expense claims on the plan's effective date. *See* 11 U.S.C. §1129(a)(9)(A); *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002). The same is generally true for priority claims under section 507(a) of the Bankruptcy Code. *See* 11 U.S.C. §1129(a)(9)(B); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 166 (D. Del. 2006). Likewise, courts typically will not approve a section 363 sale of substantially all of a debtor's assets where such a sale would leave the debtor's estate with such scant value as to frustrate or dictate a future reorganization. *See, e.g., In re Braniff Airways, Inc.*, 700 F.2d 935, 938-40 (5th Cir. 1983). The inability to confirm a plan generally constitutes cause convert or to dismiss a chapter 11 case. 11 U.S.C. § 1112(b).

51. For the Sale to proceed outside of a plan process, the Purchase Price (particularly with the credit bid) must include an amount of cash sufficient to fund an escrow for the post-sale administrative expenses of the Debtors' estates. Otherwise, there is no good or legitimate reason to allow Orchids Investment to use section 363 to liquidate the Debtors' chapter 11 estates. If Orchids Investment wishes to avail itself of the benefits of chapter 11, it must pay the costs and abide by the rules of the chapter 11 process.

52. If the Stalking Horse were permitted to take for itself the entire amount of the sale proceeds without leaving sufficient funding for the Debtors to confirm a plan, these cases would have been run solely for the benefit of the Prepetition Lender. The Prepetition Lender must not be permitted to simply liquidate its collateral while leaving the Debtors unable to pay administrative costs of their chapter 11 cases or comport with the plan confirmation process. This Court cannot determine the Sale was conducted in good faith if it renders the Debtors' estate administratively insolvent.

53. Accordingly, unless Orchids Investment's bid includes a cash component sufficient to (a) satisfy all Chapter 11 administrative expenses and priority claims as part of a Chapter 11 plan, (b) to provide sufficient funding for a plan process and the expenses that will accrue during the post confirmation wind-down period, and (c) to provide a recovery for unsecured creditors sufficient to fund a distribution under a confirmable and feasible Chapter 11 plan -- the Sale must not be approved.

## C.    SUFFICIENT CAUSE EXISTS TO ESCROW THE SALE PROCEEDS

54. The Committee has objected to the right of Orchids Investment to credit bid for the Debtors' unencumbered assets.  The Committee has also filed a Complaint challenging the extent, validity and priority of Orchids Investments' liens and security interest in various assets. If a third party purchaser is the Successful Bidder at the auction, sufficient cause exists to require an escrow of the sale proceed that would otherwise be payable to Orchids Investment on account of its alleged prepetition liens.

55. As with a denial of a credit bid that requires a lender/buyer to offer cash consideration for the debtor's assets, a requirement that a lender not receive any sale proceeds is warranted when its liens are subject to a pending challenge.  It is black letter law that the opportunity to credit bid is not absolute. *See In re The Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) ("[A] court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment") (citations omitted).  "The intent of section 363(k) is clearly to permit only those persons with a valid security interest in property to be sold to claim a setoff." *Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.),* 44 B.R. 277, 279 (Bankr. D.V.I. 1984).  Thus, courts have

denied the opportunity to credit bid when a *bona fide* dispute exists regarding the validity of the lien forming the basis for a credit bid. *See Nat'l Bank of Comm. v. L.D. McMullan (In re McMullan),* 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"); *Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.),* No. 3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale). The estate would be harmed if credit bidding is allowed and the purchaser's disputed lien is invalidated following the sale. *See McMullan,* 196 B.R. at 835. Similarly, courts may condition an insider/lender's receipt of any sale proceeds based on the outcome of a pending litigation.

56.     In light of the facts set forth in the Credit Bid Objection and as set forth in the Complaint, it would be an appropriate exercise of this Court's discretion to require that Orchids Investment not receive any sale proceeds on account of its prepetition liens until the underlying claims in the Complaint are adjudicated. To the extent sale proceeds are distributed to or for the benefit of Orchids Investment, the sale order should require Orchids Investment to post an irrevocable surety bond or letter of credit for the amount of the sale proceeds it receives.[18]

### D.     OTHER MISCELLANEOUS SALE OBJECTIONS

57.     In addition to the foregoing, the Committee raises the follow additional objections to the APA, which must be modified as part of approval of any Sale:

---

[18] Alternatively, the Court could permit a certain amount of the sales proceeds (such as $100 million) to be paid to Orchids Investment on account of its perfected liens with the remainder of the sale proceeds remaining in escrow pending resolution of the Committee's Challenge. Any sale proceeds received by Orchids Investment must be backed by an irrevocable surety bond or letter of credit and remain subject to disgorgement pending final resolution of the Committee's Challenge.

**(i)      Certain Assumed Liabilities Artificially Drive Up the Purchase Price and Minimum Overbid**

58.      There are various Assumed Liabilities that Orchids Investment is including as part of the Minimum Overbid under the APA – namely, purchase orders - that should not work to artificially increase the Stalking Horse's Purchase Price and the Minimum Overbid.  *See* APA at § 2.3.

59.      By way of explanation, a purchase order is an order that is issued by a buyer to a seller to purchase certain goods.  The purchase order has information for specific products or services orders as well as agreed upon quantities and prices but does not result in a liability (from an accounting standpoint) when issued.  Instead, the liability is recorded on a company's books and records only once the buyer takes title to the goods ordered.  Under the APA, Orchids Investment is overstating the Minimum Overbid and its Assumed Liabilities by approximately $5.28 million[19] by asserting outstanding purchase orders are a liability of the Debtors.  The minimum bid is overstated because (i) a liability is not recorded until a buyer takes receipt of the goods or services; and (ii) a basic concept in accounting is that every accounting transaction has two entries – for every invoice received, the company should increase inventory by the same amount.

60.      Therefore, the Purchase Price and Minimum Overbid must be adjusted accordingly.

---

[19] The $5.28 million purchase order amount is included on the most recent "Illustrative Minimum Qualified Bid" document posted to the data room.   Previous versions of the "Illustrative Minimum Qualified Bid" have included higher purchase order amounts.  Regardless of what number is included, the purchase orders should not artificially drive up the price and the Assumed Liabilities.

(ii)    **Any List of Assume Contracts Must be Fixed as of the Sale Hearing**

61.    The Stalking Horse proposes to accept the assumption and assignment of certain contracts, but the Stalking Horse reserves the right to amend the list of assumed contracts, including the ability to remove contracts from the Assumed Contracts list up until two (2) business days *prior to closing*.  APA § 2.6(a)(i).  Because rejection of a contract will likely result in additional claims against the Debtors' estates and therefore, impacts the value of a particular bid, the list of assumed contracts must be fixed as of the Sale Hearing.  The APA also fails to provide any escrows for post-sale Assumed Contracts list modifications and thus, modification to an assumed contract list could further result in the Debtors' estates being unable to pay post-petition administrative claims.

62.    The APA (or any purchase agreement with a Successful Bidder) must be amended to preclude the proposed purchaser from dropping assumed contracts from the Assumed Contracts list (Schedule 2.6(a)) once the Sale Hearing begins.  Otherwise, the Debtors risk administrative insolvency post-Sale approval.

(iii)    **Orchids Investment or the Successful Bidder Should be Required to Pay - In Full - All Post-Petition Obligations of the Debtors**

63.    Central to the Committee's concerns in these chapter 11 cases is the prospect of administratively insolvency (as more fully discussed on the record at the Final DIP hearing (May 30, 2019) and herein.  It is far from clear that the Debtors will have sufficient funds to pay all post-petition ordinary course obligations which are not assumed by the Stalking Horse or which accrue following the Sale hearing and prior to the Sale closing.  Accordingly, and to ensure that the sale process is not run on the backs of the Debtors' trade creditors solely for the benefit of the Prepetition Lender, Orchids Investment or the Successful Bidder must be *required* to pay *in full*

any unpaid, post-petition obligations incurred by the Debtors.[20]    Alternatively, the Stalking

Horse must leave the Debtors with sufficient cash assets to pay in full all pre-Sale closing

administrative costs of the Debtors' bankruptcy estates – even if they are not due in the ordinary

course pursuant to whatever trade terms are in place with the applicable creditor at the time of

the Sale closing.

> **(iv)** **The APA Must Provide Clarity as to Avoidance Actions, Causes of Action (and Proceeds) that Are Excluded Assets.**

64.    The APA is unclear as to which avoidance actions or other causes of action are

considered Excluded Assets (as defined in the APA) that are being retained by the Debtors.

Recovery for unsecured creditors is speculative (subject to the outcome of the auction), and ***no***

recovery by unsecured creditors will be had as a result of the Sale pursuant to the Stalking Horse

APA.  The ability to pursue any potential D&O Claims, commercial tort claims, and avoidance

actions is critical to the creditors of the Debtors' estates.  Accordingly, the APA must explicitly

clarify the avoidance actions, and any other claims and causes of action – whether commercial

tort or otherwise – that are Excluded Assets under section 2.2 of the APA and remain estate

property.

## **RESERVATION OF RIGHTS**

65.    The Committee expressly reserves the right: (1) to supplement this Objection at

any time prior to the hearing on the Sale Motion and/or at the Sale Hearing; and (2) to raise

additional or further objections to the Sale Motion at any hearing on the Sale Motion and/or at

the Sale Hearing.

---

[20] Even if the amounts are in excess of the Accounts Payable Cap or the Cure Amount Cap.

66.     Additionally, because the identity of the Successful Bidder(s) and the ultimate terms of any winning bid(s) are not presently before the Court, the Committee reserves the right to object to any proposed sale(s) at the appropriate time.

## **<u>CONCLUSION</u>**

**WHEREFORE**, for the reasons set forth above, the Committee objects to the relief sought in the Sale Motion, and the Committee respectfully requests that this Court limit the relief sought by the Debtors in the Sale Motion to the extent provided for herein and grant such other and further relief as the Court may deem just and proper.

[*Remainder of this page intentionally left blank.*]

Dated:  June 26, 2019

**MONTGOMERY McCRACKEN WALKER & RHOADS LLP**

*/s/ Marc J. Phillips*
Marc J. Phillips (No. 4445)
1105 North Market Street
Suite 1500
Wilmington, DE 19801
Telephone: (302) 504-7823
Email: mphillips@mmwr.com

-and-

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq. (*admitted Pro Hac Vice*)
Mary E. Seymour, Esq. (*admitted Pro Hac Vice*)
Bruce Buechler, Esq.  (*admitted Pro Hac Vice*)
Joseph DiPasquale, Esq. (*admitted Pro Hac Vice*)
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
E-mail: krosen@lowenstein.com
   mseymour@lowenstein.com
   bbuechler@lowenstien.com
   jdipasquale@lowenstein.com

Jennifer Kimble, Esq. (*admitted Pro Hac Vice*)
Gabriel L. Olivera, Esq. (*admitted Pro Hac Vice*)
1251 Avenue of the Americas
New York, New York
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402
E-mail: jkimble@lowenstein.com
   golivera@lowenestein.com

*Counsel for the Official Committee of Unsecured Creditors*