# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>~~ORCHIDS PAPER PRODUCTS~~<br>OPP LIQUIDATING COMPANY, INC. (f/k/a Orchids Paper Products Company), *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10729 (MFW)<br><br>~~(~~<br>Jointly Administered~~)~~ |

---

**~~FIRST~~SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF ORCHIDS PAPER PRODUCTS COMPANY, ET AL.**

---

Dated: October ~~15~~18, 2019
      Wilmington, Delaware

**POLSINELLI PC**

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Brenna A. Dolphin (Del. Bar No. 5604)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
bdolphin@polsinelli.com

-and-

Jerry L. Switzer, Jr. (*Admitted Pro Hac Vice*)
150 North Riverside Plaza
Chicago, Illinois 60606
Telephone: (312) 873-3626
Facsimile: (312) 810-1810
jswitzer@polsinelli.com

*Counsel to the Debtors and Debtors in*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are ~~Orchids Paper Products~~OPP Liquidating Company, ~~Inc.,~~ a Delaware corporation (6944~~),~~) (f/k/a Orchids Paper Products Company), OPP Liquidating Company of South Carolina, Inc., a Delaware corporation (7198) (f/k/a Orchids Paper Products Company of South Carolina~~, a Delaware corporation (7198)~~), and ~~Orchids Lessor SC~~OLSC Liquidating Company, LLC, a South Carolina limited liability company (7298)~~. The location of the Debtors' mailing address is 201 Summit View Drive, Suite 110, Brentwood, Tennessee 37027.~~) (f/k/a Orchids Lessor SC, LLC).

69844093.18

*Possession*

2

69844093.3
69844093.4
69844093.6
69844093.7
69844093.14
69844093.18
69844093.17

**TABLE OF CONTENTS**

I.      Introduction ..................................................................................................... 11

II.     Important Dates ............................................................................................... 33

III.    Definitions and Construction of Terms ........................................................... 44

        A.      Definitions ............................................................................................ 44

        B.      Interpretation; Application of Definitions and Rules of Construction ..................... 18

IV.     Disclosures ...................................................................................................... 19

        A.      General Background .............................................................................. 19

                1.      Overview of Business Operations and Corporate Structure .............................. 19

                2.      Financial Overview of the Company ........................................... 19

                3.      Events Precipitating the Chapter 11 Filing ................................ 22

        B.      The Chapter 11 Cases ........................................................................... 25

                1.      First Day Orders ...................................................................... 25

                2.      Retention of Professionals ........................................................ 26

                3.      Appointment of the Committee ................................................. 26

                4.      Sale of the Debtors' Assets ...................................................... 26

                5.      Resignation of Directors and Change of Company Names ............................... 29

                6.      FAPSA Settlement ................................................................... 29

                7.      NLRB Settlement ..................................................................... 30

                8.      Committee Adversary Proceeding ............................................. 30

                9.      Claims Process and Bar Date .................................................... 31

                10.     Satisfaction of Claims Prior to the Effective Date ..................... 31

        C.      Summary of Assets ............................................................................... 33

        D.      Summary of Treatment of Claims and Interests Under the Plan .................................. 3333

        E.      Certain U.S. Federal Income Tax Consequences to this Combined Plan and Disclosure
                Statement .............................................................................................. 34

          1.      Consequences to Debtors ........................................................... 36

          2.      Consequences to Holders of Class 4 General Unsecured Claims ....................... 39

    F.    Certain Risk Factors to Be Considered ............................................ 39

    G.    Feasibility ........................................................................... 4040

    H.    Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement .... 40

    I.    Releases by the Debtors ............................................................ 42

V.    Unclassified Claims ..................................................................... 42

    A.    Administrative Expense Claims ..................................................... 42

    B.    Professional Fee Claims ............................................................ 43

    C.    Priority Tax Claims ................................................................. 44

    D.    Statutory Fees ...................................................................... 44

VI.    Classification and Treatment of Claims and Interests ...................................... 44

    A.    Classification of Claims and Interests .............................................. 44

    B.    Treatment of Claims and Interests ................................................. 44

          1.      Class 1 – First Lien Claims ................................................. 44

          2.      Class 2 - Other Secured Claims ............................................ 45

          3.      Class 3 – Priority Claims ................................................... 45

          4.      Class 4 – General Unsecured Claims ....................................... 46

          5.      Class 5 – Equity Interests .................................................. 46

    C.    Impaired Claims and Equity Interests .............................................. 47

    D.    Cramdown and No Unfair Discrimination .......................................... 47

VII.    Confirmation Procedures ................................................................ 47

    A.    Confirmation Procedures ........................................................... 47

          1.      Combined Hearing .......................................................... 47

          2.      Procedure for Objections ................................................... 48

          3.      Requirements for Confirmation ............................................. 48

B.      Solicitation and Voting Procedures ........................................................... 48

        1.      Substantive Consolidation ............................................................. 48

        2.      Eligibility to Vote on the Combined Plan and Disclosure Statement ................ 49

        3.      Solicitation Package ....................................................................... 49

        4.      Voting Procedures and Voting Deadline .......................................... 49

        5.      Deemed Acceptance or Rejection .................................................... 50

        6.      Acceptance by Impaired Classes .................................................... 51

VIII.   Implementation and Execution of the Combined Plan and Disclosure Statement .................... 51

A.      Effective Date ........................................................................................... 51

B.      Implementation of the Combined Plan and Disclosure Statement ........................ 51

        1.      General ........................................................................................... 51

        2.      Corporate Action; Officers and Directors; Effectuating Documents ................ 52

C.      Records ...................................................................................................... 52

D.      Liquidating Trust ...................................................................................... 52

        1.      Establishment of the Liquidating Trust ......................................... 52

        2.      Transfer of Liquidating Trust Assets to Liquidating Trust .................. 52

        3.      Purpose of Liquidating Trust ......................................................... 53

        4.      Preservation of Rights .................................................................... 54

        5.      Liquidating Trustee ........................................................................ 55

        6.      Liquidating Trust Expenses ........................................................... 57

        7.      Privileges ........................................................................................ 57

        8.      Termination of Liquidating Trust .................................................. 58

        9.      Exculpation Relating to the Liquidating Trust ............................... 58

E.      Effective Date and Other Transactions ................................................... 59

        1.      Transfer of Assets to Purchaser .................................................... 59

        2.      Transfer of Assets to Liquidating Trust ........................................ 5959

Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed
Field Code Changed

F.      Provisions Governing Distributions Under the Combined Plan and Disclosure Statement 59

        1.      Distribution Record Date .................................................................... 59

        2.      Method of Payment ............................................................................ 59

        3.      Surrender of Instruments .................................................................... 60

        4.      Delivery of Distributions .................................................................... 60

        5.      Objection to and Resolution of Claims ............................................... 61

        6.      Preservation of Rights to Settle Claims .............................................. 61

        7.      Miscellaneous Distribution Provisions ............................................... 61

IX.     Executory Contracts and Unexpired Leases ..................................................... 62

        A.      Background ....................................................................................... 62

        B.      Executory Contracts and Unexpired Leases ........................................ 63

        C.      Rejection Claims ............................................................................... 63

X.      Conditions Precedent to Confirmation and the Effective Date ........................... 63

        A.      Conditions Precedent to Confirmation ................................................ 63

        B.      Conditions Precedent to the Effective Date ......................................... 63

        C.      Waiver of Conditions ......................................................................... 64

        D.      Effect of Nonoccurrence of Conditions .............................................. 6464

XI.     Exculpation, Releases, and Injunctions ........................................................... 64

        A.      Injunction ......................................................................................... 64

        B.      Exculpation ...................................................................................... 65

        C.      Estate Releases .................................................................................. 65

        D.      Third Party Release ............................................................................ 66

XII.    Retention of Jurisdiction ................................................................................ 65

XIII.   Miscellaneous Provisions ............................................................................... 68

        A.      Amendment or Modification of the Combined Plan and Disclosure Statement ............... 69

        B.      Exhibits/Schedules ............................................................................ 69

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

C.      Plan Supplement ..................................................................... 69

D.      Filing of Additional Documents ......................................... 69

E.      Binding Effect of Plan ........................................................ 69

F.      Governing Law ..................................................................... 69

G.      Time .......................................................................................... 69

H.      Severability ............................................................................ 70

I.      Revocation .............................................................................. 70

J.      Dissolution of the Committee .......................................... 70

K.      Claims Agent ........................................................................ 70

L.      Inconsistency ........................................................................ 70

M.      No Admissions ..................................................................... 71

N.      Successors and Assigns ..................................................... 71

O.      Dissolution of the Debtors and Closing of Chapter 11 Cases ................................................. 71

P.      Management ........................................................................... 71

Q.      Reservation of Rights ........................................................ 71

R.      Compromise of Controversies ......................................... 72

S.      SEC Reservation of Rights ............................................... 72

T.      No Discharge ......................................................................... 72

XIV.      Recommendation ..................................................................... 7272

69844093.18

**Plan Exhibits**

<u>Exhibit A</u>:      Liquidation Analysis

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THE COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

I.    **Introduction**[1]

The Debtors propose the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code sections 1125 and 1129, and Local Rule 3017-2. The Debtors are the "proponents" of the Combined Plan and Disclosure Statement within the meaning of Bankruptcy Code section 1129.

~~While the~~The Combined Plan and Disclosure Statement reflects substantial negotiations among the Debtors and the Committee, and the Committee ~~asserts that the Third Party Releases granted under~~encourages creditors to vote to accept this Combined Plan and Disclosure Statement ~~are inappropriate and should not be approved by the Court~~.

Copies of the Combined Plan and Disclosure Statement and all other documents related to the Chapter 11 Cases are available for review without charge on the bankruptcy case website at: https://cases.primeclerk.com/orchidspaper/Home-DocketInfo.

The Combined Plan and Disclosure Statement is a liquidating chapter 11 plan. The Acquired Assets have already been transferred from the Debtors to the Purchaser as part of the Close of Sale. The Combined Plan and Disclosure Statement provides that upon the Effective Date: (i) Liquidating Trust Assets will be transferred to the Liquidating Trust; and (ii) after completing all of their ordinary course business operations and fiduciary obligations, the Debtors will be dissolved on the Effective Date and all responsibility thereafter will transfer to the Liquidating Trust. The Liquidating Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Combined Plan and Disclosure Statement.

Each Holder of a Claim against the Debtors who is entitled to vote to accept or reject the Combined Plan and Disclosure Statement is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

Holders of Claims in Class 1, which consist of Holders of First Lien Claims, are not Impaired and were paid following the Close of Sale. Holders of Claims in Class 2, which consist of Holders of Other Secured Claims, are not Impaired and each such Holder shall (a) receive the collateral securing its Allowed Other Secured Claim; or (b) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable. Holders of Claims in Class 3, which consist of Holders of Priority Claims, are not Impaired and will be paid in full on or as soon as reasonably practicable after the later of (a) the Effective Date; (b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Debtors or Liquidating Trustee, as the case may be, and the Holder of the Allowed Other Priority Claim.

Holders of Claims in Class 4, which consist of Holders of General Unsecured Claims, are Impaired and will be paid by the Liquidating Trust Assets. The Liquidating Trust Assets shall be

---

[1]  All capitalized terms used but not defined in the introduction shall have the meanings ascribed to them in Article II of the Combined Plan and Disclosure Statement.

comprised of: (i) the Orchids Investment Settlement Payment, which is Cash equal to $825,000 that is currently held in escrow pending Confirmation; (ii) the Estate Claims, which consist of: (1) the Avoidance Actions other than the "Acquired Avoidance Actions" included in the APA; (2) commercial tort claims as defined in Article 9 of the UCC, other than Claims included in "Acquired Assets" in the APA, (3) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Bankruptcy Code section 505; (4) D&O Claims; and (5) all other rights, Claims or Causes of Action not transferred to Purchaser pursuant to the APA and not otherwise expressly released hereunder; and (iii) the Liquidating Trust Funding, which consists of the Cash allocated in the Wind-Down Budget from the Wind-Down Amount that remains after all senior claims have been satisfied. A third-party preference analysis identified $1,900,000 as potential preference claims, of which Debtors estimated approximately 10% of that is recoverable. As to other Causes of Action (including Avoidance Actions and D&O Claims), given the uncertainty of recovery and that the Debtors are not aware of any such items, no value has been assigned. Holders of Equity Interests in Class 5 are Impaired and will receive, if any, a pro rata Distribution(s) from any remaining Liquidating Trust Assets or the proceeds thereof only after all Allowed Class 4 General Unsecured Claims, including the Allowed Orchids Investment Deficiency Claim, are paid in full.

The Liquidating Trust Expenses, including the fees of the Liquidating Trustee and fees for the Liquidating Trustee's professionals, will be paid out of the Liquidating Trust Assets prior to any Distribution being made to creditors.

| Class | Estimated Allowed Claims[2] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[3] |
|---|---|---|---|---|
| Class 1 – First Lien Claims | $205,384,646.35[4] | Unimpaired | No | 100% |
| Class 2 – Other Secured Claims | $0.00[5] | Unimpaired | No | 100% |

---

[2] These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[3] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[4] The Debtors estimate that the aggregate amount of Allowed First Lien Claims as of the Petition Date was $205,384,646.35; however, the First Lien Claims were paid in full on the Closing Date in full satisfaction of the First Lien Claims.

2

| Class 3 – Priority Claims | $2,940,036.35[6] | Unimpaired | No | 100% |
|---|---|---|---|---|
| Class 4 – General Unsecured Claims | $37,058,310.10[7] ($13,451,855.69 of which is the Orchids Investment Deficiency Claim) | Impaired | Yes | 1–2%[8] |
| Class 5 – Equity Interests | N/A | Impaired, deemed to reject | No | 0%[9] |

Subject to the restrictions on modifications as set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and in the Combined Plan and Disclosure Statement, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before its substantial consummation.

## II.    Important Dates

| | |
|---|---|
| Voting Procedures Hearing Objection Deadline | October  9, 2019 at 4:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | October 16, 2019 at 10:30 a.m. (ET) |
| Voting Record Date | The earlier of October 16, 2019 or the entry of the Interim Approval and Procedures Order |
| Deadline to Mail Solicitation Packages and all Notices | Within five (5) business days after entry of the Interim Approval and Procedures Order. |

---

[5] All Other Secured Claims, if any, that have not otherwise been paid by the Debtors were transferred to, or became the responsibility of, the Purchaser under the APA at Closing or such underlying Contracts have been rejected by the Debtors and such deficiency claims are general unsecured claims against the Estates.

[6] This is the amount set forth in the Schedules and has not yet been reconciled by the Debtors. All Priority Claims, which are primarily employee wage claims that have already been paid pursuant to a First Day Order, were assumed by the Purchaser and will be paid, or were transferred to, or became the responsibility of, the Purchaser under the APA at Closing.

[7] This is the amount set forth in the Schedules and has not yet been reconciled by the Debtors, and includes the Allowed Orchids Investment Deficiency Claim; however, upon reconciliation of claims, the Debtors believe that the Allowed General Unsecured Claims will be far less than the amount set forth herein, but to date there has been no independent analysis of the actual valid amount of such claims.

[8] For the avoidance of doubt, holders of Allowed Class 4 General Unsecured Claims will receive a pro rata Distribution(s) from any remaining amounts of the Orchids Investment Settlement Payment and any net proceeds from the recovery on account of Estate Claims and other Liquidating Trust Assets after all senior Claims have been satisfied pursuant to the Combined Plan and Disclosure Statement and in accordance with the Orchids Investment 9019 Order.

[9] Holders of Allowed Class 5 Equity Interests will receive, if any, a pro rata Distribution(s) from any remaining Liquidating Trust Assets or the proceeds thereof only after all Allowed Class 4 General Unsecured Claims, including the Allowed Orchids Investment Deficiency Claim, are paid in full. The Debtors do not anticipate there will be available funds to make such a Distribution.

69844093.18

| | |
|---|---|
| Deadline for Debtors to Object to Claims for Voting Purposes Only | November 11, 2019 at 4:00 p.m. (ET) |
| Deadline to File Plan Supplement | November 18, 2019 at 4:00 p.m. (ET) |
| Deadline for Creditors to File Rule 3018 Motions | November 25, 2019 at 4:00 p.m. (ET) |
| Deadline for Debtors to Respond to Rule 3018 Motions | December 2, 2019 at 4:00 p.m. (ET) |
| Voting Deadline for the Combined Plan and Disclosure Statement | December 2, 2019 at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | December 2, 2019 at 4:00 p.m. (ET) |
| ~~Opt Out Deadline~~ | ~~December 2, 2019 at 4:00 p.m. (ET)~~ |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement, and form of Confirmation Order | December 6, 2019 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | December 6, 2019 at 4:00 p.m. (ET) |
| Combined Hearing | December 11, 2019  at 10:30 a.m. (ET) |

## III.    Definitions and Construction of Terms

### A.    Definitions

"**Acquired Assets**" means the assets that the Debtors sold, conveyed, assigned, transferred, and delivered to Purchaser, and that Purchaser purchased from Debtors, in each case, free and clear of all Liens, other than certain permitted encumbrances, in accordance with the terms of the Sale Order and APA. Any inconsistencies that arise under this definition shall be interpreted in favor of the definition of Acquired Assets in the APA, as modified by the Sale Order.

"**Administrative Expense Bar Date**" means the date that is 30 calendar days after the Effective Date.

"**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs and expenses of preserving the Estates under Bankruptcy Code sections 503(b) and 507(a)(2) including, without limitation: (a) Professional Fee Claims, and (b) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code.

"**Affiliate**" means an "affiliate" as defined in Bankruptcy Code section 101(2).

"**Allowed**" means, with reference to any Claim, proof of which was timely and properly Filed or, if no Proof of Claim was Filed, that has been or hereafter is listed by a Debtor on its Schedules as liquidated in amount and not disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed by the Bankruptcy Court, in whole or in part, by a Final Order.

69844093.18

"**Ankura**" means Ankura Trust Company, LLC.

"**APA**" means the Asset Purchase Agreement, dated July 1, 2019, between the Debtors and Purchaser, as may have been subsequently amended or modified consistent with its terms.

"**Acquired Avoidance Actions"** has the meaning set forth in the APA.

"**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise that are not Acquired Avoidance Actions.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Combined Plan and Disclosure Statement, on which the Holder is to indicate acceptance or rejection of the Combined Plan and Disclosure Statement in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined Plan and Disclosure Statement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date Motion**" means the *Motion of Debtors for Entry of an Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Section 503(b)(9) Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 264].

"**Bar Date Order**" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Section 503(b)(9) Claims and (II) Approving Form and Manner of Notice Thereof* [Docket No. 330].

"**Bar Date**" means, with respect to those Claims covered by the Bar Date Order, excluding proofs of claim by a Governmental Unit, July 30, 2019.

"**BDCF**" means Black Diamond Commercial Finance, L.L.C., a Delaware limited liability company.

"**Bidding Procedures Order**" means the *Order (I) Approving Bidding Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter into the Option Agreement and Stalking Horse Agreement,*

5

*Approving Stalking Horse Bid Protections, (V) Approving Procedures for the Assumption and Assignment of Contracts, and (VI) Granting Related Relief* [Docket No. 179].

"**Board**" means the members of the Debtors' Board of Directors from and after the Petition Date.

"**Borrower**" means Debtor Orchids Paper Products Company.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Cascades**" means Cascades Holding US Inc., a Delaware Corporation.

"**Case Website**" means the website maintained by Prime Clerk where parties are able to view the Combined Plan and Disclosure Statement and other documents related to the Chapter 11 Cases at https://cases.primeclerk.com/orchidspaper/.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action (including Avoidance Actions and D&O Claims), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" means the chapter 11 cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered by the Bankruptcy Court under Case No. 19-10729-MFW.

"**CIA**" means cash in advance.

"**Claim**" shall have the meaning set forth in Bankruptcy Code section 101(5).

"**Claims and Balloting Agent**" means Prime Clerk in its capacity as balloting agent for the Combined Plan and Disclosure Statement.

"**Claims and Noticing Agent**" means Prime Clerk in its capacity as claims and noticing agent to the Debtors.

"**Claims Register**" means the official register of Claims maintained by Prime Clerk.

6

69844093.18

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Close of Sale**" means the date on which the Debtors and Purchaser closed the transaction that transferred the Acquired Assets to Purchaser pursuant to the Sale Order and the APA.

"**Closing Date**" means the date on which the Close of Sale occurred.

"**COD**" means cancellation of indebtedness.

"**Combined Plan and Disclosure Statement**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Committee**" means the Official Committee of Unsecured Creditors of Orchids Paper Products Company and its affiliated debtors as appointed by the U.S. Trustee on April 15, 2019 [Docket No. 65].

"**Committee Adversary Proceeding**" means that certain adversary proceeding commenced by the Committee on June 21, 2019 (Adv. No. 19-50264 (MFW)) against Orchids Investment and Ankura challenging the extent, validity, priority and valuation of certain of Orchids Investment's liens and security interests in certain assets of the Debtors.

"**Committee Sale Objection**" means the Objection to the Sale Motion filed by the Committee on June 26, 2019 [Docket No. 293] to the Sale of substantially all of the Debtors' assets to the Stalking Horse Bidder pursuant to a credit bid because as set forth in the Committee Adversary Proceeding, the Committee has challenged the extent, validity, perfection and value of the First Lien Lender's asserted security interests and liens in and to certain assets of the Debtors and the valuation of certain of the Debtors' assets.

"**Company**" means Orchids along with: (i) its Debtor-affiliates (a) Orchids South Carolina and (b) Orchids Lessor SC; and (ii) its non-Debtor affiliates (x) Orchids Mexico Holdings, (y) Orchids Mexico Member, and (z) OPP Acquisition Mexico.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

"**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129.

"**Confirmation**" means confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtors as defined in Bankruptcy Code section 101(10).

"**Critical Vendors**" means certain vendors, suppliers, service providers, and other similar parties that are essential to maintaining the going concern value of the Debtors' business.

"**CSO**" means Richard S. Infantino, the Interim Chief Strategy Officer of the Debtors.

"**D&O Claims**" means any claims or Causes of Action held by the Debtors or their Estates against current and former directors and officers of the Debtors arising prior to the Petition Date, but solely to the extent of any available coverage under the D&O Policies and all rights of any nature with respect thereto running in favor of the Debtors, including all recoveries thereunder and all rights to such Claims or Causes of Action under the D&O Policies.

"**D&O Policies**" means the following insurance policies of the Debtors: (i) D&O insurance policy with carrier CNA, policy number 592420409 with policy limit $5 million; (ii) excess D&O insurance policy with carrier Everest, policy number SC8EX00063-181 with policy limits $5 million excess of $5 million; (iii) excess D&O insurance policy with carrier QBE, policy number QPL0707103 with policy limits $5 million excess of $10 million; (iv) excess D&O insurance policy with carrier Beazley, policy number V1F258180201 with policy limits $5 million excess of $15 million; and (v) excess D&O insurance policy with carrier Old Republic, policy number ORPRO 41094 with policy limits $15 million excess of $20 million (Side A).

"**Debtors**" means the debtors in the Chapter 11 Cases: Orchids, Orchids South Carolina, and Orchids Lessor SC.

"**Deficiency Claim**" means a General Unsecured Claim for the difference between (a) the aggregate amount of a Secured Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim as set forth in Bankruptcy Code section 506.

"**DIP Agent**" means Ankura in its capacity as administrative agent of the DIP Lender in the Chapter 11 Cases.

"**DIP Credit Agreement**" means the Debtor in Possession Credit Agreement among the Borrower, Guarantors, and DIP Lender [Docket No. 18, Exhibit A], as amended or modified from time to time.

"**DIP Facility**" means the senior secured superpriority loan of up to an aggregate amount of $4 million available on an interim basis as approved by the First Interim DIP Order and as modified by the Second Interim DIP Order and up to $4 million pursuant to the Final DIP Order.

8

"**DIP Facility Claims**" means all Claims asserted against the Debtors by the DIP Lender, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitations, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lender), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Lender**" means, collectively, Orchids Investment in its capacity as postpetition financier in the Chapter 11 Cases and Ankura in its capacity as DIP Agent.

"**DIP Liens**" means the senior secured superpriority liens granted to the DIP Lender in all of the Debtors' Assets under the First Interim DIP Order and as modified by the Second Interim DIP Order, the Final DIP Order, and further orders of the Bankruptcy Court.

"**DIP Motion**" means the *Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1, 4001-2 and 6004-1 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 18].

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Plan and Disclosure Statement, the Bankruptcy Code, applicable law or by Final Order.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is (a) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been Filed, or (b) the subject of an objection or request for estimation Filed by the Debtors or the Liquidating Trustee or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order.

"**Distribution**" means any distribution to the Holders of Allowed Claims.

"**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

"**DTBA**" means Deloitte Transactions and Business Analytics LLP.

"**Effective Date**" means the date on which the conditions specified in Article X.B of the Combined Plan and Disclosure Statement have been met or satisfied.

"**Effective Date Distributions**" means all Distributions required to be made on the Effective Date of the Combined Plan and Disclosure Statement to the Holders of Claims that are Allowed as of the Effective Date.

"**Effective Date Transactions**" means the transactions listed in Article VIII.E.

69844093.18

"**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

"**Equity Interests**" means all equity interests in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares or membership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"**Estate Claims**" means (1) the Avoidance Actions other than the "Acquired Avoidance Actions" included in the APA; (2) commercial tort claims as defined in Article 9 of the UCC, other than Claims included in "Acquired Assets" in the APA, (3) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Bankruptcy Code section 505; (4) D&O Claims; and (5) all other rights, Claims or Causes of Action not transferred to Purchaser pursuant to the APA and not otherwise expressly released hereunder. A non-exclusive schedule of Estate Claims is attached hereto as Exhibit C.

"**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

"**Excluded Assets**" means assets of the Debtors that are not Acquired Assets, which the Debtors shall retain and not transfer to Purchaser pursuant to the APA. Any inconsistencies which arise under this definition shall be interpreted in favor of the definition of "Excluded Assets" in the APA, as modified by the Sale Order.

"**Exculpated Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors' current Professionals as of the Petition Date; (b) the Debtors' CSO; (c) the Debtor's Board and officers who are serving in such capacity on or after the Petition Date; and (d) the Committee and current and former members of the Committee in their capacity as members of the Committee. With respect to each of the foregoing identified in subsection (d), each and all of their respective direct and indirect current and former affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives and the Committee's Professionals, each in their capacity as such.

"**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtors and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to the Combined Plan and Disclosure Statement.

"**FAPSA**" means Fabrica de Papel San Francisco, S.A. de C.V.

"**FAPSA 9019 Order**" means the order of the Bankruptcy Court approving the FAPSA Term Sheet under Rule 9019(a) of the Bankruptcy Rules [Docket No. 478].

"**FAPSA Cure Objection**" means the *Objection and Reservation of Rights of Fabrica de Papel San Francisco, S.A. de C.V. to Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 277].

10

"**FAPSA Objections**" means, collectively, the FAPSA Cure Objection and the FAPSA Sale Objection.

"**FAPSA Sale Objection**" means the *Objection of Fabrica de Papel San Francisco, S.A. de C.V. to Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 287].

"**FAPSA Settlement Parties**" means, collectively, Orchids, Orchids South Carolina, Orchids Lessor SC, Orchids Mexico Holdings, Orchids Mexico Member, Purchaser, and FAPSA.

"**FAPSA Supply Agreement**" means that certain Product Supply Agreement between FAPSA and Orchids effective as of June 3, 2014.

"**FAPSA Term Sheet**" means that certain Term Sheet among the FAPSA Settlement Parties dated August 11, 2019.

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

"**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

"**Final DIP Order**" means the *Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1, 4001-2 and 6004-1 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 490].

"**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and

11

the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

"**First Day Declaration**" means the *Declaration of Richard S. Infantino, Interim Chief Strategy Officer of Orchids Paper Products Company, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19].

"**First Day Order**" means the Final Orders entered by the Bankruptcy Court approving the First Day Motions and granting the relief set forth in each First Day Motion.

"**First Interim DIP Order**" means the *Interim Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1, 4001-2 and 6004-1 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 44].

"**First Lien Claims**" means the Claims held by Orchids Investment in its capacity as Prepetition Secured Lender, and excluding the DIP Facility Claims.

"**General Bar Date**" is as defined in the Bar Date Order.

"**General Unsecured Claims**" means any unsecured Claim against the Debtors which is not a Priority Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Secured Tax Claim, DIP Facility Claim, or Other Secured Claim and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Governmental Bar Date**" means, pursuant to the Bar Date Order, the date by which Proofs of Claim on behalf of Governmental Units must be submitted: September 30, 2019 at 4:00 p.m. prevailing Eastern Time.

"**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

"**Guarantors**" means (i) OPP Acquisition Mexico, (ii) Orchids Mexico Holdings, (iii) Orchids Mexico Member, and (iv) Orchids South Carolina.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Houlihan Lokey**" means Houlihan Lokey Capital, Inc.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Intercompany Claims**" means any Claim held by one Debtor against another Debtor.

"**Interest**" means any "equity security" in a Debtor as defined in Bankruptcy Code section 101(16), including, without limitation, all issued, unissued, authorized or outstanding

69844093.18

ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Plan and Disclosure Statement for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement [Docket No. TBD].

"**Licenses**" means required certificates of need, certificates of exemption, franchises, accreditations, registrations, licenses, permits, and other consents or approvals issued by any Governmental Entity or accreditation organizations necessary to operate the Business.

"**Liquidating Trust**" means a liquidating trust to be established on the Effective Date of the Plan pursuant to the terms of the Liquidating Trust Agreement and the Combined Plan and Disclosure Statement for the purpose of administering the Liquidating Trust Assets and to make one or more Distribution(s) to Holders of Allowed Class 4 Claims and, if applicable, Holders of Class 5 Equity Interests.

"**Liquidating Trust Agreement**" means the trust agreement that documents the powers, duties, and responsibilities of the Liquidating Trustee, and which agreement will be materially consistent with and subject to the Combined Plan and Disclosure Statement and otherwise in the substance and form included in the Plan Supplement.

"**Liquidating Trust Assets**" means the Orchids Investment Settlement Payment, Estate Claims and the proceeds thereof and the Liquidating Trust Funding, and any other remaining assets of the Estates, including any and all rights under the D&O Policies.

"**Liquidating Trust Expense**" means all actual and necessary fees, costs, expenses and obligations incurred or owed by the Liquidating Trustee or his or her agents, employees, attorneys, advisors or other professions in administering the Combined Plan and Disclosure Statement and the Liquidating Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary expense incurred by the Liquidating Trustee and his or her agents, employees and professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a final decree closing the Chapter 11 Cases, which shall be solely payable from the Liquidating Trust Assets.

"**Liquidating Trust Funding**" means the Cash allocated in the Wind-Down Budget from the Wind-Down Amount that remains after all senior claims have been satisfied and which shall be used first to fund the administration of the Liquidating Trust and pay all Liquidating Trust Expenses and, thereafter, to fund distributions to Holders of Allowed Class 4 Claims and, if applicable, Holders of Class 5 Equity Interests.

"**Liquidating Trustee**" means the Person selected by the Committee, in consultation with the Debtors, to administer the Liquidating Trust under the Liquidating Trust Agreement and as identified in the Plan Supplement and the Liquidating Trust Agreement.

69844093.18

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**NLRB Board**" means the National Labor Relations Board for the United States of America.

"**NLRB 9019 Order**" means the order of the Bankruptcy Court approving the NLRB Settlement Agreement pursuant to Rule 9019(a) of the Bankruptcy Rules [Docket No. ~~TBD~~562].

"**NLRB Settlement Agreement**" means that certain Mediation Settlement Agreement among Orchids, the NLRB Board, and United Steelworkers dated ~~September [___].~~October 15, 2019.

~~"**Opt Out Deadline**" means December 2, 2019 at 4:00 p.m., the deadline by which Holders of Claims or Equity Interests must opt out of the Third Party Release.~~

"**Orchids**" means Debtor Orchids Paper Products Company, a Delaware corporation.

"**Orchids Investment**" means Orchids Investment LLC, a Delaware limited liability company.

"**Orchids Investment Deficiency Claim**" means the Allowed Deficiency Claim of Orchids Investment in the amount of $13,451,855.69. The Orchids Investment Deficiency Claims increases by the per diem amount of $86,096.01 for each day which passes between August 27, 2019 and September 13, 2019, the date when the Sale proceeds net of the Orchids Investment Settlement Payment were paid to Orchids Investment.

"**Orchids Investment Settlement Agreement**" means that certain Settlement Agreement among Orchids Investment, the Committee and Ankura dated August 27, 2019, which resolves the Committee Adversary Proceeding and the Committee Sale Objection.

"**Orchids Investment Settlement Payment**" means Sale proceeds in the amount of $825,000 that are currently being held in escrow pending confirmation of the Plan pursuant to the terms of the Orchids Investment Settlement Agreement and subject to the Orchids Investment 9019 Order.

"**Orchids Investment 9019 Order**" means the order of the Bankruptcy Court approving the Orchid Investment Settlement Agreement by and among the Committee, Orchids Investment and Ankura pursuant to Rule 9019(a) of the Bankruptcy Rules [Docket No. 518].

"**Orchids Lessor SC**" means Debtor Orchids Lessor SC, LLC, a South Carolina limited liability company.

"**Orchids South Carolina**" means Debtor Orchids Paper Products Company of South Carolina, a Delaware corporation.

"**Orchids Mexico Holdings**" means non-debtor Affiliate Orchids Mexico (DE) Holdings, LLC, a Delaware limited liability company.

14

"**Orchids Mexico Member**" means non-debtor Affiliate Orchids Mexico (DE) Member, LLC, a Delaware limited liability company.

"**OPP Acquisition Mexico**" means non-debtor Affiliate OPP Acquisition Mexico, S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable* organized under the laws of Mexico.

"**Other Secured Claims**" means any Secured Claim other than the DIP Facility Claims, the First Lien Claims or the Secured Tax Claims.

"**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

"**Petition Date**" means April 1, 2019, the date on which the Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"**Plan Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court at least seven (7) days before the Confirmation Hearing.

"**Prime Clerk**" means Prime Clerk LLC.

"**Priority Claims**" means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than Administrative Expense Claims and Priority Tax Claims.

"**Priority Tax Claims**" means Claims of a Governmental Unit against any Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified section of Bankruptcy Code section 502(i).

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 pursuant to an Order of the Bankruptcy Court and who is to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, or 363.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

"**Professional Fee Claims Bar Date**" means the Administrative Expense Bar Date.

"**Professional Fee Escrow**" means the escrow account containing $4.4 million which was funded on the Closing Date in accordance with the APA and the Sale Order into that certain bank account established pursuant to a written agreement between the Debtors and Kurtzman Carson Consultants, LLC.

"**Proof of Claim**" means a proof of Claim Filed against any Debtor in accordance with the Bar Date Order or any other order by the Bankruptcy Court requiring for the fixing of Claims.

15

69844093.18

"**Purchaser**" means Cascades.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(a) by any of the Debtors, as limited, in the case of a rejected unexpired lease, by Bankruptcy Code section 502(b)(6).

"**Release by Debtors**" means the release given by the Debtors to the Released Parties as set forth in Article XI.C.

"**Released Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors' Professionals employed on or after the Petition Date; (b) the Debtors' CSO; (c) the Debtors' Board and officers who are serving in such capacity on or after the Petition Date, except with respect to D&O Claims; and (d) the Committee and members of the Committee in their capacity as members of the Committee. With respect to each of the foregoing identified in subsection (d), each and all of their respective direct and indirect current and former affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such.

"**Releasing Parties**" means, individually and collectively, (a) each Holder of a Claim or Equity Interest that (i) votes to accept the Combined Plan and Disclosure Statement, (ii) is conclusively deemed to have accepted the Combined Plan and Disclosure Statement, (iii) abstains from voting on the Combined Plan and Disclosure Statement, or (iv) is conclusively deemed to have rejected the Combined Plan and Disclosure Statement and does not opt out of the releases contained in the Combined Plan and Disclosure Statement; and (b) as to each of the foregoing Entities in the foregoing clause (a), each such Entities' and their affiliates' current and former officers, directors, principals, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and all other professionals and retained Professionals (in each case as to the foregoing Entities and their Affiliates in clause (a), solely in their capacity as such).

"**Rule 3018 Motion**" means a motion for temporary allowance of a claim for the purpose of voting on the Combined Plan and Disclosure Statement.

"**Sale Motion**" means the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling and Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Option Agreement and the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts, and (C) Granting Related Relief* [Docket No. 25].

69844093.18

"**Sale Order**" means the *Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrance, and Interests, (II) Authorizing the Assumption and Assignment of Contracts, and (III) Granting Related Relief* [Docket No. 362].

"**Sale**" means the sale of the Acquired Assets pursuant to the APA from the Debtors to Purchaser as approved by the Sale Order.

"**Schedules**" means the schedules of assets and liabilities, the list of Holders of Equity Interests, and the statements of financial affairs Filed by the Debtors under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Second Interim DIP Order**" means the *Further Interim Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rules 2002-1, 4001-1, 4001-2 and 6004-1 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 256].

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in the Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553.

"**Secured Tax Claims**" means any Secured Claims of a Governmental Unit which, absent their secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8), including any related Secured Claim for penalties.

"**Solicitation Package**" means the packages to be distributed to creditors for solicitation of votes on the Combined Plan and Disclosure Statement.

"**Stalking Horse Bidder**" means Orchids Investment in its role as stalking horse under the Bidding Procedures Order.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Tax Code**" means the Internal Revenue Code, as amended.

"**Third Party Release**" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article XI.D of the Combined Plan and Disclosure Statement.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

17

"**USB**" means U.S. Bank National Association in its capacity as administrative agent, sole book runner and prepetition lender under the Prepetition Credit Loan Documents.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

"**United Steelworkers**" means United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

"**Voting Classes**" means Class 4.

"**Voting Deadline**" means December 2, 2019 at 4:00 p.m.

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

"**Wind-Down Account**" means that segregated Orchids bank account holding the Wind-Down Amount.

"**Wind-Down Amount**" means the $500,000 cash paid by Purchaser pursuant to the APA and deposited into the Wind-Down Account for the benefit of Holders of Allowed Administrative Expense Claims and Allowed Priority Claims.

"**Wind-Down Budget**" means an amount equal to $500,000, as set forth in a budget setting forth Priority Claims, Administrative Expense Claims, and other costs incurred from and after the Closing Date to be paid from the Wind-Down Account for the post-Closing administration and wind-down of Debtors' Estates, including, without limitation, costs relating to the confirmation of the Combined Plan and Disclosure Statement, as agreed to by the Debtors and the Creditors' Committee or as otherwise approved by Order of the Bankruptcy Court.

**B.**     **Interpretation; Application of Definitions and Rules of Construction**

The following rules of construction, interpretation, and application shall apply:

(1)     Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2)     Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Plan and Disclosure Statement is to the respective section in, article of, schedule to, or exhibit to the Combined Plan and Disclosure Statement.

(3)     The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to

any particular section, subsection, or clause contained in the Combined Plan and Disclosure Statement.

(4)     The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Combined Plan and Disclosure Statement.

(5)     A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6)     The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.

(7)     Unless otherwise provided, any reference in the Combined Plan and Disclosure Statement to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8)     In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV.     Disclosures

### A.     General Background

#### 1.     Overview of Business Operations and Corporate Structure

The Company was a customer focused, national supplier of high-quality consumer tissue products. The Company was strategically aligned with retail's higher growth private label market, which large retail customers utilize to position competitively their brand against the dominant consumer brands. The Company was committed to supplying consistent, high quality, and competitively priced products, backed by a flexible and integrated manufacturing base. The Company provided a full range of tissue types (bath, towels, napkins and parent rolls) across the value spectrum (ultra-premium through conventional/value) with a wide range of packaging configurations to serve the diverse needs of national and regional customers. The Company offered premium virgin pulp based products, which rival national brands, along with a full suite of environmentally friendly recycled tissue products. The Company was publicly traded on the NYSE: MKT under the stock ticker "TIS". A link to the Company's website where more information about the Company may be located is https://orchidspaper.com.

Debtor Orchids directly owns the other two Debtors: Orchids South Carolina and Orchids Lessor SC. Debtor Orchids also owns, directly or indirectly, three (3) non-debtor subsidiaries: Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico, which is directly owned by Orchids Mexico Holdings and Orchids Mexico Member.

#### 2.     Financial Overview of the Company

##### a.     <u>Prepetition Credit Facility</u>

19

On or about June 25, 2015, Orchids, as borrower, USB, as administrative agent, arranger, sole book runner and lender, and the other lenders party thereto (collectively, "**Prior Prepetition Credit Lenders**") entered into that certain Second Amended and Restated Credit Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition Credit Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition Credit Loan Documents**"), pursuant to which the Prior Prepetition Credit Lenders provided Orchids with an aggregate financing commitment up to $187.3 million, consisting of a term loan commitment up to $47.3 million, a revolving loan commitment up to $25 million, and a draw loan commitment up to $115 million (the "**Prepetition Credit Agreement Loan**"). The Prepetition Credit Agreement had a final facility termination date of June 25, 2020.

The obligations under the Prepetition Credit Agreement were secured by first-priority liens (the "**Prepetition Credit Agreement Liens**") on substantially all of the assets of Debtors Orchids and Orchids South Carolina (but not Debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico, and such liens were perfected and, except as otherwise permitted in the Prepetition Loan Documents, had priority over all other liens (the "**Prepetition Credit Agreement Collateral**").

The obligations of Orchids under the Prepetition Credit Agreement were guaranteed by Debtors Orchids and Orchids South Carolina (but not Orchids Lessor SC) and non-debtor Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico.

b.    **Prepetition New Market Tax Credits Loan**

On or about December 29, 2015, Orchids, as borrower, and USB, as lender (the "**Prior Prepetition NMTC Lender**" and, together with the Prior Prepetition Credit Lenders, the "**Prior Prepetition Lenders**") entered into that certain Loan Agreement (as amended, restated or otherwise modified from time to time, the "**Prepetition NMTC Loan Agreement**," and together with all other documents, instruments, related writings, financing statements, security documents, and guarantees executed in connection therewith, the "**Prepetition NMTC Loan Documents**" and, together with the Prepetition Credit Loan Documents, the "**Prepetition Loan Documents**"), pursuant to which the Prior Prepetition NMTC Lender provided Orchids with a financing commitment equal to $11,109,050 (the "**Prepetition NMTC Loan**" and, together with the Prepetition Credit Agreement Loan, the "**Prepetition Loans**"). The Prepetition NMTC Loan had a final maturity date of December 29, 2022.

The Prepetition NMTC Loan served as the source loan for a series of transactions relating to the allocation of certain new markets tax credits (the "**NMTCs**") in favor of USBCDC Investment Fund 158, LLC ("**USBCDC**") under Section 45D of the Internal Revenue Code of 1986. A chart reflecting the structure of the NMTC transactions is attached to the First Day Declaration as Exhibit B. Orchids used the proceeds of the Prepetition NMTC Loan to make a leverage loan of $11,109,050 to USBCDC. USBCDC suballocated the NMTCs to U.S. Bancorp Community Development Corporation, as NMTC investor, in exchange for an equity investment. USBCDC then used proceeds of the equity investment and leverage loan to make equity investments in RDP 27 LLC and USBCDE Sub-CDE 146, LLC (collectively, the "**Sub-CDEs**"). The Sub-CDEs then made loans to Orchids Lessor SC so it could acquire certain converting and

20

other equipment (the "**Barnwell Equipment**") at the Barnwell, South Carolina facility owned by Orchids South Carolina. Orchids Lessor SC leased the Barnwell Equipment to Orchids, and the lease payments were used to service the secured loans owed to the Sub-CDEs. The loans by the Sub-CDEs were secured by liens on the Barnwell Equipment and the lease of such equipment by Orchids Lessor SC to Orchids.

The Prepetition NMTC Loan was secured by a first-priority lien on and collateral assignment of (the "**Prepetition NMTC Loan Agreement Liens**" and, together with the Prepetition Credit Agreement Liens, the "**Prepetition Liens**") the loan documents evidencing the leverage loan by Orchids to USBCDC (the "**Prepetition NMTC Loan Agreement Collateral**" and, together with the Prepetition Credit Agreement Collateral, the "**Prepetition Collateral**").

The Prepetition NMTC Loan to Orchids was guaranteed by Debtor Orchids South Carolina (but not Debtor Orchids Lessor SC) and non-debtors Orchids Mexico Holdings, Orchids Mexico Member, and OPP Acquisition Mexico.

c.    **Amendments to Prepetition Credit Agreement and Prepetition NMTC Loan Agreement**

Between November 6, 2016, and November 21, 2018, Orchids and the Prior Prepetition Credit Lenders entered into ten separate amendments to the Prepetition Credit Agreement, and Orchids and the Prior Prepetition NMTC Lender entered into seven separate amendments to the NMTC Loan Agreement. Certain of the amendments were necessitated by the fact the Debtors were out of compliance with various financial covenants due to its faltering financial performance as detailed more fully below, which constituted defaults under the agreements, including the following:

(a)    On February 28, 2018, the parties entered into Amendment No. 7 to the Prepetition Credit Agreement and Amendment No. 4 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the advance rates under the Borrowing Base (as defined therein) were adjusted to provide the Company more liquidity; (ii) Orchids was obligated to retain financial consultants reasonably acceptable to USB; and (iii) Orchids was obligated to retain consultants and/or advisors to assist Orchids to formulate a strategic plan with viable alternatives to facilitate repayment of the obligations under the Prepetition Credit Agreement in full with certain milestone dates relating thereto;

(b)    On April 19, 2018, the parties entered into Amendment No. 8 to the Prepetition Credit Agreement and Amendment No. 5 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the Revolving Commitment (as defined therein) was increased by approximately $21 million; (ii) Orchids was required to retain a CSO to report to the Board; and (iii) Orchids agreed to continue to retain an Investment Banker (Guggenheim Securities LLC ("**Guggenheim**"), which was retained after Amendment No. 7) to assist in the sale of Orchids' business with certain milestone dates relating thereto;

(c)      On August 3, 2018, the parties entered into Amendment No. 9 to the Prepetition Credit Agreement and Amendment No. 6 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, the milestones relating to a sale of Orchids' were extended; and

(d)      On November 21, 2018, the parties entered into Amendment No. 10 to the Prepetition Credit Agreement and Amendment No. 7 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the milestones relating to a sale of Orchids' business were extended; (ii) the Revolving Commitment was increased by $5.9 million; and (iii) Orchids agreed to retain Houlihan Lokey as its replacement Investment Banker.

The Prior Prepetition Lenders charged various fees under the foregoing amendments.

**d.      Assignment of Prepetition Loan Documents**

On or about December 24, 2018, the Prior Prepetition Lenders assigned their interests under the Prepetition Loan Documents to Orchids Investment (the "**Prepetition Secured Lender**"). On the same date, USB resigned as Administrative Agent and the Prepetition Secured Lender appointed BDCF as the new Administrative Agent. Thus, the Prepetition Secured Lender became the current owner and holder of the Prepetition Loans and the Prepetition Loan Documents, and the beneficiary of the Prepetition Liens against the Prepetition Collateral held by the Administrative Agent.

**e.      Additional Amendments to Prepetition Credit Agreement and Prepetition NMTC Loan Agreement**

On or about January 23, 2019, the parties entered into Amendment No. 11 to the Prepetition Credit Agreement and Amendment No. 8 to the Prepetition NMTC Loan Agreement pursuant to which, among other things, (i) the milestones relating to a sale of Orchids' business were extended; and (ii) the maximum Revolving Commitment under Amendment No. 10 was maintained at $51,903,846. Orchids agreed to pay various fees under the foregoing amendments.

**f.      Appointment of Successor Administrative Agent**

On or about February 15, 2019, BDCF resigned as Administrative Agent under the Prepetition Credit Agreement, and Ankura was appointed as successor Administrative Agent.

**3.      Events Precipitating the Chapter 11 Filing**

Prior to the Petition Date, the Company completed the final phase of a five year expansion plan with the goal to become a national supplier of the highest quality, primarily private label, tissue products from a lower cost asset base. On the East Coast, the Company built a $165 million greenfield facility in Barnwell, South Carolina (the "**Barnwell Facility**") capable of manufacturing both ultra-premium parent rolls and other grades on a new QRT tissue paper machine, the first of its kind in the United States, with 35,000 tons of capacity from virgin and de-inked pulps. The Company's QRT paper machine was a new technology developed by Valmet, Inc. ("**Valmet**") which combined the benefits from other tissue manufacturing machine

22

technologies (TAD, NTT, Conventional) that have been industry standards historically. The converting operations included two high-speed lines and printing capabilities.

On the West Coast, the Company made a $37 million investment in a strategic partnership with FAPSA, pursuant to which the Company acquired FAPSA's U.S. customers, acquired a tissue paper machine and converting lines located at FAPSA's facility in Mexicali, Mexico pursuant to a sale/leaseback transaction, and entered into a supply agreement with FAPSA providing access up to 19,800 tons of converted tissue. In the Midwest, the Company made a $39 million investment to replace two tissue paper machines at its Pryor, Oklahoma facility which added 17,000 tons of paper making capacity and 12,500 tons of converting capacity. The Company also added a new high speed converting line and printing capabilities and upgraded two existing lines.

At its Barnwell Facility, the two converting lines became operational in the first and third quarters of 2016, respectively. However, cost overruns in the construction of the facility and start-up inefficiencies with the operation of the converting lines and mill were significant drains on the Company's liquidity. The Barnwell Facility was not running efficiently or producing product at the original equipment manufacturer's goals. The Company worked with the original equipment manufacturer to address the operational issues with the converting lines and mill.

Compounding these problems were significant industry wide price increases on various raw materials among other things. Specifically, the price of the various pulp grades and fiber substitutes used to manufacture the Company's tissue products at both facilities rose significantly in 2018. The RISI index for Northern Softwood Kraft pricing increased from January 2018 to November 2018 by approximately 18.5%, from $1,210 per ton to $1,435 per ton. The RISI index for Eucalyptus increased from January 2018 to November 2018 by approximately 4.6%, from $1,180 per ton to $1,235 per ton. Both of these grades were significant components of raw material usage at the Barnwell facility throughout 2018 and in early 2019. A majority of the Company's tissue products were manufactured utilizing a variety of pulp substitutes including post-consumer sorted office products. From January 2018 to October 2018, the average recycle mix increased in price by about 39%. While pulp and pulp substitute pricing began to ease at the end of 2018 and continued to ease through February 2019, pricing of the Company's average recycle mix increased to about 30% higher than pricing at the beginning of 2018. At the same time there were driver shortages in the transportation industry, which increased the Company's freight costs and negatively impacted service levels to customers, sometimes resulting in customer penalties and chargebacks.

Significantly, on or about July 30, 2018, the Company received notice from a major customer that it intended to consolidate its supplier base and transition all of its product orders to a new supplier effective March 2019. This customer represented approximately 19% of the Company's converted product sales. Subsequently, on or about September 2018, the Company learned that an important, yet less significant customer as a percent of sales, intended to reduce its business. On or about December 2018, the Company learned a significant customer would be pulling its towel business effective April 2019. These customer losses were not a result of product quality or customer service problems. In each instance, according to interactions with the Company's sales personnel and management, these and other customers had expressed ongoing

23

concern about the Company's uncertain future based on its deteriorating financial condition as reported quarterly in the Company's public filings.

Further exacerbating the Company's deteriorating operating and financial condition, certain suppliers of raw materials and related manufacturing items moved the Company to CIA or significantly reduced credit terms in response to the Company's public financial reporting. Approximately ten vendors forced the Company into CIA or reduced credit terms so the Company was effectively on CIA.

In addition to the negative pressure on margins caused by increasing raw material costs, the Company experienced headwinds due to competitive pressures and industry conditions. The Company was forced to reduce prices for converted product due to market forces. In particular, manufacturers in the highly competitive tissue market, especially the larger competitors, fought for market share by reducing their prices. The Company was generally unable to set its own prices due to its smaller size and instead took prices set by its larger competitors.

The impact of these developments on the Company's financial performance was profound. Comparing the nine month periods ending September 30, 2017, and 2018:

(a) although sales improved approximately $23.9 million (20%) for a total of approximately $142.8 million, that improvement was offset by an increase in the Company's cost structure;

(b) gross profit decreased 41% from approximately $6.2 million to $3.7 million;

(c) cash flow (deficit) from operations decreased 238% from approximately $8.3 million to ($11.4 million); and

(d) net income (loss) decreased 1,044% from approximately ($2.2 million) to ($25.2 million).

Due to these significant operational and financial difficulties, the Company required significant and ongoing liquidity support. In summary, the Company accessed through its various Prepetition Credit Agreement Amendments approximately $26.9 million in additional borrowing capacity, of which it used $24 million. In addition, beginning with Amendment No. 9, the Company was able to defer payment of principal and interest, as well as amendment fees, enabling it to better focus its cash resources on maintaining its operations to avoid disruptions in production and customer service. For these reasons, and as required by Amendment Nos. 8-11 to the Prepetition Credit Agreement and Nos. 5-8 to the Prepetition NMTC Loan Agreement, the Company undertook a process to evaluate potential strategic options, including a sale of the Company or the refinancing of the Company's secured debt.

In March 2018, the Company retained Guggenheim to market a sale of the equity or assets of the Company or replacement financing sufficient to repay the obligations under the Prepetition Loan Documents in full. Guggenheim canvassed both strategic and financial buyers which led to numerous strategic and financial buyers executing confidentiality agreements and commencing some level of due diligence. In June 2018, the Company received certain indications of interest and thereafter commenced negotiating with the interested buyers. Due to

the Company's faltering financial performance and the loss of the significant customer and subsequent sales losses mentioned previously, however, the interested buyers ultimately withdrew their indications of interest.

In September and October 2018, Guggenheim obtained additional indications of interest, each of which proposed a cash purchase price far below the total amount of the Company's secured debt. In early November 2018, the Company terminated Guggenheim and after interviewing several candidates, selected Houlihan Lokey as its replacement investment banker. Houlihan Lokey thereafter contacted the two interested parties that had submitted indications of interest to commence negotiations regarding one of them acting as the stalking horse purchaser of the Company's assets. Houlihan Lokey also contacted other prospective buyers that had previously signed confidentiality agreements as well as additional strategic and financial buyers that had not participated in Guggenheim's prior marketing process.

In early December 2018, shortly after the execution of the definitive agreement pursuant to which it agreed to purchase the Prepetition Loan Documents, Orchids Investment advised the Debtors of its willingness to act as the stalking horse bidder to acquire substantially all of their assets through a credit bid. The Debtors thereafter commenced negotiations with the Prepetition Secured Lender to act as the stalking horse bidder.

In early February 2019, as a final market check, Houlihan Lokey issued a teaser and financial supplement to strategic buyers and a process letter to financial buyers that previously executed confidentiality agreements, and requested that indications of interest, including a mark-up of an asset purchase agreement, be submitted no later than February 21, 2019. Despite the Company and Houlihan Lokey's engagement with the targeted buyers, no indications of interest were timely received.

Thereafter, the Company received some additional indications of interest from potential buyers, and commenced discussions with those prospects regarding a transaction. Ultimately, however, none of the prospects made a viable proposal that would result in repayment of the Prepetition Loans as required by the Prepetition Secured Lender. Accordingly, the Company completed negotiations with the Prepetition Secured Lender, and the Debtors commenced these Chapter 11 Cases to conduct further marketing and sell substantially all of their assets pursuant to a sale under section 363 of the Bankruptcy Code.

**B.     The Chapter 11 Cases**

**1.     First Day Orders**

On the Petition Date, the Debtors Filed certain motions to transition into operations during the Chapter 11 Cases, stabilize operations, and preserve relationships with vendors, clients, and employees (the "**First Day Motions**").

The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) appoint Prime Clerk as Claims and Noticing Agent; (c) pay employee wages; (d) maintain the Debtors' cash management system; (e) pay taxes; (f) pay insurance obligations; (g) maintain utilities; (h) continue customer

25

programs; (i) pay shippers/warehousemen; (j) obtain postpetition financing; and (k) pay Critical Vendors. In support of the First Day Motions, the Debtors relied upon the First Day Declaration.

The Bankruptcy Court held hearings and granted the relief sought at hearings on April 3, 2019 and May 1, 2019. The Bankruptcy Court held an additional hearing on the DIP Motion on May 30, 2019 and entered the Final DIP Order on September 3, 2019.

### 2.    Retention of Professionals

The Debtors, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Polsinelli PC as counsel [Docket No. 139]; DTBA with Richard S. Infantino as Interim Chief Strategy Officer and certain additional personnel providing services to the Debtors [Docket No. 358]; Houlihan Lokey as financial advisor and investment banker [Docket No. 174]; and Prime Clerk as Claims and Noticing Agent and Administrative Agent [Docket Nos. 32, 469].

### 3.    Appointment of the Committee

On April 15, 2019, the U.S. Trustee officially appointed the Committee [Docket No. 65]. The Committee is made up of the following parties: (1) Cellmark Paper, Inc.; (2) Dixie Pulp & Paper Inc.; (3) Little Rapids Corporation; (4) Packaging Corporation of America; and (5) United Steelworkers.

The Committee, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Lowenstein Sandler LLP and CKR Law LLP [Docket Nos. 254 and 252], and subsequently, Montgomery McCracken Walker and Rhodes LLP as co-counsel replacing CKR Law LLP, and Alvarez and Marsal North America, LLC as its financial advisor [Docket No. 253].

### 4.    Sale of the Debtors' Assets

The Debtors, pursuant to the Sale Motion, sought to sell substantially all of their assets to Orchids Investment as the Stalking Horse Bidder, subject to any higher or better offers and in accordance with the Bidding Procedures Order.

To that end, the Debtors, through their Professionals, conducted a comprehensive postpetition marketing process. Houlihan Lokey contacted 21 strategic parties and 40 financial parties, including all parties that had previously executed an NDA as part of the prior Houlihan Lokey sale processes, sharing a process letter and summary of the key terms and dates in the Stalking Horse Agreement and sale overbid process. Houlihan Lokey worked with the Debtors to facilitate further due diligence with interested parties. Such due diligence consisted of numerous site visits by both management and engineering teams, in addition to meetings and conference calls with other key parties in interest, including suppliers and strategic partners of the Debtors. After certain potential buyers expressed interest in submitting bids for certain of Debtors' facilities on a standalone basis, Houlihan Lokey worked with the Debtors to develop a facility-level break-out of key financial and operational terms by facility using the same categories of assets and liabilities in the Stalking Horse Agreement to facilitate the submission of bids for standalone facilities in addition to bids for the entire business.

26

At the conclusion of the marketing process, the Debtors received two (2) competing cash bids: one for the purchase of substantially all of the Debtors' Assets and one for the purchase of the Barnwell Facility. The Debtors, in consultation with the Committee, determined that one of the bidders, Cascades, was a qualified bidder and its bid was a qualified bid pursuant to the Bidding Procedures Order. As set forth more fully therein, the qualified bid from Cascades sought to acquire the Acquired Assets in exchange for a cash bid of $176 million (including $500,000 cash for a wind-down budget, and $500,000 cash for the required initial overbid), repayment of the DIP Facility Claims as of the Close of Sale, and assumption of a substantial portion of the Debtors' liabilities. In connection with its qualified bid, Cascades delivered to the Debtors (c/o their escrow agent, Kurtzman Carson Consultants, LLC) a deposit in the amount of $10,645,920. Separately, the Debtors, in consultation with the Committee, determined that the second cash bid received by the bid deadline, which only sought to purchase the Barnwell Facility, was not a qualified bid and therefore the bidder would not be allowed to participate in the Auction.

On July 27, 2019, the Debtors conducted the auction at the law offices of Polsinelli PC in Wilmington, DE (the "**Auction**"). At the commencement of the Auction, the Debtors provided rules and procedures that would govern the Auction in accordance with the Bidding Procedures Order.  Counsel and other representatives for the Debtors, the Committee, Orchids Investment, Cascades, and other parties in interest were present at the Auction.

After thirty two (32) rounds of competitive bids between Orchids Investment and Cascades over the course of approximately thirteen (13) hours, Cascades made a final bid with a cash purchase price of $207 million plus certain additional cash payments as set forth in the APA, assumption of the Assumed Liabilities, and numerous value-producing alterations to its proposed APA as announced on the record during the Auction. Orchids Investment thereafter declined to make a further Overbid.

Accordingly, the Debtors determined in their reasonable business judgment, after consultation with their financial and legal advisors and the Committee, that Cascades was the Successful Bidder and that its final bid as described above was the successful bid pursuant to the Bidding Procedures Order. The Debtors also determined that Orchids Investment was the Backup Bidder. The Debtors then concluded the Auction.

The results of the Auction represented the culmination of an extensive marketing process by the Debtors that, taken together with the prior sale and refinancing process, involved outreach to more than 125 interested parties over a period of more than 12 months.

Following the Auction, the Board determined that Cascade's bid was the highest and best offer for substantially all of the Debtors' assets and that Cascade should be designated the successful bidder under the Bidding Procedure Order.

On July 1, 2019, the Bankruptcy Court held a hearing on the Sale. On July 15, 2019, the Bankruptcy Court entered the Sale Order, approving, *inter alia*, the Sale of substantially all of Debtors' assets to Cascades free and clear of all Liens, Claims, encumbrances, and Interests.

On September 13, 2019, the Close of Sale occurred. Pursuant to the Sale Order, the APA, the Final DIP Order, and other Final Orders of the Bankruptcy Court in the Chapter 11 Cases, Purchaser made payments in satisfaction of certain Claims on or subsequent to the Closing Date as discussed in more detail below.

Pursuant to Section 3.1 of the APA, the aggregate consideration paid by the Purchaser for the Acquired Assets included: (a) $207,000,000; plus the outstanding balance of the DIP Facility Claims (the "**DIP Amount**"); plus the incurred but not reported (as of the Closing Date) post-petition employee health care insurance claims of the Debtors, up to a maximum of $400,000 (the "**Health Care Amount**"); plus certain liabilities of the Debtors in respect of the matter set forth in Section IV.B.6 below, up to a maximum of $135,000 (the "**NLRB Amount**"); plus the real estate, personal property, and franchise Taxes of the Sellers for calendar year 2019, up to a maximum of $450,000 (the "**Property Tax Amount**"); plus the costs of removal or disposal of any assets removed from the Acquired Assets pursuant to Section 6.9(b) of the APA (the "**Removal Amount**"); plus the positive difference, if any, of (x) $500,000 minus (y) the amount of Cash and Cash Equivalents as of the Closing (the "**Shortfall Amount**"); plus the aggregate amount set forth on Schedule 7.1(g) of the APA (as such schedule exists as of the Effective Date, and without regard to any changes to such schedule following the Effective Date) under the "Buyer KERP" and "Buyer Consulting Agreement" columns (collectively, the "**KERP Amount**"), in cash (collectively, the "**Cash Portion**"); and (b) the assumption of certain liabilities of the Debtors including the payment of section 503(b)(9) claims and the payment of post-petition trade payables (the value of which, together with the Cash Portion, the "**Purchase Price**").

As required under Section 3.1 of the APA, the DIP Amount included the draw, if any, immediately prior to the Close of Sale that was placed in the Professional Fee Escrow in favor of Professionals equal to the aggregate projected accrued but unpaid amounts for professional costs, expenses and fees under the category "Restructuring Fees" in the approved budget annexed as Exhibit A to the Final DIP Order (the "**Approved Budget**") (but not including the utility adequate assurance deposit or critical vendor payments line items) from the Petition Date to the Closing Date, except to the extent paid pursuant to Section 6.20(b) of the APA.

At the Closing, the Cash Portion was paid in cash by wire transfer to one or more bank accounts as designated by Debtors prior to the Closing, less: (i) the Health Care Amount, (ii) the NLRB Amount, (iii) the Property Tax Amount, (iv) the Removal Amount, and (v) the KERP Amount.

Subsequent to the Closing, Purchaser paid, on behalf of Debtors, the Health Care Amount, the NLRB Amount, the Property Tax Amount and the Removal Amount directly to the Persons entitled thereto, promptly after such amounts became due and payable.

5.     **Resignation of Directors and Change of Company Names**

On or about the Closing Date, all of the directors of the Debtors, other than Mr. Steve Berlin, resigned, and Mr. Berlin will remain as the sole director through the Effective Date.

Subsequent to the Closing Date and in accordance with the APA and the Sale Order, the Debtors have changed their corporate names as set forth below:

| Old Company Name | New Company Name |
|---|---|
| Orchids Paper Products Company; Orchids Paper Products Company of South Carolina; and Orchids Lessor SC, LLC. | OPP Liquidating Company, Inc.; OPP Liquidating Company of South Carolina, Inc.; and OLSC Liquidating Company, LLC. |

6.     **FAPSA Settlement**

On June 24, 2019, FAPSA filed the FAPSA Cure Objection. On June 25, 2019, FAPSA filed the FAPSA Sale Objection. Through the FAPSA Objections, FAPSA objected to the Sale, sought to recover $8,585,790.33 for orders from Orchids owed and outstanding, and asserted that Debtors were required to cure all defaults as a condition to assumption and assignment of executory contracts.

On August 11, 2019, following negotiations, the FAPSA Settlement Parties entered into the FAPSA Term Sheet, pursuant to which the FAPSA Settlement Parties agreed to certain terms to resolve the FAPSA Objections. Pursuant to the FAPSA Term Sheet, (i) the FAPSA Supply Agreement would be modified as indicated in § 2 of the Term Sheet; (ii) the amended FAPSA Supply Agreement would be assumed and assigned to Purchaser; (iii) Purchaser agreed to pay to FAPSA Nine Million Dollars and NO/100 Cents ($9,000,000.00) plus any additional post-petition amounts owed to FAPSA that were due and payable after the Close of Sale less any payments on post-petition payables after July 31, 2019 (the "FAPSA Cure Amount"); (iii) FAPSA would pay to Orchids Mexico One Million Two Hundred Eighty Three Thousand Eighty Six Dollars and Nineteen Cents ($1,283,086.19); (iv) Cascades will directly purchase the equity of Orchids Mexico Holdings and Orchids Mexico Member and then sell, assign, convey and transfer to FAPSA the right, title, and interest to one-hundred percent (100%) of the equity or other ownership interests in Orchids Mexico for the sum of Twelve Million Dollars ($12,000,000) plus the amount of cash held in the bank accounts of Orchids Mexico at the Close of Sale; (v) Purchaser would not purchase any cause of action against FAPSA; (vi) Debtors would release FAPSA from any and all causes of action; (vii) FAPSA would release Debtors from any and all causes of action; and (viii) the FAPSA Settlement Parties would bear their own attorneys' fees and costs incurred in connection with the negotiation, execution, and effectuation of the FAPSA Term Sheet.

On August 27, 2019, the Bankruptcy Court entered the FAPSA 9019 Order approving the FAPSA Term Sheet. Pursuant to the FAPSA 9019 Order, the Sale Order, and the APA, Purchaser, and the Debtors, paid FAPSA the FAPSA Cure Amount.

### 7.    NLRB Settlement

On November 20, 2018, the NLRB Board issued a Decision and Order (the "Board Order") in Orchids Paper Products Co., 367 NLRB No. 33, finding that Orchids violated Section 8(a)(1), (3), and (5) of the National Labor Relations Act. The Board filed an application for enforcement in the United States Court of Appeals for the Tenth Circuit, Case No. 19-9503 (the "Enforcement Action"). The Enforcement Action entered the Court's mediation program.

During mediation, Orchids, the NLRB Board, and charging party United Steelworkers reached a resolution of the Enforcement Action, and in lieu of further proceedings, agreed to certain terms set forth in the NLRB Settlement Agreement. Pursuant to the Settlement Agreement, the Board calculated Orchids' make-whole liability to be in the aggregate $627,253.00 ("Total Assessed Liability"). The Total Assessed Liability is divided into three categories: (a) administrative expenses for make-whole liability accruing on and after the Petition Date pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the aggregate amounts of $13,183.00 ("NLRB Administrative Expense Claims"); (b) unsecured priority claims for make-whole liability accruing within 180 days before the Petition Date and within the applicable monetary caps pursuant to Section 507(a)(4) of the Bankruptcy Code in the aggregate amount of $104,423.00 (the "NLRB Priority Wage Claims"); and (c) general unsecured claims for all other make-whole liability accruing prior to the Petition Date in the aggregate amount of $509,647.00 (the "NLRB General Unsecured Claims", together with the NLRB Priority Wage Claims, and the NLRB Administrative Expense Claims, the "NLRB Claims"). Pursuant to the NLRB Settlement Agreement, the NLRB Claims are Allowed Claims.

On October [16],15, 2019, the Bankruptcy Court entered the NLRB 9019 Order. Pursuant to the NLRB 9019 Order, the Sale Order, and section 3.1(a)(iv) of the APA, the Purchaser agreed to pay on behalf of Orchids the liability of Orchids on account of the Allowed NLRB Administrative Expense Claims and NLRB Priority Wage Claims set forth above and related payroll taxes not to exceed $135,000.00, which amount will be placed in Escrow at Closing and released upon Bankruptcy Court approval of the NLRB Settlement. Subsequent to the Closing Date, the Purchaser paid the NLRB Administrative Expense Claims and NLRB Priority Wage Claims in full.

### 8.    Committee Adversary Proceeding

On June 21, 2019, the Committee commenced the Committee Adversary Proceeding against Orchids Investment and Ankura challenging the priority, extent, valuation and perfection of certain of Orchids Investment's liens on certain of the Debtors' assets and seeking, *inter alia*, a declaratory judgment regarding commercial tort claims, NOLs, claims and/or causes of action against directors and officers, and the D&O insurance policies, as well as the equipment owned by Debtor Orchids Lessor and certain vehicles. The defendants have answered the Complaint and filed a third party complaint against the Debtors. The Committee filed an answer to Orchids Investment's and Ankura's counterclaims**.**

On August 27, 2019, following substantial negotiations, Orchids Investment, the Committee and Ankura entered into the Orchids Investment Settlement Agreement, pursuant to which the parties agreed to certain settlement terms including, *inter alia*, (i) Orchids Investment agreed to make the Orchids Investment Settlement Payment; (ii) the Parties agreed to entry of a consensual Final DIP Financing Order; (iii) Orchids Investment agreed to a deficiency claim in the amount of $13,451,855.69[10] in these Chapter 11 Cases; (iv) Orchids Investment will vote the Orchids Investment  Deficiency Claim in support of the Debtors' Plan if such Plan is acceptable to the Lender in its reasonable discretion but will not participate in any distribution under the Debtors' Plan unless and until all other general unsecured claims of the Debtors are paid in full; and (v) the Committee agreed to dismiss the Committee Adversary Proceeding with prejudice.

On September 12, 2019, the Bankruptcy Court entered the Orchids Investment 9019 Order approving the Orchids Investment Settlement Agreement; provided, however, the Orchids Investment 9019 Order did not approve or authorize any distribution of the Orchids Investment Settlement Payment absent confirmation of a chapter 11 plan or further order of the Court on a motion on notice. The Orchids Investment 9019 Order further preserved the rights of all parties in interest, including but not limited to the United States Trustee, to object to any such distribution.

9.    **Claims Process and Bar Date**

The Debtors filed the Bar Date Motion on June 17, 2019. On July 2, 2019, the Bankruptcy Court entered the Bar Date Order.

Pursuant to the Bar Date Order, all creditors holding or wishing to assert unsecured or secured, priority or nonpriority claims (as defined in Bankruptcy Code section 101(5)) against the Debtors or the Debtors' estates, accruing prior to the Petition Date, including claims arising under Bankruptcy Code section 503(b)(9), were required to file a separate, completed, and executed Proof of Claim Form on account of each such Claim, together with accompanying documentation by the General Bar Date, July 30, 2019 at 4:00 p.m.

Pursuant to the Bar Date Order, Governmental Units, as defined by Bankruptcy Code section 101(27), with claims against the Debtors or the Debtors' estates, accruing prior to the Petition Date, were required to file Proofs of Claim by the Governmental Bar Date, September 30, 2019 at 4:00 p.m. The Debtors will supplement the Combined Plan and Disclosure Statement if necessary after reconciling Proofs of Claims submitted by Governmental Units.

10.    **Satisfaction of Claims Prior to the Effective Date**

a.    **DIP Facility Claims**

---

[10] The Deficiency Claim remains subject to adjust in the per diem amount of $86,096.01 for each day which passes between August 27, 2019 and September 13, 2019, the date when the Sale proceeds net of the Orchids Investment Settlement Payment were paid to Lender.

Prior to the Close of Sale, the Debtors did not draw any funds from the DIP Facility. Pursuant to the Final DIP Order, the Sale Order, and the APA, the DIP Facility was terminated the DIP Facility Claims were deemed satisfied in full.

### b.      First Lien Claims

The total Allowed amount of the First Lien Claims is $205,384,646.35. Pursuant to the Final DIP Order, the Sale Order, and the APA, the First Lien Claims were paid in full on the Closing Date in full satisfaction of the First Lien Claims; provided, however, that Lender agreed to make the Orchids Investment Settlement Payment pursuant to the Orchids Investment 9019 Order.

### c.      Administrative Expense Claims

Pursuant to the Sale Order, the APA, and the Final DIP Order, the Debtors will pay in full Administrative Expense Claims incurred in the Chapter 11 Cases that are not otherwise the responsibility of Purchaser under the APA and the Sale Order. As discussed above, the Debtors did not make any DIP draws prior to the Closing Date. To the extent an Allowed Administrative Expense Claim is not paid in full prior to the Effective Date or the responsibility of the Purchaser, the Holder of any such Allowed Administrative Expense Claim shall receive Cash in an amount equal to the amount of such Claim in accordance with the Wind-Down Budget and as set forth more fully in Article V of the Combined Plan and Disclosure Statement.

### d.      Priority Tax Claims

All Priority Tax Claims that were listed on the Debtors' Schedules or otherwise Filed were either paid pursuant to a First Day Order or were paid by, or became the responsibility of, the Purchaser on the Closing Date pursuant to the Sale Order and the APA in full satisfaction of such Claims. To the extent an Allowed Priority Tax Claim is not paid in full prior to the Effective Date or the responsibility of the Purchaser, the Holder of any such Allowed Priority Tax Claim shall receive Cash in an amount equal to the amount of such Claim in accordance with the Wind-Down Budget and as set forth more fully in Article V of the Combined Plan and Disclosure Statement.

### e.      Priority Claims

All Priority Claims that were listed on the Debtors' Schedules or otherwise Filed were either paid pursuant to a First Day Order or were paid by, or became the responsibility of, the Purchaser on the Closing Date pursuant to the Sale Order and the APA in full satisfaction of such Claims. To the extent an Allowed Priority Claim is not paid in full prior to the Effective Date or the responsibility of the Purchaser, the Holder of any such Allowed Priority Claim shall receive Cash in an amount equal to the amount of such Claim in accordance with the Wind-Down Budget and as set forth more fully in Article VI of the Combined Plan and Disclosure Statement.

### f.      Secured Tax Claims

69844093.18

All Secured Tax Claims were either paid pursuant to a First Day Order or were paid by, or became the responsibility of, the Purchaser on the Closing Date pursuant to the Sale Order and the APA in full satisfaction of such Claims.

C.     **Summary of Assets**

The Liquidating Trust Assets shall be comprised of: (i) the Orchids Investment Settlement Payment, which is Cash equal to $825,000 that is currently held in escrow pending Confirmation; (ii) the Estate Claims, which consist of: (1) the Avoidance Actions other than the "Acquired Avoidance Actions" included in the APA; (2) commercial tort claims as defined in Article 9 of the UCC, other than Claims included in "Acquired Assets" in the APA, (3) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Bankruptcy Code section 505; (4) D&O Claims; and (5) all other rights, Claims or Causes of Action not transferred to Purchaser pursuant to the APA and not otherwise expressly released hereunder; and (iii) the Liquidating Trust Funding, which consists of the Cash allocated in the Wind-Down Budget from the Wind-Down Amount that remains after all senior claims have been satisfied. In accordance with the terms of the Combined Plan and Disclosure Statement, the Liquidating Trust Assets will be the source of Distributions to Holders of Class 4 Claims and, if applicable, Holders of Class 5 Equity Interests.

All of the Acquired Assets of the Debtors were transferred to Purchaser upon Close of Sale.

D.     **Summary of Treatment of Claims and Interests Under the Plan**

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Allowed Claims[11] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[12] |
|---|---|---|---|---|
| Class 1 – First Lien Claims | $205,384,646.35[13] | Unimpaired | No | 100% |

---

[11]   These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[12]   The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[13]   The Debtors estimate that the aggregate amount of Allowed First Lien Claims as of the Petition Date was $205,384,646.35; however, the First Lien Claims were paid in full on the Closing Date in full satisfaction of the First Lien Claims.

33

| Class 2 – Other Secured Claims | $0.00[14] | Unimpaired | No | 100% |
|---|---|---|---|---|
| Class 3 – Priority Claims | $2,940,036.35[15] | Unimpaired | No | 100% |
| Class 4 – General Unsecured Claims | $37,058,310.10[16] ($13,451,855.69 of which is the Orchids Investment Deficiency Claim) | Impaired | Yes | 1–2%[17] |
| Class 5 – Equity Interests | N/A | Impaired, deemed to reject | No | 0%[18] |

**E.    Certain U.S. Federal Income Tax Consequences to this Combined Plan and Disclosure Statement**

Substantial uncertainty exists with respect to many of the tax issues discussed below. Therefore, each holder of a Claim is urged to consult its own tax advisor regarding the federal, state, and other tax consequences of this Combined Plan and Disclosure Statement.  No rulings have been or are expected to be requested from the Internal Revenue Service ("**IRS**") with respect to any tax aspects of this Combined Plan and Disclosure Statement.

A summary description of certain United States ("**U.S.**") federal income tax consequences of this Combined Plan and Disclosure Statement is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of

---

[14] All Other Secured Claims, if any, that have not otherwise been paid by the Debtors were transferred to, or became the responsibility of, the Purchaser under the APA at Closing or such underlying Contracts have been rejected by the Debtors and such deficiency claims are general unsecured claims against the Estates.

[15] This is the amount set forth in the Schedules and has not yet been reconciled by the Debtors. All Priority Claims, which are primarily employee wage claims that have already been paid pursuant to a First Day Order, were assumed by the Purchaser and will be paid, or were transferred to, or became the responsibility of, the Purchaser under the APA at Closing.

[16] This is the amount set forth in the Schedules and has not yet been reconciled by the Debtors, and includes the Allowed Orchids Investment Deficiency Claim; however, upon reconciliation of claims, the Debtors believe that the Allowed General Unsecured Claims will be far less than the amount set forth herein, but to date there has been no independent analysis of the actual valid amount of such claims.

[17] For the avoidance of doubt, holders of Allowed Class 4 General Unsecured Claims will receive a pro rata Distribution(s) from any remaining amounts of the Orchids Investment Settlement Payment and any net proceeds from the recovery on account of Estate Claims and other Liquidating Trust Assets after all senior Claims have been satisfied pursuant to the Combined Plan and Disclosure Statement and in accordance with the Orchids Investment 9019 Order.

[18] Holders of Allowed Class 5 Equity Interests will receive, if any, a pro rata Distribution(s) from any remaining Liquidating Trust Assets or the proceeds thereof only after all Allowed Class 4 General Unsecured Claims, including the Allowed Orchids Investment Deficiency Claim, are paid in full. The Debtors do not anticipate there will be available funds to make such a Distribution.

34

definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of this Combined Plan and Disclosure Statement as discussed herein.  Only the potential material U.S. federal income tax consequences to the Debtor and to a hypothetical holder of Claims who are entitled to vote to confirm or reject this Combined Plan and Disclosure Statement are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of this Combined Plan and Disclosure Statement, and no tax opinion is being given in this Combined Plan Disclosure Statement.  No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to any tax consequences of this Combined Plan and Disclosure Statement, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of this Combined Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of Claims.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS).  FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE NOT DISCUSSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT TO ANY SPECIFIC HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

69844093.18

1.      **Consequences to Debtors**

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("**COD**") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the Debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(1)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved, by the bankruptcy court. In such a case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income. The attributes of the taxpayer are to be reduced in the following order: current year Net Operating Losses ("**NOLs**") and NOL carryovers, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards. The reduction in the foregoing tax attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged. Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other tax attributes in the order stated above. In addition to the foregoing, Section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of debt in that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors may realize COD income as a result of this Combined Plan and Disclosure Statement.  The ultimate amount of any COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of all assets transferred to holders of claims issued on the Effective Date.

In general, if a debtor sells property to a third party it will recognize taxable income equal to the difference between the amount realized on the sale and its tax basis in such assets sold. In addition, if a debtor conveys appreciated (or depreciated) property (i.e., property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the Debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the Debtor's adjusted tax basis in such property.

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement, and shall take all steps necessary to establish the Liquidating Trust in accordance with this Combined Plan and Disclosure Statement, which shall be for the benefit of the Holders of Claims that receive beneficial interests in the Liquidating Trust. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Liquidating Trust all of their rights, title and interest in and to all of the Liquidating Trust Assets, and in accordance with Bankruptcy Code section 1141, the Liquidating

69844093.18

Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to (a) the beneficial interests in the Liquidating Trust, and (b) the expenses of the Liquidating Trust as provided for in the Liquidating Trust Agreement.

The Liquidating Trust shall be governed by the Liquidating Trust Agreement and administered by the Liquidating Trustee. The powers, rights, responsibilities and compensation of Liquidating Trustee shall be specified in the Liquidating Trust Agreement. The Liquidating Trustee shall hold and distribute the Liquidating Trust Assets in accordance with this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement. Other rights and duties of the Liquidating Trustee and the Holders of Claims that receive beneficial interests in Liquidating Trust shall be as set forth in the Liquidating Trust Agreement.

After the Effective Date, the Debtors shall have no interest in the Liquidating Trust Assets. To the extent that any Liquidating Trust Assets cannot be transferred to the Liquidating Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, such Liquidating Trust Assets shall be deemed to have been retained by the Debtors and the Liquidating Trust shall be deemed to have been designated as a representative of the Debtors pursuant to Bankruptcy Code section 1123(b)(3)(B) to enforce and pursue such Liquidating Trust Assets on behalf of the Debtors for the benefit of the Holders of Claims that receive beneficial interests in Liquidating Trust. Notwithstanding the foregoing, all net proceeds of such Liquidating Trust Assets shall be transferred to the Liquidating Trust to be distributed in accordance with this Combined Plan and Disclosure Statement.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidating Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Liquidating Trustee will take this position on the Liquidating Trust's tax return accordingly. The beneficiaries of the Liquidating Trust shall be treated as the grantors of the Liquidating Trust and as the deemed owners of the Liquidating Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of Class 4 Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust. As a result, the transfer of the Liquidating Trust Assets to the Liquidating Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. In addition, as detailed above, if the total fair value of the Liquidating Trust Assets is less than the total of the Class 4 Claims (that have been deducted for federal income tax purposes) the Debtors will recognize COD income equal to such difference. As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Liquidating Trustee, and the Holders of Claims receiving beneficial interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the 5th anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to

37

exceed 5 years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If the Liquidating Trust were not to qualify as a "liquidating trust", as described above, the Liquidating Trustee will take the position that it is a partnership for U.S. federal income tax purposes. In either case, each Liquidating Trust Beneficiary will include its distributive share of income, as reported to it by the Liquidating Trustee, and may not receive sufficient cash to satisfy its tax liability. The Internal Revenue Service may take the position that the Liquidating Trust should be taxed as a corporation for U.S. federal income tax purposes. If the Internal Revenue Service were to prevail in that position, the Liquidating Trust would be subject to U.S. federal income tax which would reduce the return to a Liquidating Trust Beneficiary. Each Liquidating Trust Beneficiary is urged to consult with its own tax advisor.

As detailed above, the Debtors will have several transactions that will give rise to taxable income or loss being generated due to implementation of the Combined Plan and Disclosure Statement. First, when the Debtors consummate the sale of substantially all of their operating assets to Cascades for $207 Million plus certain additional cash payments and the assumption of the Assumed Liabilities as set forth in the APA. Second, as detailed above, the transfer of the Liquidating Trust Assets to the Liquidating Trust will give rise to taxable income or loss equal to the difference between the tax basis and fair value of the Liquidating Trust Assets. The total taxable income that is expected to be recognized by the Debtors by virtue of the aforementioned transfer of assets is estimated to be approximately $105 Million. For the tax year 2019, it is currently estimated by the Debtors that from operations, tax deductible expenses will exceed taxable income by approximately $49 Million (such amount includes interest expense that was incurred before 2019 but not deductible due to the limitations set forth in Section 163(j) of the Tax Code). Thus, total net taxable income for 2019 for the Debtors is expected to be approximately $56 Million. As of December 31, 2018, the Debtors have accumulated approximately $93 Million of NOLs that they believe should be available to offset taxable income generated by the above detailed asset transfers. If these NOLs are entirely available to offset such estimated taxable income, the Debtors will incur no federal income tax by virtue of such asset transfers. To the contrary, if the estimated taxable income is greater than $105 Million from the asset transfers or if the available NOLs to offset such taxable income is less the $93 Million (either due to a reduction of such NOLs by the IRS in an audit or a limitation on the availability of such NOLs under Tax Code Section 382) such that the taxable income recognized is greater than the NOLs available, federal income tax could be due and payable by the Debtors, with such amount constituting an Administration Claim that could significantly impair or reduce any ultimate proceeds available to the Class 4 General Unsecured Creditors.[19]

---

[19] As filed with the IRS, Pre-2018 NOLs are $61 Million. The 2018 NOL has been estimated to be approximately $32 Million (the 2018 federal income tax return has yet to be filed). Pre-2018 NOLs may be used in their entirety to offset the taxable income generated by the Debtors in 2019. However, to the extent 2019 taxable income is greater than the Pre-2018 NOLs, the 2018 NOL may only be used to offset 80% of such excess. Thus, if the Debtor's 2019 net taxable income exceeds the Pre-2018 NOLs of $61 Million, the Debtors will owe some federal income tax due to such 80% limitation.

69844093.18

With respect to any COD income recognized due the transfer of the Liquidating Trust Assets to the Liquidating Trust, Section 108(a)(1)(A) of the Tax Code should apply and thus any COD income should be excluded. However, any NOLs (or other tax attributes) remaining after the use of said NOLs to offset taxable income generated by the asset transfers will be reduced by the amount of such COD income excluded above.

    **2.**       **Consequences to Holders of Class 4 General Unsecured Claims**

Pursuant to this Combined Plan and Disclosure Statement, each Holder of an Allowed General Unsecured (Class 4) Claim will receive in satisfaction of its Claim a *pro rata* beneficial interest in the Liquidating Trust which includes all of the Liquidating Trust Assets. The U.S. federal income tax treatment to Holders of General Claims may depend in part on the tax basis a Holder has in its Claim and, in some circumstances, what gave rise to or the nature of the Holder's Claim.

As set forth above, for federal income tax purposes, the Class 4 General Unsecured Claims will be satisfied by the deemed transfer to them of the Liquidating Trust Assets followed by a deemed contribution of said assets to the Liquidating Trust in exchange for their *pro rata* beneficial interest in said Liquidating Trust. It is intended that the Liquidating Trust be treated as a liquidating trust for federal income tax purposes, and if it does not so qualify, as a partnership for federal income tax purposes.

Because of the nature of the Liquidating Trust Assets, the deemed transfer by the Debtor of the Liquidating Trust Assets could cause a Holder to recognize gain, or loss, due to said transfer. The Liquidating Trust Assets that will be deemed transferred to Holders of Class 4 General Unsecured Claims consist of various assets including the Estate Claims (and proceeds thereof) and the Trust Funding. To the extent that the (i) fair market value of the *pro rata* beneficial interest in the Liquidating Trust Assets that a Holder of a Class 4 General Unsecured Claim receives, exceeds (or is less than) (ii) the Holder's tax basis in such Claim, the Holder should recognize gain (or loss) on such deemed transfer equal to such excess. Such gain (or loss) could be capital or ordinary in nature depending on the genesis and nature of the Claim being satisfied.

    **F.**       **Certain Risk Factors to Be Considered**

<u>Effect of Failure to Confirm the Combined Plan and Disclosure Statement.</u> If the Combined Plan and Disclosure Statement is not confirmed by the requisite majorities in number and amount as required by Bankruptcy Code section 1126, or if any of the other confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Cases may not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

"<u>Cramdown</u>." While the Debtors believe that the requirements of Bankruptcy Code section 1129 have been met, the Bankruptcy Court is afforded discretion to determine whether dissenting Holders of Claims would receive more if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Claims Estimation. While the Debtors have undertaken their best efforts to estimate the amount of Claims in each Class is correct, the actual amount of allowed Claims may differ from the estimates.

Estate Claims. Pursuant to the Combined Plan and Disclosure Statement, the Liquidating Trust Assets, including the Estate Claims, will be transferred to the Liquidating Trust upon the establishment of the Liquidating Trust upon the Effective Date. The Estate Claims include Causes of Action which are not released, waived, or transferred pursuant to the APA, the Combined Plan and Disclosure Statement, Acquired Causes of Action or otherwise. There is no assurance that the Liquidating Trust will be successful in prosecuting any Estate Claim or generate sufficient proceeds from the Estate Claims for Distribution. To the extent distributions are possible from the Estate Claims, the timing of any such Distribution is uncertain.

Delays. Any delay in Confirmation of the Combined Plan and Disclosure Statement or delay to the Effective Date could result in additional Administrative Expense Claims and/or Liquidating Trustee expenses. This may endanger ultimate approval of the effectiveness of the Combined Plan and Disclosure Statement or result in a decreased recovery for Holders of Claims entitled to a Distribution.

Sufficient Cash to Pay Claims. The Combined Plan and Disclosure Statement and the process for confirming the same is subject to the Debtors' and Estates' performance under the Wind-Down Budget. To the extent that the Debtors or the Estates incur costs beyond the Wind-Down Budget, the Holders of Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Secured Tax Claims and Priority Claims may not be paid in full.

Sufficient Cash for Liquidating Trust Distributions. There is no assurance that the Liquidating Trust Assets will be sufficient to fund the Liquidating Trust's expenses to enable the Liquidating Trust to hold and liquidate the Liquidating Trust Assets as envisioned under the Combined Plan and Disclosure Statement. Accordingly, there is no assurance that the Liquidating Trust will make any Distributions, the amount, if any, or the timing on which such Distributions may be made.

G.      Feasibility

The Bankruptcy Code requires that, in order for a plan to be confirmed, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the debtor unless contemplated by the plan.

Here, the Combined Plan and Disclosure Statement provides for the liquidation and distribution of all of the Debtors' assets. Accordingly, the Debtors believe all chapter 11 plan obligations will be satisfied without the need for further reorganization of the Debtors.

H.      Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement

The Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of creditors in an impaired class provides each such member of each impaired class of claims and interests a recovery that has value, on the effective date, at least

40

equal to the value of the recovery that each such creditor would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each holder of a claim or interest in any such impaired class which has not voted to accept the plan. Thus, if an impaired class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, on the effective date, at least equal to the value of the recovery that each such class member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Here, the Debtors believe the Combined Plan and Disclosure Statement satisfies the best interests test as the Liquidation Analysis, attached hereto as Exhibit A, demonstrates that the recoveries expected to be available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement will be greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses (including those incurred by a chapter 7 trustee) are next to receive payment. Unsecured creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtors' Assets have already been sold to Purchaser under the Sale Order. While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Debtors believe that the Combined Plan and Disclosure Statement provides the best source of recovery for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution and likely no distribution at all. Second, Distributions would likely be smaller because of the fees and expenses incurred in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors believe that a liquidation under chapter 7 would not provide for a timely distribution and that such distributions would likely be smaller because a chapter 7 trustee and his/her professionals would have to expend significant time and resources familiarizing themselves with the history of the Debtors and the Causes of Action prior to pursuing any such claims.

Under the Combined Plan and Disclosure Statement, the Liquidating Trust Expenses, including the fees of the Liquidating Trustee and fees for the Liquidating Trustee's professionals, will be paid out of the Liquidating Trust Assets prior to any Distribution being made to creditors.

At this time, there are no alternative plans available to the Debtors. The Close of Sale has already occurred, and the Debtors are no longer a going concern enterprise and have few assets remaining, if any, to administer. Therefore, the Debtors believe that the Combined Plan and

Disclosure Statement provides the greatest possible value to all stakeholders under the circumstances, and has the greatest chance to be confirmed and consummated.

I.        Releases by the Debtors

Article XI of the Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Combined Plan and Disclosure Statement will affect any claim, interest, right, or action with regard to the Debtors and certain third parties.

THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.

Under the voting procedures described in Article VII and Article VIII of the Combined Plan and Disclosure Statement, the Debtors believe that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law. The Committee disagrees.

The Debtors are not aware of any Claims or Causes of Action against its current Professionals, the Committee and members of the Committee, the Committee's professionals, or any their respective direct and indirect current and former Affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such as of the Effective Date. The Committee believes D&O Claims and other Causes of Action may exist.

While the Combined Plan and Disclosure Statement reflects substantial negotiations among the Debtors and the Committee, the Committee asserts that the Third Party Releases granted under this Combined Plan and Disclosure Statement are inappropriate and should not be approved by the Court.

V.        Unclassified Claims

A.        Administrative Expense Claims

Requests for payment of Administrative Expense Claims must be Filed no later than the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or the Estates, the Liquidating Trust or the Liquidating Trust Assets.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by any applicable Debtor or the Purchaser prior to the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for

42

release of each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash (or other available funds in the Estate) from the Wind-Down Account in accordance with the Wind-Down Budget: (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due; or (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that Administrative Expense Claims that have been assumed by the Purchaser pursuant to the APA shall not be an obligation of the Debtors; provided further that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, and liabilities arising under obligations incurred by the Debtors, as debtors in possession, and the Wind-Down Budget to the extent such obligations have not been assumed by the Purchaser, shall be paid by the Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

### B.    Professional Fee Claims

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other entity for making a substantial contribution in the Chapter 11 Cases) shall File an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The Final Fee Hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Fee Claims Bar Date. The Debtors' counsel shall File a notice of the Final Fee Hearing. Such notice shall be posted on the Case Website, and served upon counsel for the Creditors' Committee, all Professionals, the U.S. Trustee and all parties on the Debtors' Bankruptcy Rule 2002 service list.

Allowed Professional Fee Claims of the Professionals shall be paid: (a) as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court; or (b) upon such other terms as agreed by the Holder of such an Allowed Professional Fee Claims.

Allowed Professional Fee Claims shall be paid in full in Cash from the Professional Fee Escrow, and if necessary, the Wind-Down Budget or other available funds in the Estate, and in accordance with the Final Orders entered in the Chapter 11 Cases.

DTBA, as Interim CSO retained under section 363 of the Bankruptcy, shall be explicitly excluded from the requirements of this section and shall instead continue to follow the compensation and reimbursements procedures under the *Order Granting Debtors' Motion for an Order Authorizing the Debtors to (I) Retain Deloitte Transactions and Business Analytics LLP to*

43

*Provide the Debtors an Interim Chief Strategy Officer and Certain Additional Personnel, and (II) Designate Richard S. Infantino as Interim Chief Strategy Officer for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 358].

### C.    Priority Tax Claims

Except to the extent the Debtors, with the consent of the Committee or Liquidating Trustee, as applicable, and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, the Debtors, or the Purchaser pursuant to the Sale Order and APA, shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, Cash from the Wind-Down Account in accordance with the Wind-Down Budget, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due pursuant to the Wind-Down Budget or, pursuant to the Sale Order and APA, by the Purchaser. Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims that are the responsibility of the Estate will be $0.00.

### D.    Statutory Fees

All Statutory Fees incurred prior to the Effective Date shall be paid by the Debtors on the Effective Date from the Professional Fee Escrow and the Wind Down Budget. After the Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable from the Liquidating Trust Assets, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until such time that the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## VI.    Classification and Treatment of Claims and Interests

### A.    Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

### B.    Treatment of Claims and Interests

#### 1.    Class 1 – First Lien Claims

The Debtors estimate that the aggregate amount of Allowed First Lien Claims as of the Petition Date was $205,384,646.35. The First Lien Claims were paid following the Close of Sale in full and final satisfaction, settlement, and release of each First Lien Claims. The Liens securing such Allowed First Lien Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Holders of Claims in Class 1 are unimpaired under the Combined Plan and Disclosure Statement and are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 2. Class 2 - Other Secured Claims

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, or become the responsibility of the Purchaser pursuant to the Sale Order and APA, in full and final satisfaction, settlement, and release of each Allowed Other Secured Claim, each such Holder, at the option of the Debtors, in consultation with the Committee or the Liquidating Trustee, shall (a) receive the collateral securing its Allowed Other Secured Claim; or (b) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable. In the event the Debtors or the Liquidating Trustee treat a Claim under clause (a) of this Section, the liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. The Debtors and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Other Secured Claims.

The Debtors estimate that the aggregate amount of Allowed Other Secured Claims that are the responsibility of the Estate will be $0.00.

Class 2 is Unimpaired and is deemed to accept the Combined Plan and Disclosure Statement.

### 3. Class 3 – Priority Claims

Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, or has become the responsibility of the Purchaser under the Sale Order and APA, each such Holder shall receive, in full satisfaction of such Allowed Priority Claim, Cash from the Wind-Down Account, or other available funds in the Estate, in accordance with the Wind-Down Budget in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date;

69844093.18

(b) the date the Priority Claim becomes an Allowed Claim; or (c) the date for payment provided by any agreement or arrangement between the Debtors or Liquidating Trustee, as the case may be, and the Holder of the Allowed Other Priority Claim.

The Debtors estimate that the aggregate amount of Allowed Priority Claims will be $2,940,036.35; however, the Debtors estimate that all such Allowed Priority Claims have either been paid in full pursuant to a First Day Order or are the obligation of the Purchaser pursuant to the Sale Order and APA and therefore the Estate will not have any responsibility for such Allowed Priority Claims. Class 3 is unimpaired and is deemed to accept the Combined Plan and Disclosure Statement.

### 4.    Class 4 – General Unsecured Claims

Class 4 is Impaired under the Combined Plan and Disclosure Statement. Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtor prior to the Effective Date, or become the responsibility of the Purchaser pursuant to the Sale Order and APA, in full and final satisfaction, settlement, and release of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata Share of the beneficial interest in the Liquidating Trust and as beneficiary of the Liquidating Trust shall receive, on a distribution date, their Pro Rata Share of net Cash derived from the Liquidating Trust Assets available for Distribution on each such distribution date as provided under the Combined Plan and Disclosure Statement and Liquidating Trust Agreement, as full and complete satisfaction of the Claims against the Liquidating Trust.

Notwithstanding the foregoing, Orchids Investment will not be entitled to any Distribution on account of the Allowed Orchids Investment Deficiency Claim until all other Allowed General Unsecured Claims are paid in full.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims will be approximately $37,058,310.10,[20] $13,451,855.69 of which is the Orchids Investment Deficiency Claim.

Holders in Class 4 are entitled to vote to accept or reject the Combined Plan and Disclosure Statement. Any recovery under the Combined Plan and Disclosure Statement to Holders of Allowed General Unsecured Claims is contingent upon the continued investigative efforts of the Committee and any recoveries by the Liquidating Trust on account of the Estate Claims transferred to the Liquidating Trust. It is impossible to estimate at this time the amount, if any, of recoveries by the Liquidating Trust.

### 5.    Class 5 – Equity Interests

---

[20] This is the amount set forth in the Schedules, and includes the Allowed Orchids Investment Deficiency Claim. This amount has not yet been reconciled by the Debtors; however, upon reconciliation of claims, the Debtors believe that the Allowed General Unsecured Claims will be far less than the amount set forth herein, but to date there has been no independent analysis of the actual valid amount of such claims.

69844093.18

Holders of Claims in Class 5 are Impaired under the Combined Plan and Disclosure Statement. Except to the extent that a Holder of an Equity Interest has agreed to a less favorable treatment of such Claim, Holders of Equity Interests will retain no ownership interests under the Combined Plan and Disclosure Statement and, on the Effective Date, Equity Interests shall be deemed cancelled, null, and void. Further, only to the extent that all Holders of Allowed Claims in Class 4, including the Allowed Orchids Investment Deficiency Claim, are paid in full from the Liquidating Trust Assets, each Holder of an Allowed Equity Interest shall receive such Holder's Pro Rata Share of the beneficial interest in the Liquidating Trust and as beneficiary of the Liquidating Trust shall receive, on a distribution date, their Pro Rata Share of net Cash derived from the Liquidating Trust Assets available for Distribution on each such distribution date as provided under the Combined Plan and Disclosure Statement and Liquidating Trust Agreement in full and final satisfaction, settlement, and release of each Allowed Equity Interest.

Debtors estimate that Holders of Interests in Class 5 will receive no distribution. Therefore, Holders of Equity Interests are deemed to reject the Combined Plan and Disclosure Statement.

### C.    Impaired Claims and Equity Interests

Under the Combined Plan and Disclosure Statement, Holders of Claims in Classes 4 and 5 are the Impaired Classes pursuant to Bankruptcy Code section 1124 because the Combined Plan and Disclosure Statement alters the legal, equitable or contractual rights of the Holders of such Claims treated in such Class.

### D.    Cramdown and No Unfair Discrimination

To the extent that any Impaired Class does not accept the Combined Plan and Disclosure Statement, the Debtors will seek Confirmation pursuant to Bankruptcy Code section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interest that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Interests described in the Combined Plan and Disclosure Statement are fair and equitable and do not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

## VII.    Confirmation Procedures

### A.    Confirmation Procedures

#### 1.    Combined Hearing

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **December 11, 2019 at 10:30 a.m. (ET)** at the United States Bankruptcy Court, 824 North

69844093.18

Market Street, 5th Floor, Courtroom #4, Wilmington, DE 19801 to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing and Filed with the Court.

        **2.**      **Procedure for Objections**

Any objection to approval or confirmation of the Combined Plan and Disclosure Statement must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be Filed by <u>**December 2, 2019**</u> with the Bankruptcy Court and served on (i) counsel for the Debtors, Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801, Attn. Jerry L. Switzer, Jr. and Christopher A. Ward (jswitzer@polsinelli.com; cward@polsinelli.com); (ii) counsel for the DIP Lender, Winston & Strawn LLP, 35 Wacker Dr., Chicago, IL 60601, Attn. Dan McGuire (dmcguire@winston.com); Fox Rothschild LLP, Citizens Bank Center, 919 North Market Street, Suite 300, Wilmington, DE 19899-2323, Attn. Seth Niederman (sniederman@foxrothschild.com); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207 Wilmington, DE 19801, Attn: Juliet Sarkessian (juliet.m.sarkessian@usdoj.gov); and (iv) counsel to the Committee, Montgomery McCraken Walker & Rhoads LLP, 1105 North Market Street, 15th Floor, Wilmington, DE 19801, Attn. Marc J. Phillips (mphillips@mmwr.com); Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, NY 10020, Attn. Jennifer Kimble and Gabriel L. Olivera (jkimble@lowenstein.com; golivera@lowenstein.com); Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068, Attn. Kenneth A. Rosen and Mary E. Seymour (krosen@lowenstein.com; mseymour@lowenstein.com). Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

        **3.**      **Requirements for Confirmation**

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if the requirements of Bankruptcy Code section 1129 are met. As set forth in the Combined Plan and Disclosure Statement, the Debtors believe that the Combined Plan and Disclosure Statement: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to Bankruptcy Code section 1126, under the Combined Plan and Disclosure Statement, only Holders of Claims in Impaired Classes are entitled to vote.

    **B.**      **Solicitation and Voting Procedures**

        **1.**      **Substantive Consolidation**

For the purposes of the Chapter 11 Cases and the Combined Plan and Disclosure Statement, all Assets of and Claims against the Debtors shall be deemed to be substantively consolidated. As a result, Claims Filed against multiple Debtors seeking recovery of the same

69844093.18

debt shall only be entitled to receive a single Distribution from the consolidated Estates in accordance with the Combined Plan and Disclosure Statement to the extent such Claim is an Allowed Claim. Claims of Debtors against other Debtors, including Intercompany Claims, shall be disregarded for both voting and distribution purposes.

Voting will be tabulated on a substantively consolidated basis.

### 2.     Eligibility to Vote on the Combined Plan and Disclosure Statement

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 4 may vote on the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1126. To vote on the Combined Plan and Disclosure Statement, a Holder must hold a Claim in Class 4 and have timely Filed a Proof of Claim or have a Claim that is identified on the Schedules and is not listed as disputed, unliquidated, or contingent, or be the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 4**.

### 3.     Solicitation Package

Accompanying the Combined Plan and Disclosure Statement for the purposes of solicitation votes on the Combined Plan and Disclosure Statement are Solicitation Packages, which contain copies of: (a) the Confirmation Hearing Notice; (b) the Interim Approval and Procedures Order, excluding the exhibits annexed thereto; (c) a Ballot; and (d) such other documents the Bankruptcy Court may direct or approve or that the Debtors deem appropriate.

Holders of Claims in non-voting classes that are deemed to accept the Combined Plan and Disclosure Statement will receive packages consisting of: (a) the Confirmation Hearing Notice; and (b) a notice of such Holder's non-voting status (deemed to accept). Holders of Interests in Class 5 shall receive a package which contains: (a) a notice of such Holder's non-voting status (deemed to reject); (b) the Confirmation Hearing Notice; and (c) the Combined Plan and Disclosure Statement and all exhibits annexed thereto.

### 4.     Voting Procedures and Voting Deadline

The Voting Record Date for determining which Holders of Claims in Class 4 may vote on the Combined Plan and Disclosure Statement is the earlier of October 16, 2019 and the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which Prime Clerk must *RECEIVE* original Ballots is **December 2, 2019 at 4:00 p.m. (ET)**. In order to be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, each Ballot must be properly delivered to Prime Clerk by either (i) first class mail, overnight courier, or hand delivery  to Prime Clerk at the following address: Orchids Paper Products Company Ballot Processing Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, or (ii) online transmission through Prime Clerk's customized, electronic balloting platform ("**E-Ballot Portal**"). The E-

49

Ballot Portal will be available on the Case Website for these Chapter 11 Cases.  Holders may cast an E-Ballot and electronically sign and submit such electronic ballot via the E-Ballot Portal. Instructions for casting an electronic Ballot will be available on the Case Website.

If you are entitled to vote to accept or reject the Combined Plan and Disclosure Statement, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Combined Plan and Disclosure Statement; and (b) signing and returning the Ballot to Prime Clerk.

If you are a member of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, contact Prime Clerk at: orchidsballots@primeclerk.com or (844) 205-7430.

The following Ballots will not be counted or considered:

(1)     any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2)     any Ballot that is illegible or contains insufficient information;

(3)     any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class;

(4)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of the Combined Plan and Disclosure Statement;

(5)     simultaneous duplicative Ballots voted inconsistently;

(6)     Ballots partially rejecting and partially accepting the Combined Plan and Disclosure Statement;

(7)     any Ballot received other than the official form sent by Prime Clerk;

(8)     any unsigned Ballot; or

(9)     any Ballot that is submitted by facsimile or e-mail.

### 5.     Deemed Acceptance or Rejection

Holders of Claims in Classes 1, 2, and 3 are unimpaired, and thus deemed to accept the Combined Plan and Disclosure Statement. Under Bankruptcy Code section 1126(f), Holders of such Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement, and the votes of the Holders of such Claims shall not be solicited.

Holders of Claims in Class 4 are Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

50

69844093.18

Holders of Class 5 Equity Interests will not receive any distribution under the Combined Plan and Disclosure Statement. Pursuant to Bankruptcy Code section 1126(g), Holders of Class 5 Equity Interests are conclusively deemed to have rejected the Combined Plan and Disclosure Statement and the votes of these Holders therefore shall not be solicited.

### 6.    Acceptance by Impaired Classes

In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one (1) Impaired Class of creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

**YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

~~**CREDITORS ELIGIBLE TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT WILL HAVE THE OPTION TO OPT OUT OF THE THIRD PARTY RELEASE UNDER CERTAIN CIRCUMSTANCES. AS SET FORTH IN THE BALLOT, CREDITORS THAT VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT CANNOT ELECT TO OPT OUT OF THE THIRD PARTY RELEASE. CREDITORS THAT DO NOT ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED TO NOT CONSENT TO THE THIRD PARTY RELEASE.**~~

## VIII.    Implementation and Execution of the Combined Plan and Disclosure Statement

### A.    Effective Date

The Effective Date shall not occur until all conditions for the Effective Date are satisfied or otherwise waived in accordance with the terms of the Combined Plan and Disclosure Statement. Upon occurrence of the Effective Date, the Debtors shall File the Notice of Effective Date, which shall also be posted on the Case Website.

### B.    Implementation of the Combined Plan and Disclosure Statement

#### 1.    General

The Combined Plan and Disclosure Statement shall be implemented through the Effective Date Transactions as described in detail below; *provided*, *however*, that the provisions contained in the Combined Plan and Disclosure Statement shall subject in all respects to the provisions of the Sale Order, the APA and Final DIP Order; and nothing in the Combined Plan and Disclosure Statement shall be deemed to modify, negate, abrogate, overrule or supersede the terms and provisions of the aforementioned documents.

51

### 2. Corporate Action; Officers and Directors; Effectuating Documents

On the Effective Date, all matters and actions provided for under the Combined Plan and Disclosure Statement that would otherwise require approval of the officer(s) or director(s) of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the board of the Debtors.

The officer(s) and director(s) of each Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Combined Plan and Disclosure Statement.

### C. Records

The Debtors shall dissolve on the Effective Date and the Liquidating Trustee shall retain those documents maintained by the Debtors in the ordinary course of business and which were not otherwise transferred to the Purchaser pursuant to the APA. After receipt of such documents, the Liquidating Trustee shall be authorized to destroy any documents he or she deems necessary or appropriate in his or her reasonable judgment; *provided*, *however*, that the Liquidating Trustee shall not destroy any documents, including but not limited to tax documents, that the Liquidating Trust is required to retain under applicable law.

### D. Liquidating Trust

### 1. Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, which will be filed with the Bankruptcy Court in the Plan Supplement. Upon establishment of the Liquidating Trust, all Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of any of the Debtors, or any employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors. The Liquidating Trustee may elect for the Liquidating Trust to be treated as a partnership or a corporation or other entity for tax purposes only, if the Liquidating Trustee may determine, in his or her reasonable discretion, that such election would be in the best interests of the beneficiaries of the Liquidating Trust.

The Committee, in consultation with the Debtors, shall have the power and authority to enter into the Liquidating Trust Agreement on the Effective Date.

Prior to the Confirmation Date but in no event later than the filing of the Plan Supplement, the Committee, in consultation with the Debtors, shall designate a Person to serve as the Liquidating Trustee, pursuant to the Liquidating Trust Agreement.

The Liquidating Trust Agreement will be filed by no later than the filing of the Plan Supplement and will be considered an integral part of the Debtors' Combined Plan and Disclosure Statement and is incorporated herein by reference in its entirety.

### 2. Transfer of Liquidating Trust Assets to Liquidating Trust

52

Pursuant to Bankruptcy Code section 1141, all transfers and contributions made pursuant to this Article VII, Section D.2 shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets, or the Liquidating Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust's beneficiaries) will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Combined Plan and Disclosure Statement, as a transfer to the Liquidating Trust's beneficiaries, followed by a transfer by such Liquidating Trust's beneficiaries to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

### 3. Purpose of Liquidating Trust

The Liquidating Trust shall be established for the purpose of liquidating the Liquidating Trust Assets, prosecuting any Estate Claims transferred to the Liquidating Trust to maximize recoveries for the benefit of the Liquidating Trust's beneficiaries, and making Distributions in accordance with the Combined Plan and Disclosure Statement to the Liquidating Trust's beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d). The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust's beneficiaries treated as grantors and owners of the trust.

Prior to the Effective Date, Debtors will prepare for filing all required 2019 federal, state, and local tax returns and/or informational tax returns as well as the W2s for 2019. After the Effective Date, the Liquidating Trust will finalize and file and/or issue such documents. The Liquidating Trust shall be responsible for filing all required federal, state, and local tax returns and/or informational returns for the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from the Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an Unclaimed Distribution to be held by the Liquidating Trustee, as the case may be, until such time as the Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

69844093.18

In connection with the consummation of this Combined Plan and Disclosure Statement, the Debtors and the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. All Beneficiaries, as a condition to receiving any Distribution, shall provide the Liquidating Trustee with a completed and executed Tax Form W-8 or Tax Form W-9, or similar form within 60 days of a written request by the Liquidating Trustee or be forever barred from receiving a Distribution.

4.      **Preservation of Rights**

Under the Combined Plan and Disclosure Statement, but subject in all respects to the Sale Order and the APA, the Liquidating Trustee retains any and all rights of, and on behalf of, the Debtors, the Estates, and the Liquidating Trust to commence and pursue any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, regardless of whether or not such rights are specifically enumerated in the Combined Plan and Disclosure Statement, Plan Supplement, or elsewhere or the representative of the Estates pursuant to Section 1123(b)(3) of the Bankruptcy Code and all other applicable law, and all such rights shall not be deemed modified, waived, released in any manner, nor shall confirmation of the Combined Plan and Disclosure Statement or the Confirmation Order act as *res judicata* or limit any of such rights of Liquidating Trustee to commence and pursue any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, to the extent the Liquidating Trustee deems appropriate. Any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, may, but need not, be pursued by the Debtors prior to the Effective Date and by the Liquidating Trustee after the Effective Date, to the extent warranted.

Unless an Estate Claim against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Combined Plan and Disclosure Statement, or any Final Order, including the Sale Order, the Debtors expressly reserve any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, for later enforcement and prosecution by the Liquidating Trustee (including, without limitation, any Estate Claims set forth in the Plan Supplement, or not specifically identified herein, in the Disclosure Statement, or otherwise, or which the Debtors may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, upon or after the confirmation or consummation of the Combined Plan and Disclosure Statement based on the Combined Plan and Disclosure Statement or the Confirmation Order. In addition, the Liquidating Trust expressly reserves the right to pursue or adopt any and all Causes of Action that are not Acquired Causes of Action, including, without limitation, setoff, offset and recoupment rights, alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of the Combined Plan and Disclosure Statement or any Final Order.

54

The Debtors and the Liquidating Trustee do not intend, and it should not be assumed (nor shall it be deemed) that because any existing or potential Estate Claims, including, without limitation, setoff, offset and recoupment rights, have not yet been pursued by the Debtors or are not set forth herein, or otherwise, that any and all Estate Claims, including, without limitation, setoff, offset and recoupment rights, has been waived or expunged.

     5.       **Liquidating Trustee**

<u>Retention of Liquidating Trustee</u>. The Liquidating Trustee will be a disinterested Person designated by the Committee, in consultation with the Debtors, in the Plan Supplement. The Liquidating Trustee shall carry out the duties as set forth in this Section VIII.D and in the Liquidating Trust Agreement. Pursuant to Bankruptcy Code section 1123(b)(3), the Liquidating Trustee shall be deemed the appointed representative to, and may pursue, litigate, and compromise and settle any such rights, claims, and Estate Claims in accordance with the best interests of and for the benefit of the Liquidating Trust's beneficiaries. In the event that the Liquidating Trustee resigns, is removed, terminated or otherwise unable to serve as the Liquidating Trustee, then a successor shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of the Combined Plan and Disclosure Statement, the Confirmation Order and the Liquidating Trust Agreement.

<u>Responsibilities and Authority of Liquidating Trustee</u>. The responsibilities and authority of the Liquidating Trustee shall include: (a) establishing  reserves and investing Cash; (b) liquidating non-Cash assets of the Liquidating Trust; (c) retaining and paying professionals as necessary to carry out the purposes of the Liquidating Trust; (d) preparing and filing tax returns for the Liquidating Trust; (e) preparing and filing reports and other documents necessary to conclude and close the Chapter 11 Cases; (f) objecting to, reconciling, seeking to subordinate, compromising or settling any or all Claims and administering Distributions on account of General Unsecured Claims; (g) evaluating, filing, litigating, settling, or otherwise pursuing any Estate Claims; (h) abandoning any property of the Liquidating Trust that cannot be sold or distributed economically; (i) making interim and final distributions of Liquidating Trust Assets; (j) winding up the affairs of the Liquidating Trust and dissolving it under applicable law; (k) destroying records; and (l) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Combined Plan and Disclosure Statement.

<u>Powers of the Liquidating Trustee</u>. The Liquidating Trustee shall have the power and authority to perform the acts described in the Liquidating Trust Agreement (subject to approval by the Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Combined Plan and Disclosure Statement, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to take any act deemed appropriate by the Liquidating Trustee, including, without limitation, to discharge all obligations

assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by the Combined Plan and Disclosure Statement. The Liquidating Trustee shall have the power and authority without further approval by the Bankruptcy Court to liquidate the Liquidating Trust Assets, to hire and pay professional fees and expenses of counsel and other advisors, to prosecute and settle objections to Disputed Claims, to prosecute and settle any Estate Claims, and otherwise take any action as shall be necessary to administer the Chapter 11 Cases and effect the closing of the Chapter 11 Cases, including, without limitation, as follows: (a) the power to invest funds, in accordance with Bankruptcy Code section 345, and withdraw, make Distributions and pay taxes and other obligations owed by the Liquidating Trust from funds held by the Liquidating Trustee in accordance with the Combined Plan and Disclosure Statement and Liquidating Trust Agreement; (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Liquidating Trustee with respect to his or her responsibilities; (c) the power to pursue, prosecute, resolve and compromise and settle any Estate Claims on behalf of the Liquidating Trust without prior Bankruptcy Court approval but in accordance with the Liquidating Trust Agreement; (d) the power to object to Claims, including, without limitation, the power to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; and (e) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Combined Plan and Disclosure Statement. Except as expressly set forth in the Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion to pursue or not to pursue any Estate Claims as it determines is in the best interests of the Liquidating Trust's beneficiaries and consistent with the purposes of the Liquidating Trust, and shall have no liability for the outcome of his or her decision, other than those decisions constituting gross negligence or willful misconduct. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash. Subject to the other terms and provisions of the Combined Plan and Disclosure Statement, including but not limited to Section VII.D.8 concerning the Retained Privileges and the releases set forth in Article XI, the Liquidating Trustee shall be granted standing, authority, power and right to assert, prosecute and/or settle the Estate Claims and/or make a claim under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies based upon its powers as a Court-appointed representative of the Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials.

Enforcement of Any Avoidance Actions and Other Causes of Action. Pursuant to Bankruptcy Code section 1123(b), the Liquidating Trustee, on behalf of and for the benefit of the Liquidating Trust's beneficiaries, shall be vested with and shall retain and may enforce any Avoidance Actions that are not Acquired Avoidance Actions and other Estate Claims transferred to the Liquidating Trust that were held by, through, or on behalf of the Debtors and/or the Estates against any other Person, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not such Avoidance Actions that are not Acquired Avoidance Actions and other Estate Claims are specifically identified in the Combined Plan and Disclosure Statement and whether or not litigation with respect to same has been commenced prior to the Effective Date. For the avoidance of doubt, the Combined Plan and

56

Disclosure Statement preserves and transfers to the Liquidating Trust all Avoidance Actions that are not Acquired Avoidance Actions that exist as of the Effective Date and that were not transferred to the Purchaser in connection with the Sale. The recoveries from any Avoidance Actions that are not Acquired Avoidance Actions and other Estate Claims transferred to the Liquidating Trust will be deposited into the Liquidating Trust and distributed in accordance with the Liquidating Trust Agreement and the Combined Plan and Disclosure Statement.

Compensation of Liquidating Trustee. The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement; *provided*, *however* that such compensation shall only be payable from the Liquidating Trust Assets. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in the Combined Plan and Disclosure Statement, the Confirmation Order and the Liquidating Trust Agreement. The Liquidating Trustee shall not be required to file a fee application to receive compensation.

Retention and Payment of Professionals. The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his or her duties and compensate such professionals from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement, including but not limited to, Professionals retained by the Debtors and/ or by the Committee, without the need for an order of the Bankruptcy Court.

Limitation of Liability of the Liquidating Trustee. The Liquidating Trust shall indemnify the Liquidating Trustee and his or her professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee or his or her professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals of the Liquidating Trustee for performing any functions incidental to such service; *provided*, *however*, the foregoing shall not relieve the Liquidating Trustee or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing.

## 6.    Liquidating Trust Expenses

The Liquidating Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Liquidating Trust Expenses. All Liquidating Trust Expenses shall be charged against and paid from the Liquidating Trust Funding or the Liquidating Trust Assets.

## 7.    Privileges

On and subject to the terms of the Combined Plan and Disclosure Statement, all of the Debtors' privileges (the "**Privileges**"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections solely relating to the Estate Claims, in each instance arising on or after the earlier of (i) two (2) years prior to the Petition Date and (ii) the applicable statute of limitations governing any such Estate Claim (but in no event more than six (6) years prior to the Petition Date) (the "**Transferred Privileges**"), shall be transferred, assigned and delivered to the Liquidating Trust, without waiver, limitation or release, and shall vest with the Liquidating Trust

57

on the Effective Date and be jointly held by the Debtors and the Liquidating Trust on and after the Effective Date; *provided*, *however*, that notwithstanding the foregoing, Transferred Privileges do not and shall not include Privileges relating in any way to (a) any rights, Claims, or Causes of Action sold to the Purchaser, including the Acquired Avoidance Actions, (b) the preparation, filing or prosecution of the Chapter 11 Cases, or (d) any negotiations with the Purchaser, the Committee, the DIP Lender, or the DIP Agent.

The Liquidating Trust shall hold and be the beneficiary of all Transferred Privileges and entitled to assert all Transferred Privileges. No Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information or communications subject to any privilege, protection or immunity or protections from disclosure jointly held by the Debtors and the Liquidating Trust.

The Liquidating Trustee shall have until two (2) years after the Effective Date to request documents or information subject to the Transferred Privileges (each an "**Information Request**"); *provided*, *however*, that with respect to any action involving Transferred Privileges filed on or before two (2) years after the Effective Date, the Liquidating Trustee may make an Information Request subject to the Transferred Privileges involved in such action until the final resolution of such action, including any appeals.

To the extent of any conflict between this Section VIII of the Combined Plan and Disclosure Statement and any other provision of the Combined Plan and Disclosure Statement relating to Privileges, this Article VIII shall control.

### 8. Termination of Liquidating Trust

The Liquidating Trust shall be dissolved upon the earlier of the distribution of all of its assets to the Liquidating Trust's beneficiaries and the third anniversary of the creation of the Liquidating Trust, provided that the Liquidating Trustee shall, in its sole discretion, be authorized to extend the dissolution date to the fifth anniversary of the creation of the Liquidating Trust with prior Bankruptcy Court approval. If warranted by the facts and circumstances involved in resolving any Estate Claims, upon application to, and if approved by, the Bankruptcy Court upon a finding such further extension is necessary for purposes of resolving such Estate Claims and distributing the proceeds to Liquidating Trust's beneficiaries, the term of the Liquidating Trust may be further extended by the Liquidating Trustee for a specified, finite term. Notwithstanding the foregoing, the Liquidating Trust shall be automatically terminated in the event that the Chapter 11 Cases are converted or dismissed.

### 9. Exculpation Relating to the Liquidating Trust

No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any Claim or Cause of Action against the Liquidating Trustee, the Liquidating Trust or the employees or professionals thereof (solely in the performance of their duties), for making payments and Distributions in accordance with the Combined Plan and Disclosure Statement or for fulfilling any functions incidental to implementing the provisions of the Combined Plan and Disclosure Statement or the Liquidating Trust, except for any acts or omissions to act that are the

result of bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing.

    **E.**      **Effective Date and Other Transactions**

        **1.**      **Transfer of Assets to Purchaser**

        Previously, on the Closing Date, all of the Acquired Assets were transferred to Purchaser, free and clear of all liens, encumbrances, or interests of any kind in accordance with the terms of the APA and the Sale Order.

        **2.**      **Transfer of Assets to Liquidating Trust**

        On the Effective Date, except as otherwise expressly provided in the Combined Plan and Disclosure Statement, title to the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all liens, encumbrances, or interests of any kind. Except as otherwise provided in the Sale Order or the Combined Plan and Disclosure Statement, the Liquidating Trust shall succeed to all rights and interests retained by or provided to the Debtors and the Estates under the APA to the extent permitted under the APA and the Sale Order.

    **F.**      **Provisions Governing Distributions Under the Combined Plan and Disclosure Statement**

        **1.**      **Distribution Record Date**

        As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtors or the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Combined Plan and Disclosure Statement only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

        **2.**      **Method of Payment**

        Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made as soon as is reasonably practicable after the date on which such Claim becomes Allowed. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Combined Plan and Disclosure Statement, no interest shall accrue or be payable with respect to such Claims or any distribution related thereto. In the event that any payment or act under the Combined Plan and Disclosure Statement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the

59

performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the Debtors, the Liquidating Trustee, or their named successor or assign, as Disbursing Agent, on or after the Effective Date or as otherwise provided herein. For the avoidance of doubt, (i) the Debtors or such other entity designated by the Debtors, shall act as Disbursing Agent with respect to all Effective Date Distributions, and (ii) the Liquidating Trustee, or such other entity designated by the Liquidating Trustee, shall act as Disbursing Agent with respect to all General Unsecured Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Unless otherwise expressly agreed in writing, all Cash payments to be made pursuant to the Combined Plan and Disclosure Statement shall be made by check drawn on a domestic bank or an electronic wire.

### 3.    Surrender of Instruments

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Combined Plan and Disclosure Statement, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

### 4.    Delivery of Distributions

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notice of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules if no Proof of Claim is filed and the Liquidating Trustee has not received a written notice of a change of address.

Subject to applicable Bankruptcy Rules, all Distributions to Holders of Allowed Claims shall be made to the Disbursing Agent who shall transmit such Distributions to the applicable Holders of Allowed Claims or their designees. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall have no obligation to determine the correct current address of such Holder, and no Distribution to such Holder shall be made unless and until the Disbursing Agent is notified, in writing, by the Holder of the current address of such Holder within 90 days of such Distribution, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of 90 days from the

60

Distribution. After such date, all unclaimed property or interest in property shall revert to the Liquidating Trust to be distributed in accordance with the terms of the Liquidating Trust Agreement and the Combined Plan and Disclosure Statement, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

5.    **Objection to and Resolution of Claims**

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Combined Plan and Disclosure Statement or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. On or after the Effective Date, the Liquidating Trust shall be vested with any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

6.    **Preservation of Rights to Settle Claims**

Except as otherwise expressly provided herein, including in Article XI of the Combined Plan and Disclosure Statement, nothing contained in the Combined Plan and Disclosure Statement, the Plan Documents, or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors may have or which the Liquidating Trustee may choose to assert on behalf of the Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (a) any and all claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, and (b) the turnover of all property of the Estates. This Section shall not apply to any claims sold, released, waived, relinquished, exculpated, compromised, or settled under the Combined Plan and Disclosure Statement or pursuant to a Final Order, expressly including the Sale Order. Except as expressly provided in the Combined Plan and Disclosure Statement, nothing contained in the Combined Plan and Disclosure Statement, the Plan Documents, or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense. No Entity may rely on the absence of a specific reference in the Combined Plan and Disclosure Statement, the Plan Supplement, or the Disclosure Statement to any cause of action against it as any indication that the Debtors or the Liquidating Trustee, as applicable, will not pursue any and all available causes of action against them. The Debtors and the Liquidating Trustee expressly reserve all rights to prosecute any and all causes of action against any Person or Entity, except as otherwise expressly provided in the Combined Plan and Disclosure Statement.

7.    **Miscellaneous Distribution Provisions**

<u>Disputed Claims</u>. At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's Pro Rata Share of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive

61

any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

Distributions After Allowance. To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Combined Plan and Disclosure Statement. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the Distribution to which such Holder is entitled hereunder.

Setoff. The Debtors or Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records and in accordance with the Bankruptcy Code.

Post Petition Interest. Except as may be expressly provided herein, interest shall not accrue on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

Minimum Distributions. Notwithstanding anything herein to the contrary, (a) the Liquidating Trustee shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Combined Plan and Disclosure Statement would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (b) the Liquidating Trustee shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $30,000, in which case such Distributions shall be deferred to the next Distribution, (ii) if the amount to be distributed to a Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) if the amount of the final Distribution to such Holder is $50.00 or less, in which case no Distribution will be made to that Holder and such Distribution shall revert to the Liquidating Trust for distribution on account of other Allowed Claims.

Donation of Remaining Liquidating Trust Assets. After final Distributions have been made in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, if the amount of remaining Cash is less than $30,000, the Liquidating Trustee shall donate such amount to charity.

## IX.    Executory Contracts and Unexpired Leases

### A.    Background

The Bidding Procedures Order and the Sale Order contemplate the treatment of Executory Contracts and Unexpired Leases. While nothing in the Combined Plan and Disclosure Statement shall be deemed to supersede the Bidding Procedures Order and Sale Order, Article IX of the Combined Plan and Disclosure Statement is included out of an abundance of caution.

69844093.18

**B.      Executory Contracts and Unexpired Leases**

All Executory Contracts and Unexpired Leases of the Debtors which have not been assumed, assigned, or rejected, prior to the Effective Date shall be deemed rejected on the Effective Date, but effective as of the entry of the Confirmation Order.

**C.      Rejection Claims**

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Combined Plan and Disclosure Statement results in a Rejection Claim in favor of a counterparty to such executory contract or unexpired lease, such Rejection Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Liquidating Trust, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Liquidating Trustee on or before the date that is 30 days after the Effective Date. All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Combined Plan and Disclosure Statement.

**X.      Conditions Precedent to Confirmation and the Effective Date**

**A.      Conditions Precedent to Confirmation**

The following is the list of conditions precedent to Confirmation:

(1)      the Plan Supplement is Filed;

(2)      the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Committee;

(3)      the form of Liquidating Trust Agreement shall be agreed upon by the Debtors and the Committee and the proposed Liquidating Trustee identified and disclosed; and

(4)      the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as Filed unless such material amendment, alteration or modification has been made in accordance with Article XIII herein.

**B.      Conditions Precedent to the Effective Date**

The following is the list of conditions precedent to the Effective Date:

(1)      The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order;

(2)      no stay of the Confirmation Order shall then be in effect;

(3)     the Liquidating Trust Agreement shall be executed and the Liquidating Trustee shall have been appointed and accepted such appointment;

(4)     the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XIII herein; and

(5)     the Debtors shall have Filed the Notice of the Effective Date.

### C.     Waiver of Conditions

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by each of the Debtors and the Committee, without further order of the Bankruptcy Court.

### D.     Effect of Nonoccurrence of Conditions

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; *provided, however*, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (a) the Combined Plan and Disclosure Statement is null and void in all respects; and (b) nothing contained in the Combined Plan and Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice, in any manner, the rights of the Debtors or any other party in interest.

## XI.    Exculpation, Releases, and Injunctions

### A.     Injunction

All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the later of (a) the Effective Date, or (b) the date indicated in the order providing for such injunction or stay. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend or supersede any injunctions or stays granted in the Sale Order.

Except as otherwise provided in the Combined Plan and Disclosure Statement or to the extent necessary to enforce the terms and conditions of the Combined Plan and Disclosure Statement, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against any property that is to be distributed under the terms of the Combined Plan and Disclosure Statement on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in any place,

64

any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Plan and Disclosure Statement; *provided, however,* that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Combined Plan and Disclosure Statement or the Confirmation Order; *provided, further,* that the foregoing shall not apply to any acts, omissions, claims, causes of action or other obligations expressly set forth in and preserved by the Combined Plan and Disclosure Statement or any defenses thereto. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend or supersede any injunctions or stays granted in the Sale Order.

**B.    Exculpation**

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim or Interest for any post-petition act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the Combined Plan and Disclosure Statement, the pursuit of Confirmation, the consummation of the Combined Plan and Disclosure Statement, the administration of the Combined Plan and Disclosure Statement, the property to be liquidated and/or distributed under the Combined Plan and Disclosure Statement or any ~~prepetition or postpetition~~post-petition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors, except for their willful or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Combined Plan and Disclosure Statement.

The foregoing paragraph shall apply to attorneys to the greatest extent permissible under applicable bar rules and case law.

~~**C.    Estate Releases**~~

~~**Pursuant to Bankruptcy Code section 1123(b), and notwithstanding anything to the contrary in the Combined Plan and Disclosure Statement or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties shall be deemed released by the Debtors and the Estates from any and all Claims, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever (other than for illegal conduct, gross negligence, bad faith, or fraud), including derivative claims asserted or assertable on behalf of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that and of the Debtors or the Estates, as applicable, would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any debt, security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to,**~~

65

~~any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Combined Plan and Disclosure Statement and any other agreements or documents effectuating the Combined Plan and Disclosure Statement, or related agreements, instruments, or other documents, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to the Debtors or the Estates. For purposes of the releases contained in the Combined Plan and Disclosure Statement, the Liquidating Trustee is deemed to be a successor to the estates and, therefore, is bound by the releases contained in the Combined Plan and Disclosure Statement. Notwithstanding anything to the contrary above, the D&O Claims shall not be released and shall be preserved for the benefit of the Debtors, their Estates, and the Liquidating trust.~~

~~Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Release of the Released Parties by the Debtors and the Estates, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Release of the released parties by the Debtors and the Estates is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtors or the estates; (c) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtors or the Estates asserting any Claim or Cause of Action released pursuant to the Release by the Debtors or the Estates.~~

~~D.    Third Party Release~~

~~Effective as of the Effective Date, each of the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever releases (and each Entity so released shall be deemed released by the Releasing Parties) each and all of the Released Parties, and their respective property from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever (other than for illegal conduct, gross negligence, bad faith, or fraud), including with respect to any rights or Claims that could have been asserted against any or all of the Released Parties with respect to any derivative claims, asserted or assertable on behalf of the Debtors, or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any debt, security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtors and any Released Party, the restructuring or any alleged restructuring or reorganization of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Combined Plan and Disclosure Statement and any other agreements or documents~~

effectuating the Combined Plan and Disclosure Statement, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Combined Plan and Disclosure Statement or the reliance by any Released Party on the Combined Plan and disclosure statement or the Confirmation Order in lieu of such legal opinion), and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to the Debtors or the Estates.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; (f) consensual; and (g) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release.

While the Combined Plan and Disclosure Statement reflects substantial negotiations among the Debtors and the Committee, the Committee asserts that the Third Party Releases granted under this Combined Plan and disclosure statement are inappropriate and should not be approved by the Court.

## XII.    Retention of Jurisdiction

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)    to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)    to issue such orders in aid of execution and consummation of the Combined Plan and Disclosure Statement, to the extent authorized by Bankruptcy Code section 1142;

(4)    to consider any amendments to or modifications of the Combined Plan and Disclosure Statement, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)    to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

67

69844093.18

(6)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Combined Plan and Disclosure Statement;

(7)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Sale Order;

(8)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(9)     to hear any other matter not inconsistent with the Bankruptcy Code;

(10)    to enter the Final Decree;

(11)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Plan and Disclosure Statement;

(12)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(13)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Plan and Disclosure Statement, except as otherwise provided herein;

(14)    to determine any other matters that may arise in connection with or related to the Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Combined Plan and Disclosure Statement;

(15)    to determine any other matters that may arise in connection with or related to the Sale Order or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Sale Order;

(16)    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(17)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(18)    to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose.

## XIII.  Miscellaneous Provisions

69844093.18

A.      **Amendment or Modification of the Combined Plan and Disclosure Statement**

The Debtors, in consultation with the Committee, may modify the Combined Plan and Disclosure Statement at any time after Confirmation and before substantial consummation, provided that the Combined Plan and Disclosure Statement, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement shall be deemed to have accepted such Combined Plan and Disclosure Statement as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

B.      **Exhibits/Schedules**

All exhibits and schedules to the Combined Plan and Disclosure Statement are incorporated into and are part of the Combined Plan and Disclosure Statement as if set forth in full herein.

C.      **Plan Supplement**

The Debtors will File the Plan Supplement by November 18, 2019 at 4:00 p.m. The Plan Supplement will contain, among other things: (a) the Liquidating Trust Agreement; (b) identification of the Liquidating Trustee; (c) the Estate Claims Schedule; (d) the Acquired Avoidance Actions Schedule; and (e) any other disclosures as required by the Bankruptcy Code.

D.      **Filing of Additional Documents**

On or before substantial consummation of the Combined Plan and Disclosure Statement, the Liquidating Trustee shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

E.      **Binding Effect of Plan**

The Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns. Notwithstanding anything to the contrary herein, nothing in the Combined Plan and Disclosure Statement modifies, alters, or amends the respective rights and obligations of the Debtors or Purchaser under the Sale Order, the APA, or any other document governing the Sale.

F.      **Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

G.      **Time**

To the extent that any time for the occurrence or happening of an event as set forth in the Combined Plan and Disclosure Statement falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

**H.      Severability**

Should any provision of the Combined Plan and Disclosure Statement be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Combined Plan and Disclosure Statement.

**I.      Revocation**

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

**J.      Dissolution of the Committee**

On the Effective Date, the Committee shall be dissolved and its members deemed released of any continuing duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Combined Plan and Disclosure Statement and its implementation, and the retention and employment of the Committee's Professionals shall terminate, except with respect to: (a) any matters concerning Distributions; (b) prosecuting applications for Professionals' compensation and reimbursement of expenses incurred as a member of the Committee; (c) asserting, disputing and participating in resolution of Professional Fee Claims; or (d) prosecuting or participating in any appeal of the Confirmation Order or any request for consideration thereof. Upon the resolution of (a) through (d), the Committee shall be immediately dissolved, and released.

**K.      Claims Agent**

Prime Clerk, in its capacity as Claims and Noticing Agent and as Administrative Agent, shall be relieved of such duties on the date of the entry of the Final Decree or upon written notice by the Debtors or Liquidating Trustee, and subject to approval by the Bankruptcy Court.

**L.      Inconsistency**

To the extent that the Combined Plan and Disclosure Statement conflicts with or is inconsistent with any agreement related to the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall control; *provided*, *however*, that nothing in the Combined Plan and Disclosure Statement shall be deemed to supersede, amend, modify the provisions of the Sale Order, the Bidding Procedures Order, the APA, or the Final DIP Order.

69844093.18

In the event of any inconsistency between any provision of any of the foregoing documents, and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence; *provided*, *however*, that nothing in the Confirmation Order shall be deemed to supersede, amend, modify the provisions of the Sale Order, the Bidding Procedures Order, the APA, or the Final DIP Order.

**M.      No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Plan and Disclosure Statement shall be deemed an admission by any Entity with respect to any matter set forth herein.

**N.      Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such Person or Entity.

**O.      Dissolution of the Debtors and Closing of Chapter 11 Cases**

The Confirmation Order shall act as a final decree pursuant to section 350 of the Bankruptcy Code formally closing the Chapter 11 Cases on the Effective Date of Debtors Orchids Lessor SC and Orchids South Carolina without the need for any filings with the Secretary of State or any other governmental official in each of these Debtors' respective states of incorporation or formation; provided, however, that the Bankruptcy Case of Debtor Orchids Paper shall remain open until such time as the Liquidating Trustee files with the Bankruptcy Court such documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close such Chapter 11 Case.   Upon entry of the occurrence of the Effective Date, the Debtors shall submit proposed forms of order to the Bankruptcy Court to enter on the docket of Debtors Orchids Lessor SC and Orchids South Carolina Orders to close said Chapter 11 Cases effective as of the Effective Date, except for the Chapter 11 Case of Debtor Orchids Paper shall be deemed to continue to exist, but its corporate governance structure shall be deemed amended and modified to state that the Liquidating Trustee shall be the sole shareholder and director of Debtor Orchids Paper on the Effective Date.

**P.      Management**

On and after the Effective Date, the Debtors' CEO and CSO will continue to act solely to the limited extent necessary to facilitate the filing of the 2019 tax returns and will use reasonable efforts to assist with issuing the 2019 W2s to employees after the Effective Date. Upon completion of those limited set of tasks, the Debtors' CEO and CSO will be deemed to have resigned. Immediately on the Effective Date, the Debtors' other remaining members, directors, managers, and officers, and any remaining employees shall be deemed to have resigned.

**Q.      Reservation of Rights**

Except as expressly set forth herein, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of

69844093.18

the filing of the Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Equity Interests before the Effective Date.

### R.    Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Combined Plan and Disclosure Statement and in the Chapter 11 Cases. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements, provided for in the Combined Plan and Disclosure Statement and the Chapter 11 Cases. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estate, and all Holders of Claims and Equity Interests against the Debtors.

### S.    SEC Reservation of Rights

Notwithstanding any language to the contrary contained in this Combined Plan and Disclosure Statement and/or the Confirmation Order, no provision of this Combined Plan and Disclosure Statement or the Plan Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("**SEC**") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

### T.    No Discharge

As set forth in Bankruptcy Code section 1141(d)(3), the Combined Plan and Disclosure Statement does not grant the Debtors a discharge. However, notwithstanding the foregoing, except as otherwise provided herein, including the rights afforded pursuant to the Combined Plan and Disclosure Statement and the treatment of all Claims and Equity Interests of any nature whatsoever against the Debtors or any of their Assets, all Persons and Entities shall be precluded from asserting against the Debtors, or the Liquidating Trustee, as applicable, or any of their assets any further Claims or Equity Interests based upon any act, or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, except as otherwise provided in the Combined Plan and Disclosure Statement.

## XIV.    Recommendation

In the opinion of the Debtors, the Combined Plan and Disclosure Statement is superior and preferable to the alternatives described in the Combined Plan and Disclosure Statement. Further, the value being provided to creditors under the Combined Plan and Disclosure Statement was subject to a competitive process. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Combined Plan and Disclosure Statement vote to accept the Combined Plan and Disclosure Statement and support Confirmation.

69844093.18

Dated:  October 1518, 2019
Wilmington, Delaware

**Orchids Paper Products Company, et al.**
Debtors and Debtors in Possession

/s/ Richard S. Infantino
Richard S. Infantino
Interim Chief Strategy Officer

73

**Exhibit A**

Liquidation Analysis